

CONSTANTINO BASILE
7816 Waterfalls Ave
Las Vegas, NV. 89128
(424) 645-4175
constantino.basile6213@gmail.com

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVAD

**2:24-cv-00108-APG-MDC**

| | |
|---|---|
| **CONSTANTINO BASILE,** an individual | Case No. |
| v. | **COMPLAINT FOR:** |
| **THE LOS ANGELES FILM SCHOOL, LLC. ,** D.B.A. **THE LOS ANGELES FILM SCHOOL;** | **(1)VIOLATIONS OF 18 U.S.C.§1961, §1962(a), §1962(b), §1962(c), §1962(d) to (CIVIL RICO) - Civil Remedy pursuant to 18 U.S.C. § 1964** |
| **TWENTIETH CENTURY FOX FILM CORPORATION,** a Delaware Corporation; **SCOTT FREE** | **(2) 42 U.S.C. § 1983** |
| **FILMS, LLC.,** a California corporation; **TMZ**, a California corporation; **SONY PICTURES** | **(3) 42 U.S.C. § 1985(1), § 1985(2), § 1985(3)** |
| **ENTERTAINMENT**, **INC.,** Delaware corporation; **AMBLIN** | **(4) 42 U.S.C. § 1986, § 1988** |
| **ENTERTAINMENT , INC.,** a Delaware corporation; **SONY** | **(5) 17 U.S.C. § 106, § 501(a), § 501(b) § 104(a), and § 102(a)** |
| **PICTURES TELEVISION**, a Delaware Corporation; **ONZA PARTNERS SL,** | **(6)** *Contributory Copyright* |
| | **(7) 28 U.S.C. § 4101** |
| | **(8) RECKLESSNESS** |
| | **(9) INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS-** |

1  **ONZA ENTERTAINMENT**, a Spanish,
2  Sociedad Limitada, Madrid, Spain;
3  **KRIPKE ENTERPRISES,**
4  a California corporation;  **NBC UNIVERSAL,**
5  a Delaware corporation, **WARNER**
6  **BROS. ENTERTAINMENT , INC.,**
7  a Delaware corporation; **LEGENDARY**
8  **PICTURES,** a California corporation;
9  **CHRISTOPHER NOLAN,** an individual;
10  **JONATHON NOLAN**, an individual;
11  **ANDREW WACHOWSKI**, an
12  individual; **LANA WACHOWSKI**, an
13  individual; **RIO ALL - SUITES HOTEL**
14  **AND CASINO - CAESARS**
15  **ENTERTAINMENT CORPORATION**, a
16  Nevada Corporation; **THORNDAL,**
17  **ARMSTRONG, DELK, BALKENBUSH, &**
18  **EISINGER,** a Nevada Corporation; Dr.
19  Robert Leark, an individual: **LAS VEGAS**
20  **METRO POLICE DEPARTMENT; LOS**
21  **ANGELES SUPERIOR COURT - VAN**
22  **NUYS; U.S. DISTRICT COURT –**
23  **CENTRAL DISTRICT OF CALIFORNIA**
24  **WESTERN DIVISION; NINTH CIRCUIT**
25  **COURT OF APPEALS; FEDERAL**
26  **BUREAU OF INVESTIGATION; JAMS,**
27  **INC.,** a California Corporation;
28

**OUTRAGEOUS CONDUCT**
**(10)  CIVIL CONSPIRACY**

2

1  **MITCHELL, SILBERBERG & KNUPP,** a
2  California Corporation; **FORD HARRISON,**
3  **LLP,** a California Corporation; **OXNARD**
4  **POLICE DEPARTMENT; BEVERLY**
5  **HILLS POLICE DEPARTMENT;**
6  **MICHELLE OBAMA,** an individual;
7  **BLAKE LIVELY,** an individual;
8  **NANCY PELOSI,** an individual; **GOLD**
9  **COAST CAB COMPANY;**
10 *
11 **WILL SMITH,** an individual**; CHRIS ROCK,**
12 an individual; **AMERICAN BROADCAST**
13 **COMPANY,** a California Corporation**; THE**
14 **UNITED STATES SUPREME COURT; THE**
15 **PENTAGON; HARRISON FORD,** an
16 individual; **THE SANTA MONICA POLICE**
17 **DEPARTMENT (City of Santa Monica); LOS**
18 **ANGELES COUNTY MEDICAL**
19 **EXAMINER and JOHN AND JANE**
20 **DOES 1-10,** inclusive
21
22
23
24
25
26
27
28

COMPLAINT

**COMPLAINT FOR VIOLATIONS OF 18 U.S.C. § 1961, § 1962(a), § 1962(b), § 1962(c) and § 1962(d) to (CIVIL RICO) - Civil Remedy pursuant to 18 U.S.C. § 1964; 42 U.S.C. § 1983; 42 U.S.C. § 1985(1), § 1985(2), § 1985(3), § 1986; and § 1988; 17 U.S.C. § 106, § 501(a), § 501(b) § 104(a), and § 102(a); *Contributory Copyright Infringement,* 28 U.S.C. § 4101 – DEFAMATION; RECKLESSNESS, INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS - OUTRAGEOUS CONDUCT; CIVIL CONSPIRACY AND A DEMAND FOR A JURY TRIAL**

## I. PARTIES

1.   Plaintiff, Constantino Basile, has been at all relevant times, a citizen and resident of Oxnard, Ca.

2.   At all times mentioned herein, DEFENDANT, The Los Angeles Film School, LLC, DBA The Los Angele Film School, upon information and belief, has been, a Corporation organized under the existing laws of the state of California, with principal offices at 6363 Sunset Blvd., Hollywood, Ca. 90028.

3.   At all times mentioned herein, DEFENDANT, Twentieth Century Fox Film Corporation, upon information and belief, has been a Corporation organized under the existing laws of the state of Delaware, with principal offices at 2121 Avenue of the Stars, Los Angeles, Ca. 90067.

4.   At all times mentioned herein, DEFENDANT, Alston & Bird. LLP. (Casondra K. Ruga) upon information and belief, has been a Corporation organized

under the existing laws of the state of California, with principal offices at 333 South Hope St, 16th Floor, Los Angeles, Ca. 90071-3004.

5.   At all times mentioned herein, DEFENDANT, Scott Free Films, LLC, upon information and belief, has been a Corporation organized under the existing laws of the state of California, with principal offices at 614 N. La Peer Dr., West Hollywood, Ca. 90068.

6.   At all times mentioned herein, DEFENDANT, Sony Pictures Entertainment, Inc., upon information and belief, has been a Corporation organized under the existing laws of the state of Delaware, with principal offices at 10202 Washington Blvd., Culver City, Ca. 90232.

7.   At all times mentioned herein, DEFENDANT, TMZ, upon information and belief, has been a Corporation organized under the existing laws of the state of California, with principal offices at 13031 W Jefferson Blvd. Los Angeles, Ca. 90066.

8.   At all times mentioned herein, DEFENDANT, Amblin Entertainment Inc., upon information and belief, has been a Corporation organized under the existing laws of the state of Delaware, with principal offices at 200 Universal City Plaza, Universal City, Ca. 91608.

9.   At all times mentioned herein, DEFENDANT, Sony Pictures Television, upon information and belief, has been a Corporation organized under the existing laws of the state of Delaware, with principal offices at 10202 Washington Blvd., Culver City Ca. 90232.

COMPLAINT

10. At all times mentioned herein, DEFENDANT, Onza Partners SL - Onza Entertainment, a Spanish Sociedad Limitada, upon information and belief, has been a Corporation organized under the existing laws of the state of Madrid Spain, Delaware, with principal offices at Suero de Quinones, 38. Planta 1, Madrid, Spain.

11. At all times mentioned herein, DEFENDANT, Kripke Enterprises, upon information and belief, has been a Corporation organized under the existing laws of the state of California, with principal offices at 9465 Wilshire Blvd. Suite 900, Beverly Hills Ca. 90212.

12. At all times mentioned herein, DEFENDANT, NBC Universal, upon information and belief, has been a Corporation organized under the existing laws of the state of Delaware, with principal offices at 10 Universal City Plaza, Universal City, Ca. 91608.

13. At all times mentioned herein, DEFENDANT, Warner Bros. Entertainment, Inc., upon information and belief, has been a Corporation organized under the existing laws of the state of Delaware, with principal offices at 4000 Warner Blvd., Burbank, Ca. 91522.

14. At all times mentioned herein, DEFENDANT, Legendary Pictures Films, upon information and belief, has been a Corporation organized under the existing laws of the state of California, with principal offices at 2900 W. Alameda Ave., Burbank, Ca. 91505.

COMPLAINT

15.    At all times mentioned herein, DEFENDANT, Christopher Nolan, upon information and belief, has been an individual with offices at 4000 Warner Blvd., Building 81, Suite 203, Burbank, Ca. 91522.

16.    At all times mentioned herein, DEFENDANT, Jonathon Nolan, upon information and belief, has been an individual with offices at 4000 Warner Blvd., Building 81, Suite 203, Burbank, Ca. 91522.

17.    At all times mentioned herein, DEFENDANT, Andrew Wachowski, upon information and belief, has been an individual with offices at 4000 Warner Blvd., Burbank, Ca. 91522.

18.    At all times mentioned herein, DEFENDANT, Lana Wachowski, upon information and belief, has been an individual with offices at 4000 Warner Blvd., Burbank, Ca. 91522.

19.    At all times mentioned herein, DEFENDANT, Caesars Entertainment Corporation - Rio All-Suites Hotel and Casino, upon information and belief, has been a Corporation organized under the existing laws of the state of Nevada, with principal offices at 3700 W. Flamingo Rd., Las Vegas, NV. 89103.

20.    At all times mentioned herein, DEFENDANT, Southwest Airlines, Co. . upon information and belief, has been a Corporation organized under the existing laws of the state of Texas, with principal offices at 2702 Love Field Drive, Dallas Texas, 75235.

COMPLAINT

21. At all times mentioned herein, DEFENDANT, Thorndal, Armstrong, Delk, Balkenbush, & Eisinger, upon information and belief, has been a Corporation organized under the existing laws of the state of Nevada, with principal offices at 1100 E Bridger Ave, Las Vegas, NV. 89101.

22. At all times mentioned herein, DEFENDANT, Dr. Robert A. Leark, upon information and belief, has been an individual residing at 7514 Girard Ave La Jolla, Ca. 92037-5149.

23. At all times mentioned herein, DEFENDANT, Las Vegas Metro Police Department, upon information and belief, has been located at 400 S. Martin Luther King Blvd., Las Vegas, NV. 89106.

24. At all times mentioned herein, DEFENDANT, The Los Angeles Superior Court - Van Nuys, upon information and belief, has been located at 14400 Erwin St., Van Nuys, Ca. 91401.

25. At all times mentioned herein, DEFENDANT, U.S. District Court - Central District Court of California - Western Division, upon information and belief, has been located at 312 N. Spring St., Los Angeles Ca. 90012.

26. At all times mentioned herein, DEFENDANT, The Ninth Circuit Court of Appeals, upon information and belief, has been located at 95 Seventh St., San Francisco, Ca. 94103.

COMPLAINT

27.   At all times mentioned herein, DEFENDANT, The Federal Bureau of Investigation, upon information and belief, has been located at 11000 Wilshire Blvd, #1700, Los Angeles, Ca. 90024.

28.   At all times mentioned herein, DEFENDANT, JAMS, Inc., upon information and belief, has been a Corporation organized under the existing laws of the state of California, with principal offices at 555 West Fifth St., Los Angeles, Ca. 90013.

29.   At all times mentioned herein, DEFENDANT, Mitchell, Silberberg & Knupp, upon information and belief, has been a Corporation organized under the existing laws of the state of California, with principal offices at 11377 W. Olympic Blvd. Los Angeles, Ca. 90064.

30.   At all times mentioned herein, DEFENDANT, Ford Harrison, LLP, upon information and belief, has been a Corporation organized under the existing laws of the state of California, with principal offices at 350 S. Grand Ave., Suite 2300, Los Angeles, Ca. 90071.

31.   At all times mentioned herein, DEFENDANT, Oxnard Police Department, upon information and belief, has been located at 251 S. C. St. Oxnard, Ca. 93030.

32.   At all times mentioned herein, DEFENDANT, The Beverly Hills Police Department, upon information and belief, has been located at 464 N. Rexford Dr. Beverly Hills, Ca. 90210.

33.   At all times mentioned herein, DEFENDANT, Michelle Obama, upon information and belief, has been an individual with offices at          Belmont Rd. NW, Washington , D.C. 20009.

34.   At all times mentioned herein, DEFENDANT, Blake Lively, upon information and belief, has been an individual with offices at Pound Ridge, New York, 10576.

35.   At all times mentioned herein, DEFENDANT, Nancy Pelosi (California's 12th Congressional District), upon information and belief, has been located at 233 Cannon H.O.B., Washington, DC. 20515

36.   At all times mentioned herein, DEFENDANT, Gold Coast Cab Company – Owner - Jim Carmona, upon information and belief, has been a Corporation organized under the existing laws of the state of California, located at 3755 Nyeland Ave, Oxnard, Ca. 93036.

37.   At all times mentioned herein, DEFENDANT, Alston & Bird, LLP (Casondra K. Ruga), upon information and belief, has been a Corporation organized under the existing laws of the state of California, with principal offices at 333 S. Hope St., Los Angeles, Ca. 90071.

38.   At all times mentioned herein, DEFENDANT, Caldwell, Leslie & Proctor (Linda M. Burrow), upon information and belief, has been a Corporation organized under the existing laws of the state of California, with principal offices at 725 Figeroa St. 31st Floor, Los Angeles, Ca. 90017.

39.  At all times mentioned herein, DEFENDANT, WILL SMITH, upon information and belief, has been an individual with principal offices in Los Angeles, Ca.

40.  At all times mentioned herein, DEFENDANT, CHRIS ROCK, upon information and belief, has been an individual with principal offices in Los Angeles.

41.  At all times mentioned herein, DEFENDANT, AMERICAN BROADCAST COMPANY, upon information and belief, has been a Corporation organized under the existing laws of the state of California, with principal offices at 2300 W Riverside Dr, Burbank, CA 91506.

42.  At all times mentioned herein, DEFENDANT, THE UNITED STATES SUPREME COURT, upon information and belief, has been located at One First ST. NE, Washington, DC 20543.

43.  At all times mentioned herein, DEFENDANT, THE PENTAGON; upon information and belief, has been located at 1400 Defense Pentagon, Arlington, VA 20301.

44.  At all times mentioned herein, DEFENDANT, HARRISON FORD, upon information and belief has been an individual with principle offices located at

45.  At all times mentioned herein, DEFENDANT, THE SANTA MONICA POLICE DEPARTMENT (City of Santa Monica); upon information and belief, has been located at 685 Main St Santa Monica Ca. 90401.

46.   At all times mentioned herein, DEFENDANT, LOSANGELES COUNTY MEDICAL EXAMINER, upon information and belief, has been located at 1104 N Mission Rd., Los Angeles, Ca.  90033.

**\*For purposes of maintaining accuracy of any references, the following paragraphs are unchanged from "the RICO Complaint" - 2:18-cv-08604.**

**\*All new violations of U.S. Code and "RICO" by previously existing Defendants and newly added Defendants essentially amending the "RICO Complaint anew as "the New RICO Complaint" with events that occurred between 10-17-19 and 10-31-23, are detailed and listed beginning p. 201.**

## II.  JURUSDICTION

37.   The NEVADA DISTRICT COURT is the judicial district in which substantial part of the events or omissions giving rise to the claim occurred; and where Plaintiff currently lives with parents; Las Vegas, Nevada being where the latest extension of RICO violations occurred during litigation of the corruption issues relating to 18 U.S.C. § 1961, involving Nevada District Court and LVMPD, now to include furtherance of all violations of U.S. Code and RICO related activities to include 18 U.S.C. § 1958-murder for hire; venue in this court is proper pursuant to  28 U.S.C. § 1391 (a)(1) and 28 U.S.C. § 1391 (b)(2).

38.   28 U.S.C. 1391 (c)(3), states that, " a defendant not resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants."; therefore this court maintains jurisdiction over DEFENDANT - Onza Productions, not located in the United States.

39.  28 U.S.C. § 1332 (a)(3), states that, "The district courts shall have original jurisdiction of all civil actions where the matter of controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States and in which citizens or subjects of a foreign state are additional parties."; jurisdiction in this Court is proper.

40.  28 U.S.C. § 1332 (a)(4), states that, "The district courts shall have original jurisdiction of all civil actions where the matter of controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between a foreign state, defined in 28 U.S.C. section1603(a), section 1603(b)(1), section 1603(b)(2) and 1603(b)(3) , therefore this Court maintains jurisdiction over all parties and agencies or instrumentalities of foreign states.

## III. STATUTES

41.  This is an action for violations of 18 U.S.C. § 1961, § 1962(a), § 1962(b), § 1962(c) and § 1962(d) - (CIVIL RICO) - Civil Remedy pursuant to 18 U.S.C. § 1964; 42 U.S.C. § 1983; 42 U.S.C. §1985(1), §1985(2), §1985(3); 42 U.S.C. § 1986; 17 U.S.C. §106(a), § 501(a), § 501(b) § 104(a), and § 102(a); Underlying Torts: *Contributory Copyright Infringement*; Recklessness; Intentional Infliction of Emotional Distress - Outrageous Conduct; and Civil Conspiracy.

# IV. FACTS

42.  This case arises from the proven and admitted theft and sale of Plaintiff's copyright works entitled, "The World of Jupiter" and "Crisis on Jupiter" that were submitted as assignments to staff of The Los Angeles Film School on 9-8-11 and 9-18-11. Marilyn Giardino-Zych, the teacher to whom these works were submitted, in concert with Peter J. Abrahams, sold all original protected and copyrighted story and character elements from these works to Damon Lindelof, who had just been brought on by Twentieth Century Fox and Scott Free Films, LLC., to rewrite the "Prometheus" script.

43.  Damon Lindelof admitted receipt and use of Plaintiff's copyrighted works when he released statements in interviews to the press 9-27-11 through 9-30-11, to date the creation myth material as having been added by him in preparation for a copyright infringement lawsuit, seemingly knowing that Plaintiff had submitted the assignments via email to the Los Angeles Film School teachers and would have creation and submission dates in forensics profiles of the assignments, protecting Plaintiff's original works pursuant to 17 U.S.C. 102(a) "tangible medium of expressions" and showing the use of the Plaintiff's works by Mr. Lindelof, Scott Free Films, LLC, Twentieth Century Fox and all other DEFENDANTS to the previously filed copyright claims, (Complaint, Exhibits - Volumes I. - IV.) and (Complaint, Non-paper Exhibits on DVD - Volumes I. - IV.) and Sony Pictures Television and NBC Universal for infringement of Plaintiff's copyrighted works in "Timeless", to be in <u>violation of federal copyright laws: 17 U.S.C. §106(a), § 501(a), § 501(b) § 104(a), §102(a ); and the doctrine of contributory copyright infringement established in *Kalem v. Harper Bros.*, and *Gershwin Publishing Co. v. Columbia Artists Management, Inc.*</u>

44.  When U.S. Copyright Registration for "Prometheus" was presented to this Court by Alston and Byrd - counsel for Twentieth Century Fox on 6-27-14, during litigation of *Basile v. Twentieth Century Fox Film Corporation*, it was attached to a declaration given by Twentieth Century Fox employee Mary McGuire who stated that she had submitted the attached script to the U.S. Copyright Office for registration. <u>The script and U.S. copyright registration certificate was erroneously accepted by this Court as authentic, even though a copy of the original script filed with the U.S. Copyright Office had not yet been received by Twentieth Century Fox's counsel at the time of the filing</u>, and the titles of the script and registration certificate were <u>different</u> and indicated that the documents were fraudulent, "Prometheus" A.K.A. Paradise.  (*See* Complaint, Exhibits - Volume II. - Exh. 3 - Declaration of Mary McGuire)

45.  In the articles released in the press 9-27-11 through 9-30-11,  Mr. Lindelof confirmed his having been brought on to rewrite the script for "Prometheus", noting the addition of a creation myth – creation myth from Plaintiff's work  " The World of Jupiter ", which was referenced by the press as "the groundbreaking mythology", that did not exist in the "Prometheus" script before Plaintiff had written and submitted the two assignments, "Crisis on Jupiter" and "The World of Jupiter" to the Los Angeles Film School staff who immediately sold the materials to Mr. Lindelof.  After his receipt, Mr Lindelof fused Plaintiff's works into his rewrite of the "Prometheus" script, then resold various concepts from Plaintiff's copyrighted works separately, to other writers working on films in production at that time.

46.   Michael Angelo Soccio and Etan Cohen, while writing for the MIB3 production, fused the time travel story and other specific and protectable concepts from Plaintiff's copyrighted works, that he received from Damon Lindelof, specifically  (1) two time travel devices having been created and one being stolen, the remaining device being used to chase the character who stole it through time; (2) The MIB having regulated all time travel; and  (3) time travel having been banned throughout the galaxy.

47.   The "MIB3" production released a trailer on December 12, 2011, advertising the time travel story elements added to the film,  the same day as a shooting in front of The Los Angeles Film School, Plaintiff was scheduled to walk to school that morning but was busy writing an assignment and stayed at his apartment. The apartment Plaintiff lived at next door to the Los Angeles Film School at 1555 N. Vine St., #275, was referenced in emails between Nancy Pelosi and Amy Pascal during their discussions planning the Metrolink attack, noted in the Leaked Sony Emails. (*See* Complaint, Exhibits - Volume III. - Exh. 16 - pp. 45-82)

(A true and correct copy of the trailer released on 12-12-11, has been manually filed on DVD as Exhibit 1)

(A true and correct copy of the article announcing the trailer released on 12-12-11 is appended hereto as Exhibit 1a.)

(*See* Complaint, Non-Paper Exhibits on DVD - Volume I. - Disk 1 - Folder 1 - [Decl., Exhs. 1 and 2 ] Original assignments, "The World of Jupiter" and "Crisis on Jupiter" , submitted to The Los Angeles Film School 9-8-11 and 9-18-11)

COMPLAINT

(A true and correct copy of Plaintiff's U.S. Copyright Registration certificate of "The World of Jupiter and "Crisis on Jupiter" with deposited text is appended hereto as Exhibit 2)

48.   Warner Bros. - The Wachowskis and Jonathon and Christopher Nolan – who fused many protectable elements from Plaintiff copyrighted works into films in production at that time at Warner Bros., the most brazen use of Plaintiff's works was by the Wachoskis in "Jupiter Ascending". Proving Warner Bros.' receipt of Plaintiff's works, on 10-20-11 and 10-22-11, the Wachoskis announced the " beginning of development " of their new film "Jupiter Ascending" having infringed The Global Military of Jupiter from Plaintiff's work "Crisis on Jupiter"; all life on Earth having been created by Supreme beings of Jupiter; and interplanetary travel between Jupiter and Earth to seek the descendants of the first ever created.

(*See* Complaint, Non-Paper Exhibits on DVD - Volume I. - Disk 1 - Folder 2 - Decl., Exh. 4 [Second Amended Complaint, Exhs. 60 and 61] - "Jupiter Ascending" press releases dated 10-20-11 and 10-22-11)

(*See* Complaint, Non-Paper Exhibits on DVD - Volume I. - Disk 1 - Folder 2 - Decl., Exh. 4 [Second Amended Complaint, Exh. 65] - trailer released for "Jupiter Ascending")

(*See* Complaint, Non-Paper Exhibits on DVD - Volume I. - Disk 1 - Folder 1 - [Complaint, Exh. 14] - film "Jupiter Ascending" on DVD

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

49.    The creation of the character "Bane" in "The Dark Knight Rises" by Christopher Nolan, Jonathon Nolan and David S. Goyer, was based in part on wardrobe suggested in Plaintiff's photo rendering of character General 322, Plaintiff's complete outline of "Crisis on Jupiter" having been revealed through exposition during the ***opening sequence***, before and after Bane stealing the Military plane with scientist. The mention of Bane and reference to him as being a mercenary establishes him as an ex-soldier, but the footage cut from theatre to DVD release, contained a narrative by Marion Cotillard's character exposing Bane's backstory. After the 4 hr. screening of the completed film with all infringing footage at Warner Bros., the film was released theatrically and although infringing material was cut before the theatrical release, elements of Bane's story derived from Plaintiff's works remained in the final film. The trailer used to advertise "The Dark Knight Rises" in theatres screened at the beginning of Mission Impossible: Ghost Protocol, and revealed the removal of Robin Williams' entire character from the film due to the character he played having been the scientist or doctor conducting the experimentation on Bane, derived from Plaintiff's works. This footage was removed before theatre release but after the Warner Bros. screening:

(*See* Complaint, Non-Paper Exhibits - Volume IV. - Disk 1 - Folder 1[Complaint, Exh. 17]); (*See also* Complaint, Exhibits - Volume I. - Exh. 13 [Exh. 3. pp. 251-262]) and (Complaint, Non-Paper Exhibits on DVD - Volume IV. - Disk 1 - Folder 1 [Complaint, Exh. 20]).

50.    The director of "The Dark Knight Rises" - DEFENDANT - Christopher Nolan and DEFENDANT – WB (Nathan Krowley - Set designer) conveyed a

COMPLAINT

"threatening communication" by reference in the background during a scene
showing signs in the background during a chase scene:

SAKS FIFTH AVENUE and Jos A Bank

while Bane told Batman that he was killing him. The Jos A Bank sign was a
reference to the man who derailed the Metrolink train whose name was Jose; the
SAKS FIFTH AVENUE sign a reference to both the cross street where the man
derailed the Metrolink train,(Fifth St. and Rice Ave) and where Plaintiff's sister,
Elizabeth Basile, was attacked by B.H. Police in front of SAKS FIFTH AVENUE
whose security cameras captured the attack. This attack occurred at the very
beginning of litigation for Plaintiff's claims, the first draft of *Basile v. The Los
Angeles Film School* having been finished and saved to Plaintiff's computer on
10-28-13, 7 days before the B.H. Police attacked. ( *See* Complaint, Exhibits -
Volume III. - Exh. 16 - pp. 158-168) and (Complaint, Non-Paper Exhibits -
Volume I. - Disk 1 - Folder 2 - Decl., Exh. 4 [Second Amended Complaint - Exh.
67])

**(*See* Complaint, Non-Paper Exhibits on DVD - Volume IV. - Exh. 23 - DVD of
"The Dark Knight Rises"**
[2:23:58] - [2:24:05]  -  Marion Cotillard says, "Shoot them all"
[2:24:12]  -  Bane says to Batman, "We both know that I have to kill you now."
[2:24:44]  -  During a car chase scene, SAKS FIFTH AVENUE and Jos A Bank
signs appear in the background.
[2:24:58] - Reference to Johnny Depp's Skull and Bones tattoo. (*See* Complaint,
Exhibits - Volume VI. - Exh. 13)

COMPLAINT

**(*See* also Complaint, Non-Paper Exhibits - Volume V. - Disk 1 - #2 [Decl., Exh. 16] - Clip of "The Dark Knight Rises")**

[0:12] - [ 0:19]  -  Marion Cotillard says "Shoot them all"

[0:26]  -  Bane says to Batman, "We both know that I have to kill you now."

[0:55]  -  During a car chase scene, SAKS FIFTH AVENUE and Jos A Bank signs appear in the background.

[01:08] - Reference to Johnny Depp's Skull and Bones tattoo. (*See* Complaint, Exhibits - Volume VI. - Exh. 13)

51.   During the litigation of *Basile v. Warner Bros,* all non-paper exhibits Plaintiff manually filed with its Complaint, which included the 2nd draft of Plaintiff's work "Crisis on Jupiter" from which the "fuel to power the machine" (written as "ore to power the machine") was taken and used as part of Bane's backstory involving the two machines, were stolen from Plaintiff's briefcases when Plaintiff was kidnapped on 10-31-15 in Las Vegas when Plaintiff went to file its Motion Opposing Defendant's Motion to Dismiss. These exhibits also contained the further details and evidence of conspiracy between parties to the copyright claims. <u>A few months  later, Judge Gee noted in her dismissal of *Basile v. Warner Bros. Entertainment, Inc.,* that the court never received the exhibits even though the exhibits were posted as received on PACER.</u> (*See* Complaint, Exhibits - Volume IV. - Exh. 9)

52.   Michael Angelo Soccio admitted to Plaintiff that he had used Plaintiff's material in the rewrite of "MIB3" in a phone conversation shortly after Plaintiff was forced to leave The Los Angeles Film School because of false accusations by Los Angeles Film School staff, only a few weeks after Plaintiff asked for one of the assignments he had submitted, "The World of Jupiter", to be returned to him

after it having gone missing from his student email. When Plaintiff was falsely accused of theft by Robert Sweeney, Plaintiff was also threatened of an "accident"; the B.H. attack was this threatened accident.(*See* Complaint, Non-Paper Exhibits - Volume I. - Disk 1 - Folder 1 - [Decl., Exh. 4])

53.   The Leaked Sony Emails discovered that Etan Cohen and Amy Pascal admit responsibility for the attack and that WB was not going to let something go, indicating that the subject of the email - "promise" - was discussion that the attack was a miss. (*See* Complaint, Exhibits - Volume III. - Exh. 16 - p. 70)

54.   Charlize Theron released a threatening communication in an interview online for Twentieth Century Fox and the "Prometheus" production, seemingly to all parties involved in the production, only a few days after Plaintiff had approached Peter J. Abrahams about having seen the trailer for "Prometheus" and realizing that his materials submitted had been stolen and sold school by the school's staff and already in the "Prometheus" film. (*See* Complaint, Non-Paper Exhibits on DVD - Volume I. - Disk 1 - Folder 2 - Decl., Exh. 4 [Complaint, Exh. 69]) ( *See also* Complaint, Exhibits - Volume III. - Exh. 16 - p. 71)

55.   The article read: "Charlize Theron Promises Death in Prometheus". Because Plaintiff's loans were cancelled a few days after Plaintiff had the discussion with Mr. Abrahams, and Charlize Theron also issues the threat a few days later, it's clear that not only did Mr. Abrahams notify the owners of the school, he also notified the parties at Twentieth Century Fox who he had sold Plaintiff's assignments to that the student stolen from was aware of the infringement.

21

56.   A newly discovered Leaked Sony Email exchange is further evidence that the B.H. attack was plotted in part by Sony Pictures - Amy Pascal and Etan Cohen – as the email to Amy Pascal from another executive at CAA (blourd@caa.com) on 11-3-13, only 2 days before the B.H. attack, uses the word WEIRD as reference to Officer WEIR who carried out the B.H. attack. The responding email in this exchange from Amy Pascal on 11-4-13, the day before the attack, tells her that the spam email received by everyone from hansexunkerawery:

he is very

clear and resolute

was the notification that the BH attack (C.A.R.) was going to occur using Officer Weir.

The text of the hansexunkerawery email was in later emails used as reference to the B.H. attack after it occurred. [notes/advice/thoughts]

(A true and correct copy of the emails from the security liaison-hansexunkerawery - who confirmed that the B.H. attack was occurring the next day, the attack was taking place the next day, is appended hereto as Exhibit 3)

(A true and correct copy of the newly discovered Leaked Sony Email exchanged between CAA and Sony Pictures - Amy Pascal discussing that she was getting Officer Weir for the B.H. attack the next day is appended hereto as Exhibits 3a.) *(See also* Complaint, Exhibits - Volume III. - Exh. 16 - p. 70) ( A true and correct copy of the email discussing the attack the previous month between Amy Pascal and Etan Cohen admitting responsibility for the B.H. attack is appended hereto as Exhibit 3b.)

57.   When these exhibits are considered with the new footage from the 2013 Film Symposium at The White House, we find that Michelle Obama - who seems to at least have supported the B.H. attack - conveys several "threatening communications" to Plaintiff and his family by gloating about the attack, only three days after it was carried out by B.H. Police. A message was sent to Plaintiff and his family by Ms. Obama by her having been in the company of Blake Lively. This being received as such because Blake Lively came to find Plaintiff while at The Los Angeles Film School without notice and tried to have Plaintiff falsely arrested by assaulting Plaintiff in front of the paparazzi around January 20th, 2012, shortly after the shooting missed Plaintiff in front of his apartment building next door to The Los Angeles Film School a few weeks earlier on 12-9-11. The shooting occurred three days before the release of the "MIB3" trailer that included the added time travel elements from Plaintiff's stolen works.

It is now confirmed that Ms. Lively's visit and efforts to conspire against Plaintiff around January 20th, 2012, only one month after the shooting, were not coincidence. The shooting in front of LA Film School and Plaintiff's apartment took place on **12-9-11**, after Plaintiff's works had been stolen by LA Film staff and already in use by several studios, who Ms. Lively was working for when she attempted have Plaintiff falsely arrested. Plaintiff did not yet have knowledge of the theft of his works, her effort was to prevent him from discovering this.

58.   Recently discovered was that at the time Blake Lively visited Plaintiff and tried to create an arrest situation, a month after the shooting in front of The Los Angeles Film School and Plaintiff's apartment, 12-9-11, that not only was she working on  "Savages" with Twentieth Century Fox - who had already began to infringe Plaintiff's works but not yet released the trailer to "Prometheus"  - but also

COMPLAINT

she was represented by CAA. (A true and correct copy of online news discussing her being represented by  CAA are appended hereto as Exhibit 4a.)

59.   When it was announced in online news that Blake Lively had left CAA, the story was released on 12-9-13, two years later but the same date as the shooting that took place in front of The Los Angeles Film School and Plaintiff's apartment. (A true and correct copy of the online article noting that Blake Lively had left CAA is appended hereto as Exhibit 4b.)

60.   12-12-11, three days after the shooting on 12-9-11, the "MIB3" trailer with newly added time travel elements from Plaintiffs works was released. (A true and correct copy of the article detailing the shooting on 12-9-11 is appended hereto as Exhibit 4c.)

61.   As it was previously suspected, Blake Lively having visited a month after the shooting was no coincidence. It was an executive at CAA who discussed with Amy Pascal at Sony Pictures in Emails 11-3-13 and 11-4-13, that Amy Pascal was **"getting Weir**d" it would Officer Weir (Exh. 3b.) who would carry out the attack, the attack that occurred in Beverly Hills the next day, 11-5-13, attacking Plaintiff's sister. (*See* Complaint, Exhibits - Volume I. - Exh. 10)

62.   The facts surrounding Ms. Lively's visit and Plaintiff's previous relationship with her family and *why* it was suspected before these discoveries that her having spit in Plaintiff' face in front of paparazzi was part of a conspiracy to have Plaintiff falsely arrested on the night of her visit, were already reported to the District Attorney in Plaintiff's Writ of Error Coram Nobis prepared for filing on **10-31-17,** later filed with the District Attorney's Office on **11-29-17** relating to

COMPLAINT

another previous conspiracy that has been investigated and exposed relating to Plaintiff's attack in 1999(00). (*See* Complaint, Exhibits - Volume VI. - Exh. 2 - pp. 83-89)

63.   The video of Ms. Obama's speech recently discovered with Blake Lively present with all studios represented at the 2013 Student Film Symposium, confirms Ms. Lively was working for the studios at the time of her visit, who later were sued for copyright infringement, her having done so in an attempt to prevent Plaintiff from discovering the infringement had occurred and then filing Complaints, by having spit in Plaintiff's face in front of paparazzi after a night of spending time together, without any provocation at all.

(A true and correct copy of the 2013 Film Symposium footage has been manually filed on DVD as Exhibit 4)

( A true and correct copy of a document from a real estate website showing the home previously owned by Plaintiff's parents that was referenced by Michelle Obama is appended hereto as Exhibit 5)

64.   **There are some additional discovered facts relating to the Beverly Hills Police Department attacking Plaintiff's sister on 11-5-13:**

Already established : **9-8-11 and 9-18-11** – Plaintiff submitted to The Los Angeles Film School 2 assignments entitled, "The World of Jupiter " and " Crisis on Jupiter ".

65.   **Facts not yet known until after investigation:**

- **Between 9-18-11 and 9-27-11,** two things happened:

(1) Marilyn Giardino-Zych and Peter J. Abrahams sold Plaintiff's copyrighted works to Damon Lindelof who had been brought on to do the rewrite of "Prometheus".

(2) Damon Lindelof immediately released statements to the press discussing that he had added a creation myth to the "Prometheus" script , to falsely establish the Plaintiff's copyrighted creation myth, "The World of Jupiter" as having been added by him, as early as possibly knowing Plaintiff would have creation and submission dates on the original email's forensic properties.

- **Between 9-27-11 and 12-12-11**, before the shooting in front of Plaintiff's apartment and the school, Damon Lindelof had sold certain elements from Plaintiff' works  to MIB3 writers  who used the time travel story and character from Plaintiff's "Crisis on Jupiter" and Warner Bros. who created "Jupiter Ascending"  and the character "Bane" in "The Dark Knight Rises" from the works.

- **10-20-11 and 10-22-11**, the Wachoskis at Warner Bros, released statements to the press announcing that they were in the "beginning of development" of their new film entitled, "Jupiter Ascending". Later the film was found to encompass all elements from Plaintiff's works, Global Military of Jupiter, all life on Earth having been created by supreme beings of Jupiter. Global Military searching for the descendants of the first ever created.

**Timeline of events:**

66.   November 2011 - While driving to a location near school to film a project, Plaintiff was pulled over by Hollywood Police and told that he had a warrant for his arrest. The LAPD Officer just told Plaintiff to call and find out what it was. Plaintiff had not been set up since 2004 and did not know what the warrant was about so he contacted his attorney, Joel Isaacson. Joel Isaacson found that a warrant had been issued after notice to appear was never sent to Plaintiff's parents' home or Plaintiff's apartment which appears to indicate that the warrant issued was a backdated indictment. The outrageous warrant was for failure to appear for obstruction by resisting arrest – during an incident that occurred two years earlier - for not opening the door to Plaintiff's parent's house after Plaintiff's ex-girlfriend who Plaintiff had just broken up with - had come over had come over to Plaintiff's parent's home in 2009, ate some sandwich, then called Police from the bathroom to come to Plaintiff's parent's house, then ran outside when the Police arrived and attempted to have Plaintiff arrested by making false statements, because she was angry that Plaintiff had just broken up with her.

67.   Plaintiff's ex-girlfriend's plan did not lead to arrest as she had planned, Plaintiff was not arrested but detained overnight based on her false statements, then released. The prosecutor decided to charge Plaintiff essentially for not opening the door, two years later. Plaintiff did not open the door during this incident until he could have his home security arrive to monitor the LAPD's actions who had been conspiring against Plaintiff for several years. The warrant was to provide assistance to DEFENDANTS  to the current copyright claims who knew that Plaintiff would eventually file copyright complaints after he knew the LA Film School had stolen and sold his works. This case was investigated and dismissed.

(*See* Complaint, Exhibits - Volume VI. - Exh. 2 - p. 54, line 17)

68.   **12-12-11:**     On the day Sony released  the trailer for "MIB3" with the time travel elements added from Plaintiff's copyrighted works which the "MIB3" writers -  Michael Angelo Soccio and Etan Cohen -  received from Damon Lindelof, there was a shooting in front of The Los Angeles Film School, right in front of Plaintiff's apartment entrance on Vine St. This apartment located at: 1555 N. Vine St Apt # 275.

Plaintiff's apartment number - #275 - was used to reference Plaintiff (who was the writer of the short at issue in the Plaintiff's claim against Sony Pictures for copyright infringement  )  by Nancy Pelosi in emails with Amy Pascal and her associates. (*See* Complaint, Exhibits - Volume III. - Exh. 16 - pp. 50-61)

The Email between Amy Pascal and Nancy Pelosi who was repeatedly requesting campaign contributions and other unknown elements to the conversation being references that had probably been previously discussed, also noting Plaintiff's apartment #275.

69.   Around January 20th, 2012, a few days before the hearing on the backdated warrant, Plaintiff went to an outdoor restaurant bar near school. Plaintiff sat alone at the bar and saw that bartending was the sister of a very old friend of Plaintiff's with whom Plaintiff had spent much time with in their home as his father was Plaintiff's acting coach. Blake Lively, the sister of Plaintiff's old friend, was young when Plaintiff would see her at the house in the 1980s and had now become an actress. After some investigation, Plaintiff found that at the time of the incident, she was working on "Savages"  with Oliver Stone and Twentieth Century Fox; Damon Lindelof and  Twentieth Century Fox having been the company who

had infringed Plaintiff's copyrighted works creating "Prometheus." The trailer for "Prometheus" released only a few weeks later.

70.   The night was discovered to have been a setup from the beginning to have Plaintiff falsely arrested after drugging Plaintiff at the bar. Blake Lively's intention seems to have been - after insisting that Plaintiff go out to another party with her down the street which they did, after stopping to eat pizza with some of her friends - to spit in Plaintiff's face in front of the paparazzi when arriving at a crowded party to provoke a reaction from Plaintiff for which he could be arrested. After she spit in Plaintiff's face, Plaintiff was shocked as they had just spent several hours together, he did nothing and was then man handled by security who began to harassing Plaintiff. Plaintiff then ran to his apartment a few blocks away.

71.   The problem with this event requires attention as it has been discovered after investigation that 1999 through 2011 - when Plaintiff moved back to Hollywood to go to school - Plaintiff had been first conspired against by a corrupted attorney then setup several times by current girlfriends as part of a conspiracy controlled by an unknown agency that began just before, then became increasingly serious  immediately after Plaintiff survived an illegal assassination attempt on Sunset Blvd. carried out by government for a Hollywood actor - detailed in the Writ of Error *Coram Nobis* (***See* Complaint, Exhibits - Volume VI.)**

72.   The outcome of Ms. Lively's mission was to have Plaintiff arrested so he would have been arrested before hearing on the backdated warrant, guaranteeing that Plaintiff would be imprisoned, before seeing that his copyrighted

works had been stolen and sold by Los Angeles Film School , when the trailer for "Prometheus" released in February 2012.

It seems that the parties who were soon releasing films created in part from Plaintiff's works submitted to The Los Angeles Film School, not only used Blake Lively to create a situation for Plaintiff to be falsely arrested on that night around January 20th, 2012, - same as had been done using Plaintiff's previous girlfriends in the past - but also used her to convey a message as a "threatening communication" or carry a message to the White House from studios on **11-8-13**, only 3 days after the Beverly Hills Police attacked Plaintiff's sister in the car accident on **11-5-13**.

73.   The conspiracy to cover up the theft and sale of Plaintiff's copyrighted works at The Los Angeles Film School beginning with Plaintiff's loans being cancelled and stalled the day after Plaintiff approached Peter J. Abrahams about the trailer he had just seen for "Prometheus"  on **3-18-12**.
**(*See* Complaint, Exhibits - Volume I. - Exh. 13 - [Exh. 3  - Second Amended Complaint - p.6,  ¶¶ XIII. - XIX.])**

74.   The email Plaintiff sent to Blake Lively's sister a few days later, was timid and non-threatening, hoping she would return his email, asking her to have Blake contact Plaintiff without going into too much detail not wanting to cause problems for Blake Lively with her family if she hadn't told them she was in L.A., however, the email has since been edited and her sister Lori Lively's response has been deleted. This email was stored in Plaintiff's lafilm.edu student email which was proven during litigation to have been hacked by lafilm I.T. when one of Plaintiff's assignments was removed, I.T. probably having edited the email upon direction of the Los Angeles Film School staff who knew of the setup.

75. **December 2012 – January 2013** – Plaintiff spoke with Los Angeles Film School owner Diane Derycz – Kessler - who went to Harvard Law School with Barack Obama - who emailed several times to Plaintiff and then said that the V.P. of Operations - Jenna Langer was going to contact Plaintiff to resolve the issue relating to the theft of his submitted assignments. The conversation Plaintiff later had with Jenna Langer resulted in findings that it was known by the staff that a conspiracy had been put in motion to sabotage Plaintiff after his copyright works had been stolen by the teachers. After saying that the school would take a few days to come up with an appropriate number Ms. Langer called back and said that they didn't have any wish to settle out of court. (*See* Complaint, Non-Paper Exhibits - Volume I. - Disk 1 - Folder 5 [Decl., Exh. 1] - Jenna Langer conversation)

(A true and correct copy of a webpage showing Diane Derycz-Kessler and Barack Obama attended Harvard together is appended hereto as Exhibit 6)

76. **April - May 2013,** Plaintiff began receiving LinkedIn views to his LinkedIn account from Twentieth Century Fox security as threats to not pursue the claim for copyright infringement after settlement discussions with Jenna Langer. (*See* Complaint, Non-Paper Exhibits - Volume I. - Disk 1 - Folder 5 [Decl., Exh. 11])

77. After briefing the ACCSC with facts and exhibits proving what had happened, to receive some kind of help resolving the issue with The Los Angeles Film School. Before receiving the exhibits, the ACCSC said that they had spoken to the school and the school told them that they had investigated the issue and had reported back to the ACSC that they had found no wrong doing. The ACCSC had taken the word of the school who had stolen and sold Plaintiff's materials then

conspired to have him falsely arrested so he would be out of school and unable to file a claim for copyright infringement.

Plaintiff then studied copyright laws and drafted a Complaint to file in the court system.

**10-28-13,** Plaintiff completed the first draft of the Complaint he would then file in court *Basile v. The Los Angeles Film School.*

**11-5-13** - Plaintiff's sister was attacked while driving in Beverly Hills near her work.

**11-8-13** - Blake Lively visited Barack Obama at the White House with Whoopi Goldberg.

(A true and correct copy of an article reporting the Student Film Symposium at The White House is appended hereto as Exhibit 4d.)

    78.    Amy Pascal and Etan Cohen were not only found in the Leaked Sony Emails to have ordered this car attack for DEFENDANT Sony Pictures Entertainment and other parties including DEFENDANT Warner Bros. Entertainment, with the help or just support of Michelle Obama, but to have conspired with Nancy Pelosi and Sony pictures to provide Nancy Pelosi with campaign contributions in exchange for her and other parties engaging ISIS to carry out the Metrolink attack. ( *See* Complaint, Exhibits – Volume IV. - Exh. 3, p. 101 [Exh. 33]) (*See also* Complaint, Exhibits - Volume III. - Exh 16 [p. 38, ¶ 2 - p. 51])

The emails between Amy Pascal and Nancy Pelosi read as follows on an Iphone:

Sent to Amy Pascal at Sony Pictures on behalf of Nancy Pelosi:

Sony Email ID – 94981

Date:  2014 – 10 – 20 02:00:38 UTC (10-20-14)

From: admin@schneiderforcongress.com

To: pascal, amy

    Sorry to repeat ourselves, but Nancy Pelosi wouldn't be asking for your support if it wasn't important.

This is the **FINAL CHANCE** to answer Nancy Pelosi's call-to-action.

**Amy Pascal**

**Answered Nancy Pelosi's call-to-action?**

## NO DONATION ##

As of 8:30 PM CDT, we stand just 21 donations shy of a JAW-DROPPING 5O,OOO strong. If we can **hit** the **mark** before midnight, it'll make Boehner **think** twice about messing with Illinois.

**MIDNIGHT DEADLINE: Amy -- are you in?**

**Chip in $5 immediately >>**

**Chip in $35 immediately >>**

**Chip in $50 immediately >>**

**Chip in $100 immediately >>**

COMPLAINT

**Chip in $250 immediately >>**
**Or click here to donate another amount >>**

Thank you,

Schneider HQ

Sent from Nancy Pelosi directly to Amy Pascal

Sony Email ID – 94796

Date:  2014 – 10 – 28 01:19:22 UTC (10-28-14)

From: dccc@dccc.org

To: pascal, amy

Amy -- th**is is** my second email tonight asking you for $5.

I have no choice at this point. We're 8 days out from Election Day. An election in which we can shock Republicans in deep-red districts -- if we have the resources we need to do it.
So I'm pleading with you -- **can you make sure we reach our goal for tomorrow's big deadline by giving $5 or more today?**

**Chip in $5 immediately >>**
**Chip in $35 immediately >>**

34

**Chip in $50 immediately >>**
**Chip in $100 immediately >>**
**Chip in $250 immediately >>**
**Or click here to donate another amount.**

I'm not going to go on and on about how important this election **is.** You already know how important it **is.** You've already heard that from President Clinton and President Obama.

I'm just going to tell you the cold math that we have to deal with right now: we have a huge ad buy deadline tomorrow night, and we're coming up $275,OOO short.

Please, Amy. Keep the hopes of our Democratic campaigns alive and give $5 or more right now: **https://action.dccc.org/Chip-In**
Thank you for all of your contributions. They are deeply appreciated and a huge help.

Nancy Pelosi

---

**79.**    At the 2013 Student Film Symposium event at the White House on 11-8-13, shockingly, during the speech given by Michele Obama she makes not one but several references to Plaintiff which are understood now to be threatening

communications in support of both Blake Lively's failed attempt to have Plaintiff falsely arrested after assaulting him in front of the paparazzi in January 2012, and in support of the attack on Plaintiff's sister by the Beverly Hills Police Department on 11-5-13.

References in the speech:

(1)  Subtle inuendo in speech with effort to say "Shirley" - the street Plaintiff lived with his family until just before moving back to Hollywood to go to school;
(2).  Subtle inuendo in speech with effort to say Plaintiff's last name, "Basile". (pronounced that way)
(3)  Subtle inuendo in speech with effort to say "sister" , 3 days after Plaintiff's sister was attacked by Beverly Hills Police while driving, nearly much worse of an accident.
(4)  Subtle reference to "first", the first draft of Plaintiffs complaint against the Los Angeles Film School that has just been saved to his computer on 10-28-13,  7 days before Beverly Hills Police attacked Plaintiffs sister. Plaintiffs computer was being monitored.

       80.   The word  S I S T E R was also spoken about in emails between Sony executives asking about Steven Bernard's whereabouts( Head of Sony Security) during the planning the Beverly Hills attack.  ( *See* **Complaint, Exhibits – Volume IV. – Exh. 3 - p. 33, line 24 – p. 37. line 8)** (*See also* Complaint, Exhibits - Volume III. - Exh. 16 - p. 72)

       81.   Michelle Obama appears to have had knowledge of the B.H. attack before and wanted it clear 3 days afterwards that the White House engages in

violence for their friends or supporters issuing these inappropriate threats from the White House, noting "Welcome to the White House. "

82.   This leads us to the questions:

" What could Blake Lively, Twentieth Century Fox, Sony Pictures or their associates have said to their friend and supporter Michelle Obama to enroll her and the White House into engaging Plaintiff's sister in such a violent display of corruption?"

"Did the White House also have knowledge and engage in the planning of the night Blake Lively attempted and failed to frame Plaintiff in January 2012 on Hollywood Blvd near The Los Angeles Film School?"

83.   These strong threatening communications directed at Plaintiff and his family by Michelle Obama and Blake Lively have engaged in "racketeering" activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961 - relating to 18 USC §  1503(a) (obstruction of justice) and 18 U.S.C. § 1512 (intimidation of a victim) - as the statements in Michelle Obama's speech are threats related to the attack in Beverly Hills three days earlier making references to Plaintiff's family; Ms. Obama's use and emphasis of the word "first" was a <u>threat not to pursue the filing of the First Draft of the Los Angeles Film School complaint saved to Plaintiff's computer that as being monitored by Fox Security beginning (April or May 2013).</u>

84.   Beverly Hills Police made a threat in the exact same way by writing in the traffic report of the Beverly Hills attack, the word "illuminate" which was a

phrase used in Plaintiff's work, "The World of Jupiter". This assignment at issue had been concealed by Los Angeles Film School staff Robert Sweeney at the beginning of  August 2012, who then falsely accused Plaintiff of theft a few weeks later.

85.   Michelle Obama conveys threats also in violation of 18 USC § 2339A , as the threats clearly provide "material support" as defined in this section by providing Blake Lively and the studios who were expecting copyright infringement complaints filed against them, a "service" enabling them to further intimidate the Plaintiff into not pursuing the claims for copyright infringement against all Defendants liable for copyright infringement, many of whom were at the White House for the 2013 Student Film Symposium 3 days after the B.H. attack to convey a message of solidarity between the studios and Michelle Obama.

86.   The fact the Blake Lively is indicating with her black dress with what looks like an M on the front of it,  a reference to MIB3 / Sony Pictures - against whom Plaintiff was expected to file a claim for copyright  infringement and included this infringement in its complaint against The Los Angeles Film School that was prepared for filing on 10-28-13 - strongly supports the perception that the "threatening communications"  are part of a conspiracy to attack and threaten Plaintiff and his family to prevent Plaintiff from pursuing legal remedy particularly for *Basile v. Sony Pictures Entertainment.*

**THE LEAKED SONY EMAILS:**

87.   On November 24, 2014, a hacker group which identified itself by the name "Guardians of Peace" (GOP) leaked a release of confidential data from

the film studio Sony Pictures. The data included personal information about Sony
Pictures employees and their families, e-mails between employees, information
about executive salaries at the company, copies of then-unreleased Sony films, and
other information. The perpetrators then employed a variant of the Shamoon wiper
malware to erase Sony's computer infrastructure.

88.    In November 2014, the GOP group demanded that Sony pull its
film *The Interview*, a comedy about a plot to assassinate North Korean leader Kim
Jong-un, and threatened terrorist attacks at cinemas screening the film. After major
U.S. cinema chains opted not to screen the film in response to these threats, Sony
elected to cancel the film's formal premiere and mainstream release, opting to skip
directly to a downloadable digital release followed by a limited digital theatrical
release the next day United States intelligence officials, after evaluating the
software, techniques, and network sources used in the hack, alleged that the attack
was sponsored by North Korea. North Korea has denied all responsibility.

89.    The Metrolink attack occurred on **2-24-15**, and Onza Partners SL –
Onza Entertainment provided clear evidence by its release of "El Ministerio Del
Tiempo" - the Spanish version of "Timeless" which was created by Sony
Television after the use of the same material by Sony Pictures in "MIB3" - that the
attack was an international collaboration between parties who had infringed
Plaintiff's copyrighted works, and the parties with whom they had conspired in the
United States to evade liability for copyright infringement through intimidation
and violence.

90.    Plaintiff provided evidence in all copyright claims that clearly outlined
"when" and "how" each party received Plaintiff's works satisfying the necessary

access, and comparisons satisfying substantial similarity requirements of copyright laws, proving Plaintiff's copyright claims as a matter of law.

91.   A Complaint was filed against The Los Angeles Film School for (Fraud, Copyright Infringement, Trademark Infringement, Deceit, Breach of Contract, Defamation, Inflicting Severe Emotional Distress – Outrageous Conduct, Reckless Endangerment/Recklessness) due to its staff having stolen from then initiated a conspiracy against Plaintiff, facilitating the infringement for the studios who used the Plaintiff's materials in violation of copyright laws, then engaged in the same conspiracy to prevent being held liable for copyright infringement.

92.   Complaints for copyright infringement were filed against the three studios who infringed Plaintiff's works, Twentieth Century Fox for "Prometheus" Sony Pictures for "MIB3", Warner Bros. for "Jupiter Ascending" and "The Dark Knight Rises".  After the erroneous and outright illegal dismissal of all four cases with blatant disregard for federal tort laws, copyright law, and Plaintiff's constitutional rights by this Court - Judge Dolly M. Gee having ignored the theft of documents and exhibits by Court employees during litigation and proceeded to dismiss two of the cases: *Basile v. The Los Angeles Film School* and *Basile v. Warner Bros.,* - Plaintiff appealed the four cases to the Ninth Circuit Court of Appeals noting the corruption and obstruction encountered in the Central District Court by its employees, the disregard for law and acts of racketeering by JAMS arbitrator - Judge Diane Wayne(ret) - during the Los Angeles Film School arbitration, and how the arbitrator's threat on 2-13-15 – "Mr. Basile, off with your head!", was also related to the **2-24-15** attack on the Metrolink train that Plaintiffs father had travelled on every day for several years. Judge Wayne had threatened Plaintiff only two weeks before the attack, just before the threats received from

Sony and Los Angeles Film School's  counsels. The threat disguised as an "Offer to Compromise" sent to Plaintiff by Ford Harrison with reference to the car accident Plaintiff had in 1999 and Plaintiff's father's business address, was immediately reported to Judge Wayne after its receipt on 2-19-15, but Judge Wayne did not respond.

(*See* Complaint, Exhibits - Volume IV. - Exh. 3 - pp. 72-85)
(*See* Complaint, Non-Paper Exhibits - Volume IV. - Disk 1 [Complaint, Exh. 29]
(*See also* Exhibit 5a. appended hereto)

**93.   Several facts relating to the deposition of Peter J. Abrahams occurred 10-30-14 through 2-21-15.**

On 10-30-14, in  telephonic JAMS hearing, Judge Wayne told Plaintiff to serve Peter J. Abraham's with subpoena for his deposition even asking if Plaintiff had Peter J. Abrahams' address. (*See* Complaint, Non-Paper Exhibits - Volume I.- Disk 1 - Folder 3[Decl., Ex 8a.]) - recorded JAMS hearing 10-30-14 - Judge Wayne's order from the hearing states;

2.  "The Deposition of Peter J Abraham's is to go forward on a mutually agreeable date."
(A true and correct copy of this order is appended hereto as Exhibit. 6a.)

On 11-8-14, when served with subpoena, Peter J. Abraham's ripped up the subpoena and said that 'he had been getting a lot of these and that he wasn't going to the deposition and also that there wasn't anything that they could do about it.'
(*See* Complaint, Exhibits - Volume I. - Exh. 10 - Deposition of Sarah Thompson)

On 11-21-14, Plaintiff refiled a Motion to Compel Compliance with Subpoena that was filed 10 days earlier, making the requested adjustments. (*See* Complaint, Exhibits - Volume I. - Exh. 10)

On 11-28-14, Plaintiff notified The Los Angeles Film School's Counsel of the filing. (A true and correct copy of the email is appended hereto as Exhibit 6b.)

On 1-6-15, one week before hearing in Plaintiffs Motion To Compel Compliance with Subpoena, Plaintiff received an email from Los Angeles Film Schools Counsel asking that Plaintiff withdraw its Motion to Compel Compliance with Subpoena. (A true and correct copy if this email is appended hereto as Exhibit 6c.)

On 1-7-15, Plaintiff responded to Counsel's email saying that he would not withdraw the Motion to Compel Compliance with Subpoena. (A true and correct copy if this email is appended hereto as Exhibit 6d.)

On 1-7-15, Plaintiff sent an email to JAMS Arbitration noting the contradiction of what Judge Wayne had said in hearing on 10-30-14, Granting the subpoena, and now withdrawing the subpoena after Plaintiff had filed the Motion to Compel Compliance with Subpoena after Peter J Abraham ripped up the subpoena when served. (A true and correct copy if this email is appended hereto as Exhibit 6e.)

On 1-13-15, the day before hearing in the motion, Plaintiff contacted JAMS Arbitration again requesting clarification. (A true and correct copy of this email is appended hereto as Exhibit 6f.)

COMPLAINT

On 1-15-15, the day after Judge Wilmer had denied the Plaintiff's motion, Anne Lieu at JAMS responded saying that the subpoena for Peter J Abraham's was denied, even though it had been granted 10-30-14, served, and ripped up. (A true and correct copy if this email is appended hereto as Exhibit 6g.)

On 1-19-15, Plaintiff again sought clarification of Judge Wayne's order deeming interrogatories answered, that had not been answered. Plaintiff also noted that Defendants had provided Plaintiff the in further responses to interrogatories, the assignment "The World of Jupiter" that had been removed from Plaintiff's student email, and denied to ever have been received by Los Angeles Film School twice.(A true and correct copy if this email is appended hereto as Exhibit 6h.)

On 2-21-15, Plaintiff notified Judge Wayne of the threat he had received from Los Angeles Film School's Counsel a few days earlier that made references to a car accident Plaintiff had in 1999(00) while driving a Jeep Grand Cherokee. Judge Wayne did not respond to this email, the Metrolink attack occurred three days later. (A true and correct copy if this email is appended hereto as Exhibit 6i.)

Plaintiff realized later that on 2-13-15, Judge Wayne had also threatened Plaintiff by shouting "Mr. Basile off with your head!" (*See* Complaint, Non-Paper Exhibits - Volume I. - Disk 1 - Folder 6 - [Decl., Exh. 21] - JAMS recorded hearing - 2-13-15)

94.    The Central District Court's dismissals were all illegally affirmed by the Ninth Circuit Court of Appeals on the same day, 2-27-17, after a long briefing process, even though the four cases were at different stages of litigation indicating an executive order was entered to do so, regardless, the affirmation of the JAMS

Arbitration dismissal and U.S. District Court's dismissals of claims which during litigation encountered violations of "RICO" laws, related to obstruction of justice §1503(a), brings additional violations of those same "RICO" laws relating to § 2339A by the Ninth Circuit Court of Appeals for providing material support by means of providing "service" to Defendants by removing evidence filed , **(Requested Replications of Exhibits # 6-MIB3 on DVD)** creating bias that could have contributed to erroneous dismissal of the copyright claims against Sony Pictures and preventing the filing of and striking the Oversized Brief with details surrounding the activities of DEFENDANT, Oxnard Police Department relating to threats and a possible frame up that was occurring but prevented by Plaintiff having reported the facts to the Pentagon.

95. Due to an emergency situation that occurred during litigation of these four copyright cases, <u>on **11-4-16** Plaintiff filed an Emergency Motion Under Circuit Rule 27-3, a Motion for Leave to File a Brief in Support of Plaintiff's Reply Brief in *Basile v. Sony Pictures*.</u> After its filing it was requested by the Ninth Circuit Court of Appeals to be filed as a Corrected Reply Brief. Before the filing of the Corrected Reply Brief, <u>on **11-19-16**, the FBI visited Plaintiff's family's home,</u> knocked at the door requesting entry to speak about Plaintiff's kidnapping **10-31-15**, over a year earlier, which is also when the Warner Bros. non-paper exhibits that were denied to have been received by the Court were also stolen from Plaintiff's  briefcase. The kidnapping was reported to the authorities in Las Vegas and to The Nevada District Courts' magistrate Cam Ferenbach during 26f scheduling in an emergency statement on **11-10-15**, (*See* Complaint, Exhibits - Volume V. - Exh. 8) but was ignored and no action taken.

96.    After several communications with LVMPD, the LVMPD refused to retrieve the camera footage of the kidnapping from the RIO All-Suite Hotel and Casino knowing the retention of the security cameras was only 7 days, obstructing justice and providing "material support" to those who had just kidnapped Plaintiff, ( RIO Hotel Security). This kidnapping was  related to the filing of documents outlining all violations Federal Statutes and  "RICO" laws encountered during litigation of previous related claims , specifically *Basile v. The Los Angeles Film School and Basile v. Sony Pictures Entertainment,*  by other DEFENDANTS.

(*See* Complaint, Exhibits -Volume V. - Exh. 14)

(*See* Complaint, Exhibits - Volume V. - Exh. 29 [Exh. 7 - p. 73])

(A true and correct copy of a recorded telephone communication with LVMPD and Detective Burns of  LVMPD who refused to retrieve the camera footage or investigate the kidnapping has been manually filed on DVD as Exhibit 7)

97.    The visit from the F.B.I. establishes that the F.B.I. engaged in a "racketeering" conspiracy with Nancy Pelosi in violation of "RICO" laws relating to 18 U.S.C. § 1512 - intimidation of a victim and 1503(a) - obstruction of justice. Plaintiff had just returned from Las Vegas a few days before the F.B.I. visited his family's home on **11-19-16** and conveyed threats as part of conspiracy after an attack. Plaintiff had only a few days earlier received a call from a man who identified himself as Joe from the FBI. FBI agent Joe said that he wanted Plaintiff to come to the FBI office in Westwood and talk about the kidnapping. Because the kidnapping was a year earlier, **10-31-15,** and had been reported and ignored - nobody ever having contacted Plaintiff other than an LVMPD detective who followed months later up and never called again - Plaintiff suspected something

was wrong as he had been in litigation with Southwest Airlines throughout that year after their personnel had attempted to have Plaintiff illegally arrested by false statements when <u>returning from opening the investigation into the train attack on</u> **3-19-15,** <u>when filing in its Reply Brief for Sony Pictures, the threatening emails received from The Los Angeles Film School's and Sony Picture's counsel, in the few days before the train attack.</u> (**_See also_ Volume I. - Exh. 13 [Exhs. 24-28]**

98.   Plaintiff referred the man who only identified himself as Joe, to all documents that had been filed reporting the kidnapping to the Nevada District Court and told Joe that if he had any further questions to call after being briefed.

(_See_ Complaint, Exhibits - Volume V. - Exh. 29 [Exh. 7 - p.73])  - Kidnapping report filed with Nevada District Court)

99.   It was then only a few days later on 11-19-16, that Agent Conrad Byrd and another unknown agent appeared at Plaintiff's family's door. Plaintiff suspected some type of corruption as the kidnapping had been ignored, and the information just filed in the Ninth Circuit Court of Appeals in the Brief in Support of Plaintiff's Reply Brief that noted conversations found in emails between Sony Pictures executive Amy Pascal and Nancy Pelosi about campaign contributions in exchange for something, that something later discovered through analysis of the Leaked Sony Emails to have been the Metrolink attack.

100.   When viewed with the dates of attacks and other Sony emails with references made by Sony employees to Plaintiff and his family while Sony Security was doing surveillance on them, it becomes clear that <u>these were the emails of their discussions while coordinating attacks.</u>

These emails evidence that the train attack in Oxnard on 2-24-15 - threatened in emails the days before by Los Angeles Film School's counsel and Sony Pictures' counsel - was in exchange for campaign contributions.

101.    Sony Pictures coordinated with Nancy Pelosi who indicated in her email  that she had contracted out to ISIS to carry out the Metrolink attack; this being an effort to discourage Plaintiff from pursuing legal remedy for copyright infringement against Sony Pictures by attacking him by attacking his family, and because other Defendants made efforts online and in infringing footage to send "threatening communications" related to attacks, Nancy Pelosi and ALL DEFENDANTS attempted to aid Defendants to the copyright claims associated with the Plaintiff's copyrighted works, in evading liability for copyright infringement which now involves "RICO" violations including criminal infringement of a copyright – damages amounting to billions, by threatening Plaintiff and his family with violent acts of terror.

102.    On 11-19-15, when Agent Byrd first said that he wanted to speak about the kidnapping, Plaintiff told him that everything had already been filed and was detailed on record. Agent Byrd then suspiciously changed his reason for visiting and said that he had information of Plaintiff threatening Nancy Pelosi. Plaintiff briefly stated that there were documents filed with analysis of emails between Nancy Pelosi and Amy Pascal related to the copyright infringement cases in The Ninth Circuit Court of Appeals and that was the only time Plaintiff had ever written about or mentioned Nancy Pelosi.

Now knowing this visit was a threat, Plaintiff asked if Agent Byrd had a warrant, he said that he did not but threatened Plaintiff to not report anything further about Nancy Pelosi to the Ninth Circuit Court, who had just requested the

47

COMPLAINT

information in the Reply Brief to be resubmitted as a Corrected Reply Brief.  The
unknown agent with Agent Byrd then walked towards the door, staring at Plaintiff
through the glass while putting his hand on his gun in his shoulder holster and
smiling menacingly, while <u>Agent Byrd threatened Plaintiff again not to further
brief the Ninth Circuit judges</u>. Plaintiff told the agents good bye and proceeded to
contact his attorney to date the visit in case there was something that was
happening <u>that was not by the order of the F.B.I. but by Nancy Pelosi or another
party.</u>

103.   When Agent Byrd and the other unknown agent first knocked on the
door, Plaintiff feared for his life as when he just reported the threatening emails
received from Sony Pictures and Los Angeles Film School, on 3-19-15 in its Reply
Brief in the Ninth Circuit Court of Appeals for *Basile v. Sony Pictures*, Southwest
Airlines employees had first unsuccessfully attempted to frame Plaintiff for what
seems to have been "terror relating to a suspicious bag" that didn't exist, then
contrived a scene and reported falsely from the plane to LVMPD who attempted to
arrest Plaintiff when deplaning in Las Vegas. When confronted getting off the
plane Plaintiff told LVMPD that what had just been reported earlier that day and
that he suspected conspiracy. Plaintiff then provided the LVMPD his counsel's
phone number to call if they had any further issue, then calmly walked out of the
airport with no incident fearing a false arrest or kidnapping. Plaintiff then
contacted counsel to advise about contacting the authorities.

104.   During the F.B.I. visit on 11-19-15, when Plaintiff asked Agent Byrd
for ID, he provided Plaintiff a number to call and verify them as agents. The person
who answered the phone number provided by Agent Byrd said that he was an

Agent of the FBI but did not know his reason for his visit. Plaintiff then appropriately told Agent Byrd that without a warrant he would not open the door.

105.   As the agents left that evening, Plaintiff's mother who was on the balcony upstairs was yelled at by Agent Byrd who shouted, "Is your son taking any medication?", after having just threatened to contrive evidence against Plaintiff by holding up a stack of papers when referring to the threats he lied about having had evidence of Plaintiff having made to Nancy Pelosi; an indication that the FBI was threatening to later coerce Plaintiff's mother by saying that they would  submit additionally false statements about her son, creating a false depiction of his being mentally ill possibly as part of a hoax to falsely obtain an arrest in violation of 18 U.S.C. § 1038.

106.   The ADT footage at Plaintiff family's home recording of the front door was prevented by the camera having been shut off before the F.B.I. arrived.

## EVENTS RELATED TO THE METROLINK ATTACK

107.   **On 2-13-15**, a telephonic hearing took place for the JAMS Arbitration of *Basile v. The Los Angeles Film School*, between Judge Wayne , Plaintiff, and Elizabeth Levy of Ford Harrison. The hearing was oral argument on a motion for continuance by the Los Angeles Film School to retain new counsel as Ms. Levy was leaving Ford Harrison.

( Ms. Levy appeared to have been fired because she had lied to Judge Wilner in her opposing motion and then in hearing for Plaintiff's  Motion to Compel Compliance with subpoena for Peter J. Abrahams. Plaintiff presented Judge

Wilner in hearing on **1-14-15**, a document proving that service of Mr. Abrahams' subpoena was proper, contrary to Ms. Levy's contention that it was to have been served to Mr. Abrahams' attorney, and therefore Plaintiff's motion to compel compliance should be denied.)

108.   When Plaintiff stated during this hearing that the reason Ms. Levy was leaving is because she had committed fraud upon the court, Judge Wayne shouted, "Mr. Basile off with your head!"  - angry that Plaintiff had sought from the US District Court an order to compel the teacher who had sold Plaintiff's material to appear for deposition.

( It was this teacher, Peter J. Abrahams, who sold Plaintiff's material as his own, Peter J. Abrahams, who caused the staff of the school to begin a conspiracy against Plaintiff - which included removing one of the original assignments from Plaintiff's student email to prevent Plaintiff him from using it when filing its copyright claim - who forced Plaintiff to leave school in fear of being setup before filing its complaint. A few weeks after Plaintiff requested that the missing assignment be returned, Robert Sweeney falsely accused Plaintiff of theft of a computer from the classroom of a teacher to force his leaving the school. Additionally, when falsely accusing Plaintiff, Robert Sweeney subtly conveyed a threat of an "accident" that did later occur, only a week after the first draft of the LAFILM Complaint was completed on Plaintiff's computer that was being discovered to have been being monitored by Twentieth Century Fox security since their threat by LinkedIn view sent to Plaintiff, 3 months after Plaintiff had a settlement discussion with Jenna Langer - V.P. of Operations at The Los Angeles Film School - who admitted to the theft sale and conspiracy by Los Angele Film

School staff. It was then noticed that Twentieth Century Fox security began cyber- stalking Plaintiff. )

109.   There could have also been a reference at the beginning of the 2-13-15 hearing to Nassau, by Elizabeth Levy to Judge Wayne, when asked where she was going? , Ms. Levy replied "…probably Shaw?" (*See* Volume I. - Disk 1 - Folder 6 [Decl., Exh. 21])

( When Judge Wayne was first handed the Motion to Compel Compliance with Subpoena in a related JAMS hearing on **12-9-14** that was not recorded, after the Motion to Compel Compliance with Subpoena had been filed a few weeks earlier - hearing scheduled with Judge Wilner in this court - Judge Wayne had gotten upset that Plaintiff had asked for help from the District Court for the subpoena for Mr. Abrahams asking "where did he get the motion from?" and "how did he know how to compel the deposition?". Coincidentally or maybe not, the night before the hearing, **on 12-8-14**, the DaVinci Apartments near JAMS Arbitration in Downtown, was totally burned to the ground by fire.

(A true and correct copy of an article reporting the fire is appended hereto as Exhibit 8)

110.   Justice Scalia of the Supreme Court died on **2-13-16,** exactly one year later. The editor of the film "Prometheus" which infringed virtually every protectable element of Plaintiff's works, even after cutting a substantial amount of footage to the extent that the film had unexplained story elements, was edited by a man named Pietro Scalia. This seems to be a message to everyone involved in the

"Prometheus" production to not speak about the cut footage that was infringing Plaintiff's stolen works.

( A true and correct copy of the production crew names and the article reporting Pietro Scalia's death are appended hereto as Exhibit 9)

111.    **On 2-19-15**, not long after Judge Wayne at JAMS had released the order on Los Angeles Film School's Motion to Dismiss, not dismissing the claim for defamation ( per se defamation which was an accusation of theft as part of a proven and  admitted conspiracy by LAFILM staff)  but dismissing all other causes of action including the copyright claim, which was proven as a matter of law, Plaintiff received a threat disguised as an "Offer to Compromise" from The Los Angeles Film School's counsel .The accumulated damages in *Basile v. The Los Angeles Film School* had risen up to 1.6 billion dollars, the  "Offer to Compromise" was for $1000.01. Plaintiff immediately recognized this as a threat: the 1000 was reference to a car accident ending Plaintiff's acting career in 1999 while driving a Jeep **Grand** Cherokee on Sunset Blvd., and the .01 a reference to Plaintiff's father's business address at **7701** Densmore. Plaintiff emailed Judge Wayne at JAMS; neither she or her assistant answered Plaintiff's email. (*See* Complaint, Exhibits - Volume VI. - Exh. 2 [Decl., Exh.2] - Traffic Report of attack on 1-30-99(00) while Plaintiff was driving a Jeep Grand Cherokee,  falsely reported by police as a car accident)

(A true and correct copy of two printouts from online websites showing Plaintiff's father's business address has been 7701 Densmore Ave for 62 years, are appended hereto as Exhibit 5a.)

112.   **On 2-23-15**, Plaintiff sent a "Rejection to the Offer to Compromise" to Ford Harrison - noting "Proof of Value" of the copyright cases and the damages Plaintiff was entitled to. Later in the evening on **2-23-15**, Plaintiff received an email from Daniel Kohler of Mitchell, Silberberg & Knupp - counsel for Sony Pictures in *Basile v. Sony Pictures* - <u>after not having had any contact with Plaintiff for several months</u> <u>during litigation -</u> the email making references to details of the attack that occurred the very next day. <u>The email seems to be an admission of responsibility as it makes references to details of the train attack that occurred the very next morning placing emphasis on the number 4. The man who had intentionally derailed the train had 4 names, and he did so with a Ford F450 Truck.</u>

113.   The train attacked **on 2-24-15**, was the Metrolink train that Plaintiff's father had taken every day for several years. The surveillance of Plaintiff's father by Sony Security was discovery when analyzing the Leaked Sony Emails. (*See* Complaint, Exhibits - Volume III. - Exh. 16 - p. 123 - Plaintiff's father's name is Guy and his license plate also has the name Guy on it)

The man with 4 names that was referenced by Daniel Kohler in his email, parked his Ford F450 truck on the train tracks, engaged the emergency brake, and left the truck there to derail the train.

( The intersection where the train was attacked was Fifth and Rice;
(*See* Complaint, Non-Paper Exhibits - Volume IV. - Disk 1 - Folder 1
[Complaint, Exh. 30]
The B.H. attack carried out by Beverly Hills Police - which was reported to Judge Wilner on 11-21-14, when Plaintiff requested that the court compel the compliance of Mr. Abrahams with subpoena - took place in front of Saks Fifth Avenue in Beverly Hills, near Plaintiff's sister's work.

(*See* Complaint, Non-Paper Exhibits - Volume IV. - Disk 1 - Folder 1
[Complaint, Exh. 25]
(*See* Complaint, Exhibits - Volume IV. - Exh. 3 - p. 61 [Exh. 26]
(*See* Complaint, Exhibits - Volume III. - Exh. 16 - p. 47)

(*See* Complaint, Exhibits - Volume I. - Exh. 10 - Motion to Compel Compliance
with Subpoena)

114.   Even though the NTSB reported their finding after investigating the
Metrolink attack, that the emergency brake was applied when the Ford - F450
truck was parked and left on the tracks, the Oxnard Police investigating - Chief
Jason Benitez who was interviewed, and his Officers - released the man - Jose
Alejandro Sanchez Ramirez.

115.   Indicating very strongly that the case was dropped and the man
released was in collaboration with the parties to the copyright claims who plotted
the attack and who were corrupting others into covering it up, ***the following things
are true:***

(1) When the emails Plaintiff had received on 2-19-15 and 2-23-15, from
Daniel Kohler of Mitchell, Silberberg & Knupp (Sony Pictures Entertainment), and
Lynne Richardson of Ford Harrison (The Los Angeles Film School) were filed
with additional information in a 2049 page Declaration in Support of Plaintiff's
Motion To Vacate Arbitration of the JAMS Arbitration of *Basile v. The Los
Angeles Film School* in this court, it was concealed and said to have been lost after
having been filed.

After filing and noticing that it was scanned onto Pacer as received, Plaintiff called the clerk for two weeks and was told repeatedly to be patient that it would be posted. Plaintiff knew something was wrong and went to the clerk's window. Plaintiff's telephone number was taken by the clerk and Plaintiff was told by the clerk to wait for his call later in the day after researching the problem. Plaintiff received a call at the end of the day from Kane Tien, who told Plaintiff that he looked for the declaration all day and found it, and that he didn't know what had happened. He said he would properly forward the declaration and the post it to Pacer. It was posted **6-30-15,** after the Defendants Responses were posted. (*See* Complaint, Exhibits - Volume I. - Exh. 1 - *See* Docket # 96, entered 6-30-15.

(A true and correct copy of printouts from Wikipedia and IMDB with details on the Blade Runner 2049 production are appended hereto as Exhibit10)

Knowing that the declaration was concealed from Judge Gee, Plaintiff went downtown a few days before **7-20-15** to re-file the declaration, a smaller revised version. The day Plaintiff left, Plaintiff family's home was broken into immediately and his phone notified, while he was traveling on the train downtown. It appears that whoever did it did so knowing Plaintiff had just left, and that Plaintiff's mother who works in the area would come to meet the alarm company after their responding.

When the police arrived over 30 minutes later and Plaintiff's mother went to the house, the police searched the house but one Officer did and said something extremely threatening and reference to Kane Tien:

The Officer searched Plaintiff's room, then told Plaintiff's mother to tell her son that he better keep his room cleaner, which meant mouth shut. He said he has **teen**agers. Plaintiff's room was clean and bed made. It was a message and threat

that Plaintiff was to understand referencing Kane Tien, who had called Plaintiff several hours after he had visited the clerk around 6-30-15, and told them the declaration had not been posted and that it had been filed 6-10-15. When Plaintiff left to refile the declaration several days before 7-20-15, the Oxnard police were apparently following Plaintiff and staged the break in to respond. It was becoming clear at that time that Plaintiff was being targeted in Oxnard.

*(See* Complaint, Exhibits - Volume IV. - Exh. 17 – This Oversized Brief was filed then denied and stricken by the Ninth Circuit Court of Appeals)

(2)  It was on **1-21-15** that Ridley Scott came to Oxnard to film "Concussion" - a collaboration between Sony Pictures and Scott Free Films. Covering the shoot was TMZ, owned by Warner Bros., who posted photos of a buffet arranged as a mock train with the article noting they didn't know who paid for the lunch, but TMZ was referencing the attack that occurred a few weeks later as they had arranged the buffet to look like a train, taken pictures of it and included a photo of someone eating pink cotton candy, reference to the Metrolink train. (*See* Complaint, Exhibits - Volume III. - Exh. 16. - pp. 48-49)

(3) Ridley Scott released Blade Runner 2049, as reference to the stolen declaration after it was concealed and possibly reference to the Oxnard Police having threatened Plaintiff through his mother and saying they know Kane Tien, when Plaintiff went to refile the 2049 declaration around 7-10-15, among other things noting the Oxnard Police Department's failure to properly investigate, showing no regard for the information the NTSB had reported.

(4) The next time additional analysis of the conversations in Leaked Sony Emails between Sony executives was filed, and the email from Daniel Kohler was

manually filed as E.S.I. (digital image of the email) on a DVD with all non-paper exhibits manually filed with Plaintiff's Complaint in *Basile v. Warner Bros.*, Judge Gee dismissed the copyright claim and noted in her order that the Court never received the manually filed exhibits, which included the 2nd Draft of Plaintiff's Crisis on Jupiter" with addition of "the ore to power the machine" and E.S.I. of Plaintiff's submitted assignments. Judge Gee's order stated:

> "Because the court does not appear to have received the exhibits lodged by Basile purportedly containing the copyrighted works the court takes judicial notice sua sponte of Exhibit 1a. – 1n. and 2 to the Complaint in *Basile v. The Los Angeles Film School, LLC* No. CV14 00412 DMG(MRWx), which are copies of the same works at issue in this case. ("Basile Works Exhibits")

(*See* Complaint, Exhibits - Volume IV. - Exh. 10 [Motion for Entry of an Order to Preserve Evidence, Exh1- *Basile v. Warner Bros.* Order]

(5) These non-paper exhibits were outright stolen by an unknown court employee after having been received by this Court's clerk, Andres Pedro and posted to Pacer as received. Plaintiff's stamped copy of these exhibits were stolen from his briefcase when kidnapped in Las Vegas on 10-31-15. To be noted, the appeal for *Basile v. The Los Angeles Film School* was filed 10-19-15.

(*See* Complaint, Exhibits - Volume I. - Exh. 21- Plaintiff 's Opening Brief – *Basile v. The Los Angeles Film School , LLC* )

Every time the email from Daniel Kohler was filed in this Court as paper exhibit or E.S.I., it was concealed from the judge.

116.   Judge Diane Wayne stated in trial on 4-27-15 to Lynne Richardson, counsel for Los Angeles Film School, that her husband was Homeland Security and that she was not worried. They seem to have been discussing before Plaintiff arrived her having threatened Plaintiff **2-13-15,** and the train attack having occurred a week later. Plaintiff had reported to Judge Diane Wayne on **2-19-15**, the threat he had received from Lynne Richardson of Ford Harrison in the "Offer to Compromise", it went unanswered. On **2-23-15**, Plaintiff sent Ford Harrison a Rejection to the "Offer to Compromise", later that evening the email was received from Daniel Kohler of Mitchell, Silberberg, & Knupp with references and admission of responsibility to the train attack that occurred the very next day. Discovered later was a TMZ article released on 1-21-15, with photographs of a buffet arranged as a train, with text of the article noting that they didn't know if Will Smith or Sony Pictures had paid for it, using reference to the lunch as the train attack. TMZ  is owned by Warner Bros. (*See* Complaint, Exhibits - Volume III. - Exh. 16 - p. 59)

117.   The fact that the Beverly Hills attack on 11-5-13 had occurred after a threat was received from Mr. Sweeney, was brought to the attention of Magistrate Judge Wilner in hearing on **1-14-15** for Plaintiff's Motion to Compel Compliance with Subpoena . The filing included the <u>video footage of the B.H. attack which was clearly a staged accident.</u>

118.   Plaintiff requested the subpoena for testimony and documents of Peter J. Abrahams, the teacher who had sold Plaintiff's assignments as his own. The Motion to Compel Compliance with the subpoena was erroneously denied by Judge Wilner on **1-14-15**, even though Plaintiff and his family were clearly in danger of attack. The Metrolink attack occurred <u>six weeks later.</u> The first studio

58

threats came from Twentieth Century Fox security shortly after Jenna Langer at
The Los Angeles Film School admitted to the conspiracy put in motion after
Plaintiff's submitted materials had been sold by the staff. Plaintiff's computer
began being monitored at this time also.

(*See* Complaint, Volume I. - Exh. 13 [Second Amended Complaint, Exh. 3 - pp.
196-197])

119.   On 3-19-15, another attempt to frame Plaintiff occurred but with much
more serious surrounding circumstances deeming it necessary for Plaintiff to file a
complaint against Southwest Airlines, Co. for damages and to begin investigation
into what was "an attempted frame up for terror" by Southwest Airlines Personnel.

120.   On **3-19-15**, Plaintiff filed a Reply Brief in *Basile v. Sony Pictures in
the Ninth Circuit Court of Appeals.* In the Reply Brief, Plaintiff included the two
threats from Los Angeles Film School's and Sony Pictures' counselors noting the
attack that occurred just afterwards, asking for investigation.

121.   On the Plaintiff's trip home on the day of filing the Reply Brief,
**3-19-15**, Southwest Airlines personnel first attempted to have Plaintiff falsely
arrested in SFO for something having to do with a "suspicious bag", then on the
plane to Burbank through Las Vegas, a flight attendant contrived an argument then
secretly reported a scene from the plane to ground crew in Las Vegas to relay to
LVMPD, that did not occur, with provocative language to elicit Plaintiff being
violently arrested in Las Vegas by LVMPD. The Southwest employees made false
follow up statements to the initial false statements during the thwarted setup,
making references to the "MIB3" film as threats that they had corrupted the

Southwest employees to have Plaintiff falsely arrested or worse, and prevent
investigation into the suspects just reported.

122.   Through investigation and depositions received in *Basile v. Southwest
Airlines, Co.* on April 18th and 19th in Las Vegas Nevada, this was proven to have
been a deliberate frame up and the references were discovered to have been just
that - threats by reference to the MIB3 production, as the false statements that the
references were attached to were admitted by the initiating flight attendant to have
never occurred. The supporting false statements by the other employees were all
conflicting and proven false. (*See* Complaint, Exhibits - Volume V. - Exhs. 42-47)

123.   The incident on **3-19-15** with Southwest personnel was therefore
proven to be an intentional frame up by means of defamation and conspiracy in
SFO and Las Vegas McCarran Airport, to prevent Plaintiff from further
investigating and discovering the admissions by the suspects available in online
media. This case was recently dismissed illegally on grounds that a Rule 35
Neuropsychological Exam didn't take place. The exam did take place and the
recording of the two hour oral interview and the two hour audio recorded while
several written tests were taken was filed reporting the noncompliance by
Southwest Airlines' counsel by altering the PTSD that the court had ordered
Plaintiff to prepare for the doctor conducting the exam to review before testing.
When the doctor, Dr. Robert Leark was confronted about the PTSD report and his
receipt, he lied about receipt, evaded questions and threatened to falsely report
Plaintiff as noncompliant. Plaintiff properly sought guidance of the court on this
issue; the Court recently erroneously and dismissed the case based on the
manipulation of truth, in furtherance of a proven conspiracy by Defendants,
Southwest Airlines. This case is being appealed to the Ninth Circuit of Appeals.

124.   Discovered later after further investigation and collection of evidence, it was found that the Spanish version of the infringing television series "Timeless" - adapted by Sony Pictures Television from Plaintiff's copyrighted works already used by Sony Pictures and Amblin Entertainment in "MIB3" - was released in Madrid Spain, as "El Ministario Del Tiempo"  by Onza Partners SL - Onza Entertainment , on  **2-24-15,** the same day of the train attack in Oxnard, Ca. proving the train attack to have been an internationally coordinated attack by all parties at Sony Pictures and Sony Pictures Television, Onza Partners ' Onza Entertainment, and the parties infringing Plaintiff's materials in "Prometheus", "Jupiter Ascending" and "The Dark Knight Rises", some of whom also bragged in online media and infringing footage of having also been responsible for the train attack**. (*See* Complaint, Exhibits - Volume III. - Exh. 16 - p. 47, pp. 73-79)**

125.   There are several additional layers to this conspiracy all reported in briefs to the Ninth Circuit Court of Appeal as they were occurring to make record of.

(*See* Complaint, Exhibits - Volume III.- Exh. 12)

(*See* Complaint, Exhibits - Volume IV. - Exh. 17)

126.   During litigation of the four copyright infringement cases: *Basile v. The Los Angeles Film School*;  *Basile v. Twentieth Century Fox Film Corporation*; *Basile v. Sony Pictures Entertainment*;  *Basile v. Warner Bros. Entertainment;* obstructions occurred by both private parties and government employees including employees of the U.S. District Court Central District and Federal Bureau of Investigation, engaged in "racketeering" activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961, and in violation Plaintiff's civil rights under the United States Constitution, Amendments I., IV.,V., and XIV. All acts were in

furtherance of the conspiracy to aid the Defendants to the copyright claims in evading liability for copyright infringement in violation of 18 U.S.C. § 1962(a), § 1962(b), § 1962(c), and § 1962(d); after their having infringed Plaintiff's copyrighted works in violation of 17 U.S.C. §106(a), § 501(a), § 501(b) § 104(a), and § 102(a); and 17 U.S.C. § 506 in violation of "racketeering" laws as defined in § 1961 - 18 U.S.C. § 2319 - relating to <u>criminal infringement of a copyright.</u>

127. These and other violations actionable under 42 U.S.C. 1983, 1985(3), 1986, and 1988 with several additional resulting torts: intentional infliction of emotional distress - outrageous conduct, recklessness and civil conspiracy.

128. All violations of Plaintiff's civil rights by Defendants to the four copyright claims, the Los Angeles Film School, LLC; Twentieth Century Fox Film Corporation, *et al*; Sony Pictures Entertainment, *et al*; Warner Bros. Entertainment, *et al*; ( hereinafter - "Defendants to the copyright claims" ) claimed in this Complaint under 42 U.S.C. 1983, 1985(3) 1986, and 1988, were willful and malicious acts knowingly in violation of the copyright laws, other Defendants activities relating to the conspiracy intended to aid in the furtherance of conspiracy to evade liability for copyright infringement.

129. All violations of 42 U.S.C. 1983, 1985(3), 1986 and 1988, Article III. Section 1 of the United States Constitution by government entities; The U.S. District Court Central District Western Division; The Ninth Circuit Court of Appeals; Oxnard Police Dept.; Beverly Hills Police Dept.; The LA Superior Court Van Nuys; were intended to aid in the furtherance of the conspiracy initiated by Defendants to the copyright claims who enrolled other parties into participation of the conspiracy to evade liability for copyright infringement through various acts of

COMPLAINT

obstruction and racketeering: The U.S. District Court and Ninth Circuit Court of Appeals among other violations having violated: (1) US Constitution, Article III, Section1 – "The judicial power of the United States, shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish. The judges, both of the supreme and inferior courts, shall hold their offices during good behavior, and shall, at stated times, receive for their services, a compensation, which shall not be diminished during their continuance in office."; (2) FRCP Rule 1 governs the procedure in all civil actions and proceedings in the United States district courts. They should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.

130.   All violations of 42 U.S.C. 1983, 1985(3) and 1986, 1988 by Southwest Airlines Co., were to aid and abet the DEFENDANTS in evading liability for copyright infringement claims; Defendants – Sony Pictures Entertainment, Amblin Entertainment, and Daniel Kohler of Mitchell of Silberberg & Knupp, who had just been discovered to have had knowledge of or have been partly responsible for the Metrolink attack in Oxnard Ca., had just a few hours earlier been reported to the Ninth Circuit Court of Appeals on the day of the attempted set up by Southwest employees on 3-19-15; Sony Pictures Entertainment threatened Plaintiff through their counsel 2-23-15, after having willfully and maliciously violated copyright laws, engaged in violence and violations of "RICO" laws by plotting and conspiring with other Defendants, and as was admitted by Southwest personnel in deposition, enrolled Southwest personnel to try and prevent investigation by first trying to have Plaintiff framed for something having to do with a "suspicious bag" in SFO, and later have Plaintiff falsely arrested by making

false statements from the plane on the same day of filing of the Reply Brief in
*Basile v. Sony Pictures Entertainment*.

131.  Plaintiff submitted Petitions for Writ of Certiorari to be heard on three
of the four copyright claims to the United States Supreme Court having sent
Petitions for Writ of Certiorari and accompanying record. Prior to sending any
petitions, Plaintiff had explained to the Clerk of the court that there had been
spoliation of the record problems throughout the litigation process and was told to
submit 40 copies of all record referenced in the Petitions for Writ of Certiorari.
Plaintiff did so several times for each case and each time the petitions and record
were sent back with a letter only stating that each petition must comply with the
format rules, which the petitions did. Finally, after the third time of making small
revisions to the text in the petitions and resubmitting, the last time even proving the
photos in the emailed assignment were the same as the originals and were not
modified. Plaintiff received email notification from the shipping company that the
petitions were being sent back again. Plaintiff contacted the U.S. Supreme Court
Clerk Scott Traverse and asked what the problem was. Mr. Traverse told Plaintiff
that the record had to also be in 6.125 x 9.25 format, a nearly impossible task due
to the extensive record for each case. This also contradicting what Plaintiff had
been told at the beginning of the effort to have the cases heard in the U.S. Supreme
Court.

(A true and correct copy of the last letter sent to the U.S. Supreme Court with the
Petitions for Writ of Certiorari and accompanying record is appended hereto as
Exhibit 11)

COMPLAINT

(A true and correct copy of photos of a few of the Petitions for Writ of Certiorari that were stamped are appended hereto as Exhibit 12)

132.    Plaintiff discovered when preparing an Appendix for Petition for Writ of Certiorari, and checking the court's website, that an illegal conviction on Plaintiff's record procured through conspiracy that had just been expunged after investigation of the several cases that were all part of a conspiracy between 1999-2009 - related to the attempted assassination of Plaintiff on Sunset Blvd in 1999 - had been placed back on Plaintiff's record by the court sometime between when it was dismissed in September 2016 and May - July 2017, when Plaintiff was briefing the four copyright cases in the United States Supreme Court.

133.    This frame up resulted in 2 felonies being placed on Plaintiff's record and was the most serious of the several frame ups and illegally procured convictions that took place over the years. Not coincidentally, after the investigation into the conspiracy that is known to have taken place against Plaintiff 1999-2009, followed by dismissal of this case and all other cases with exception of one case at the beginning of the conspiracy that has some serious issues relating to Police corruption, the court's employees changed the dismissal documents of the two felony case already dismissed to reflect that the felonies were not dismissed, before Plaintiff had submitted its Petitions for Writ of Certiorari for three of the four copyright claims to The U.S. Supreme Court creating a negative background of Plaintiff that has been adjusted and conspiracy exposed.

134.    Plaintiff contacted Attorney Jeff Voll about what had just been found that the LA Superior Court had done. Mr. Voll had appeared on Plaintiff's behalf in September 2016 with a document Plaintiff had prepared summarizing the

findings of the investigation to share with the District Attorney, and obtained immediate dismissal.  Although Plaintiff had previously received a document by email from Mr. Voll noting dismissal of all charges in the case, Mr. Voll changed his story to say that the court had not dismissed the felonies and refused to give Plaintiff the original paper copy of the dismissal document. The original dismissal document stored as attachment in the email sent from Mr. Voll  that noted the dismissal of ALL CHARGES, had been changed by an unknown hacker.

135.   On 10-31-17, Judge Michael Kellogg of the LA Superior Court – Van Nuys stated to Plaintiff when presented with a verbal summary of what Plaintiff had discovered through investigation into the already dismissed illegal arrest and two felony conviction, that he remembered the case and that he had dismissed ALL CHARGES in the case in September 2016 when Attorney Jeff Voll had presented the court with the request for dismissal noting the Plaintiff's findings that the arrest and conviction was achieved by frame up then corruption of Plaintiff's counsel. He then only said that "they" changed the document referring to his employees. Judge Kellogg then ordered the employees in the courtroom to give Plaintiff a document that reflected that it had originally been dismissed in September 2016, and that it the record that was changed has now been corrected to reflect the original dismissal a year before.  Plaintiff has this original document and it reflects that this obstruction was brought to the attention of the Court and corrected after being addressed. (*See* **Complaint, Exhibits - Volume VI. - Exhs. 2 - 3** )

136.   This conviction and every conviction on Plaintiff's record were each proven to have been created through conspiracy and a part of a larger conspiracy that was put in motion immediately after Plaintiff survived an attempted assassination on Sunset Blvd in 1999, falsely on record as 2000. This operation

against Plaintiff was monitored by an unknown agency and carried out by several entities, its objective was to secretly place three felonies on Plaintiff's record without his knowledge, to prevent the investigation into the Sunset attack and prevent the parties responsible from being exposed by having the option of a final frame up if Plaintiff was to achieve the ability to expose the truth.

This conspiracy is now a matter of record but Plaintiff has not been given remedy by Judge Scott M Gordon even though the Writ of Error Coram Nobis that was previously prepared was included in Plaintiff's second petition to dismiss the case  pursuant to P.C. 1203.4.

(A true and correct copy of the record of submission of the Writ of Error Coram Nobis and the Petition for Dismissal with scheduled court date showing that the D.A. did receive the information before hearing, is appended hereto as Exhibit 13)

137.   To briefly summarize, the one remaining illegal felony conviction on Plaintiff's record is from a deliberate frame up by the LAPD Hollywood Division Detective Brower, who several months after Plaintiff had been carjacked, called Plaintiff to identify the carjacker through mugshots at Hollywood Station and when Plaintiff arrived, told Plaintiff to write a confession of carjacking himself. Plaintiff did not understand what Det. Brower was doing and left immediately to contact his Attorney at that time, Fred Browne. To elicit an illegal and fraudulent indictment from the District Attorney's office, Det. Brower then changed the original statements given when Plaintiff filed a police report of the carjacking, **(the man wearing gloves was changed to a man wearing a mask)** presented false statements by witnesses, and corrupted Plaintiff's Attorney at the time to conceal what was being presented as the prosecution's argument. Plaintiff was shot in the head on Sunset Blvd between hearings in this case on 1-30-99(00), at nearly the

same intersection on Sunset Blvd as where he was carjacked. Plaintiff appeared with wounds on 3-28-99(00) for sentencing and was lied to by Fred Browne. <u>The attack was covered up by the same LAPD Hollywood Division who had just framed Plaintiff by false witness statements and manufacturing evidence.</u>

138.   Plaintiff's Attorney Fred Browne, having then told Plaintiff to plea to a felony because he was worried that the LAPD would contrive further false statements or manufactured evidence, when Plaintiff approached Fred Browne and began investigating to remove the illegal convictions and to obtain the original documents that would have original genuine dates (Plaintiff's arrests have all been forward dated 1 year to place an admission by the man who ordered the attack as having taken place before) Fred Brown apologized for what seemed to be conspiring then mysteriously died a few days later.  His secretary - Maria Delgado - refuses now to provide Plaintiff with the original documents related to that case that would contain the original dates proving that the records in the court and online have all been changed as part of one extraordinary conspiracy.

Plaintiff complains for causes of action and alleges as follows:

## V.   FIRST CAUSE OF ACTION

**DAMAGES PURSUANT TO RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT [RICO] AS AGAINST ALLDEFENDANTS – VIOLATION OF 18 U.S.C. § 1961, 18 U.S.C. § 1962(a) 18 U.S.C. § 1962(b), § 1962(c), § 1962(d)**
**Against all Defendants and John/Jane Does 1-10**

COMPLAINT

Plaintiff hereby incorporates certain of the above paragraphs of this complaint as if fully set forth at length: To wit paragraphs **I –IV.**

139.    Plaintiff alleges damages pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, § 1962(a), § 1962(b), § 1962(c), and § 1962(d), concurrent jurisdiction is applicable for the claims herein.

140.    Defendants actions violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, § 1962(a), § 1962(b), § 1962(c), and § 1962(d).

141.    Section 1962(a) prohibits any person from investing in an enterprise any income derived from a pattern of racketeering activity.

142.    Section 1962(b) <u>prohibits any person from using a pattern of racketeering activity,</u> or the collection of an unlawful debt, <u>to acquire or maintain control over an enterprise.</u>

143.    Section 1962(c) <u>prohibits any person from conducting the affairs of an enterprise through a pattern of racketeering activity</u> or the collection of an unlawful debt.

144.    Section 1962(d) prohibits any person from conspiring to violate Sections 1962(a), (b), or (c).

145.    Congress defined "racketeering activity", an element common to all of "RICO's" prohibitions, to include a long list of state and federal predicate crimes.

When it was enacted RICO, Congress included a civil remedy provision (18 U.S.C. §1964) that allowed private parties to sue for injuries to their business or property caused by "reason of " a Defendant's violation of RICO. Under this provision, a private Plaintiff may sue in state or federal court to recover treble damages and attorney's fees caused by a RICO violation. A Plaintiff need not allege that a Defendant has been convicted of a predicate act to bring a civil claim.

146.   18 U.S.C. §1964(c) - <u>Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and **shall recover threefold** the damages he sustains and the cost of the suit, including a reasonable attorney's fee,</u> except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute to run on the date on which the conviction becomes final.

147.   Plaintiff alleges that DEFENDANTS engaged in racketeering activity as defined in 18 U.S.C. § 1961(1) and **§** 1962(a), § 1962(b), § 1962(c), § 1962(d), by violation of predicate crimes **18 U.S.C. § 1503** (relating to obstruction of justice); **§ 1512** (relating to tampering with a witness, victim, or an informant); **§ 1832** (relating to economic espionage);  **§ 1957** (relating to monetary transactions in property derived from specified unlawful activity); **§ 2332b** (acts of terrorism transcending national boundaries) **§ 1958** (relating to murder for hire – attack by car accident and attack by train derailment);  **§ 2319** (relating to <u>criminal infringement of copyright)</u>

70

COMPLAINT

**148. Violations of 18 U.S.C. § 2319 (relating to criminal infringement of copyright)**

**(a)** Any person who violates section 506(a) (relating to criminal offenses) of title 17 shall be punished in subsections (b), (c), and (d) and such penalties shall be in addition to any other provisions of title 17or any other law.

**(b)** Any person who commits an offense under section 506(a)(1)(A) of title 17 -

>  **(1)**shall be imprisoned not more than 5 years, or fined in the amount set forth in this title, or both, if the offense consists of the reproduction or distribution, including by electronic means, during any 180-day period, of at least 10 copies or phone records, of 1 or more copyrighted works, which have a total retail value of more than $2,500;

>  **(2)** shall be imprisoned not more than 10 years, or fined in the amount set forth in this title, or both, if the offense is a felony and is a second subsequent offense under subsection (a); and

>  **(3)**shall be imprisoned not more than 1 year, or fined in the amount set forth in this title, or both, in any other case.

**(c)** Any person who commits an offense under section 506(a)(1)(B) of title 17—

>  **(1)** shall be imprisoned not more than 3 years, or fined in the amount set forth in this title, or both, if the offense consists of the reproduction or distribution of 10 or more copies or phonorecords of 1 or more copyrighted works, which have a total retail value of $2,500 or more;

>  **(2)** shall be imprisoned not more than 6 years, or fined in the amount set forth in this title, or both, if the offense is a felony and is a second or subsequent offense under subsection (a); and

71

**(3)** shall be imprisoned not more than 1 year, or fined in the amount set forth in this title, or both, if the <u>offense</u> consists of the reproduction or distribution of 1 or more <u>copies</u> or <u>phonorecords</u> of 1 or more copyrighted works, which have a total retail value of more than $1,000.

**(d)** Any <u>person</u> who commits an <u>offense</u> under <u>section 506(a)(1)(C) of title 17</u>—

**(1)** shall be imprisoned not more than 3 years, fined under this title, or both;

**(2)** shall be imprisoned not more than 5 years, fined under this title, or both, if the <u>offense</u> was committed for purposes of commercial advantage or private <u>financial gain</u>;

**(3)** shall be imprisoned not more than 6 years, fined under this title, or both, if the <u>offense</u> is a felony and is a second or subsequent <u>offense</u> under subsection (a); and

**(4)** shall be imprisoned not more than 10 years, fined under this title, or both, if the <u>offense</u> is a felony and is a second or subsequent <u>offense</u> under paragraph (2).

**(e)**

**(1)** During preparation of the presentence report pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure, victims of the <u>offense</u> shall be permitted to submit, and the probation officer shall receive, a victim impact <u>statement</u> that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim, including the estimated economic impact of the offense on that victim.

**(2)** <u>Persons</u> permitted to submit victim impact <u>statements</u> shall include—

**(A)** producers and sellers of legitimate works affected by conduct involved in the <u>offense</u>;

**(B)** holders of intellectual property rights in such works; and

**(C)** the legal representatives of such producers, sellers, and holders.

**(f)** As used in this section—

    **(1)** the terms "<u>phonorecord</u>" and "copies" have, respectively, the meanings set forth in section 101 (relating to definitions) of title 17;

    **(2)** the terms "reproduction" and "distribution" refer to the exclusive rights of a copyright <u>owner</u> under clauses (1) and (3) <u>respectively of section 106</u> <u>(relating to exclusive rights in copyrighted works),</u> as limited by sections 107 through 122, of title 17;

    **(3)** the term "<u>financial gain</u>" has the meaning given the term in <u>section 101</u> <u>of title 17;</u> and

    **(4)** the term "<u>work being prepared for commercial distribution</u>" has the meaning given the term in <u>section 506(a) of title 17</u>.

149.    DEFENDANTS, The Los Angeles Film School, LLC, Twentieth Century Fox Film Corporation, Scott Free Films, LLC, Sony Pictures Entertainment, Inc., Amblin Entertainment, Inc., Sony Pictures Television, NBC Universal, Warner Bros. Entertainment, Inc., Legendary Pictures, Christopher Nolan, Jonathon Nolan, Andrew Wachowski and Lana Wachowski, having willfully and maliciously infringed Plaintiff's copyrighted works, "The World of Jupiter" and "Crisis on Jupiter", in violation of 17 U.S.C. § 506(a)(1)(A), § (a)(1)(B), § (a)(1)(C), § (a)(2), (a)(3)(A)(i), consequently violating "RICO" laws related to criminal infringement of a copyright - 18 U.S.C. § 2319(a).

150.    DEFENDANT, Twentieth Century Fox Film Corporation, Scott Free Films, LLC, having willfully and maliciously infringed Plaintiff's copyrighted works in the theatrically released "Prometheus" trailer footage first used to advertise the film, that was then cut due to its infringing content, before the complete film was released in public theatres are in violation of "RICO" laws

relating to criminal infringement of a copyright - 18 U.S.C.§ 2319 (a)(3)(B)(i) and § 2319(a)(3)(B)(ii). (*See* **Complaint, Exhibits - Volume II.)**

(*See* Complaint, Exhibits - Volume II. - Exh. 2 - pp. 20-35 and pp.140-159)

(*See* Complaint, Non-Paper Exhibits - Volume II. - Disk 1 - Folder 1 [Decl., Exhs. 2,7,10,26, (22- "Prometheus" Released Film])

(*See* Complaint, Non-Paper Exhibits - Volume II. - Suppl., Exhs.)

151.   DEFENDANT, Twentieth Century Fox Film Corporation, having submitted  a copy of the Prometheus A.K.A. Paradise – script with a declaration from its employee – Mary McGuire, misrepresenting it to be identical to "the official copy that had been submitted for U.S. Copyright Registration". The U.S. Copyright registration certificate was backdated to before Plaintiff had written "The World of Jupiter" or "Crisis on Jupiter" and before Damon Lindelof had received the Plaintiff's material from Peter J. Abrahams, that he used in his rewrite of "Prometheus" with creation myth that he made statements in the press to date as his original creation myth ideas 9-27-11 through 9-30-11. Damon Lindelof's rewrite of "Prometheus" was  infringing Plaintiff's copyrighted material submitted to Los Angeles Film School 9-8-11 and 9-18-11 and protected as Plaintiff' intellectual property pursuant to 17 U.S.C. 102(a) "tangible medium of expression". Twentieth Century Fox, Scott Free Films, LLC and Damon Lindelof used these original concepts and ideas knowingly in violation of 17 U.S.C. § 506(e) and are therefore in violation of "RICO" laws relating to criminal copyright infringement - 18 U.S.C. § 2319(a).

(*See* Complaint, Exhibits - Volume II. - Exh. 3)

152.   DEFENDANTS, Warner Bros., Christopher Nolan, Jonathon Nolan, David S. Goyer, and Legendary Pictures, having willfully and maliciously infringed Plaintiff's copyrighted works in footage of "The Dark Knight Rises" shown in private Warner Bros. screening of the 4 hr. version - which was then cut before public threatrical release after screening - with additional footage relating to what was shown in the trailer advertising the film in public theatres with Robin Williams' character that was completely removed from the film before the completed film was released in public theatres due it having infringed story elements used from Plaintiff's works, more specifically the story element of Robin Williams' character having been the scientist experimenting on BANE, did so in violation of "RICO" laws related to criminal infringement of a copyright - 18 U.S.C.§ 2319(a)(3)(B)(i) and § 2319(a)(3)(B)(ii).

153.   Establishing Access for Warner Bros.

(*See* Complaint, Non-Paper Exhibits - Volume IV. - Disk 1 - Folder 1[Complaint, Exhs. 4, 5, 10, 14a., 14b.])

(*See* Complaint, Non-Paper Exhibits - Volume IV. - Disk 1 - Folder 1[Complaint, Exhs. 1 and 2])

154.   Detailing Cut footage:

(*See* Complaint, Exhibits - Volume IV. - Exh. 3 - [pp. 17 - 27, line 17] and all non-paper exhibits referenced in Complaint, Non-Paper Exhibits - Volume IV.)

*(See* Complaint, Exhibits – Volume I. -Exh. 13[Second Amended Complaint, Exh. 3 – pp. 52-67])

**155.    Violations of 18 U.S.C. § 1503(a) (relating to obstruction of justice):**

"Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection."

**and 18 U.S.C. § 2339A(relating to proving " material support")**

(a) Offense - Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 229, 351, 831, 842(m) or (n), 844(f) or (i), 930(c), 956, 1091, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, 2340A, or 2442 of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), section 46502 or 60123(b) of title 49, or any offense listed in section 2332b(g)(5)(B) (except for sections 2339A and 2339B) or in preparation for, or in

carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law.

**In violation of 18 U.S.C. § 1503(a) and § 2339A,**

156. DEFENDANT, The Los Angeles Film School, LLC, - (Venita Rene) notified Plaintiff of his loans not being approved on 3-22-12, only a few days after Plaintiff approached Peter J. Abrahams about discovering that his assignments submitted to Marilyn Giardino - Zych had been stolen and used in "Prometheus". The Los Angeles Film School financial aid department began to corruptly prevent Plaintiff from attending school for three months while Marilyn Zych and Peter J. Abrahams could stop teaching so they could not be ask any questions. Plaintiff was lied to about his Sallie Mae Private Loan not being approved until July 2012 when he was then allowed to continue attending classes. The Sallie Mae loan had been approved a few days after its submission, the same as it had the previous two loans while attending school. The Los Angeles Film School, in JAMS Arbitration of *Basile v. The Los Angeles Film School,* **changed their story of the private Sallie Mae loan not having been approved to it being the FAFSA loans that weren't approved**. A deposition of the parties in JAMS hearing revealed that this non approval was a process that The Los Angeles Film School controlled, therefore, DEFENDANT,  The Los Angeles Film School, LLC had deliberately prevented Plaintiff from attending school for three months by stalling his loans, for these two teachers who had conspired and sold Plaintiff's works to Damon Lindelof, could

leave without being confronted or questioned, engaging in "racketeering" activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961 - relating to 18 U.S.C. § 1503(a) - (obstruction of justice) and 18 U.S.C. § 2319 (criminal infringement of copyright). (*See* Complaint, Exhibits - Volume I. - Exh. 13 [Closing Argument - Exh. 31])

157.   DEFENDANT, The Los Angeles Film School, LLC, ( Robert Sweeney - Director of Education) on the evening of 8-13-12 after Plaintiff had returned home from school, issued a "threatening communication" in violation of "RICO" laws as defined in 18 U.S.C. § 1961 - relating to 18 U.S.C. § 1503(a) and 18 U.S.C. § 2339A, with intention to obstruct Plaintiff from pursuing remedy for copyright infringement, when he called Plaintiff and left a message alleging that Plaintiff's math teacher Christopher Lippi, had reported to him that he had seen Plaintiff take his computer at the end of class that day. (*See* Complaint, Non-Paper Exhibits - Volume IV. - Disk 1 - Folder 1[Complaint, Exh.24])

158.   Not only was this accusation completely false, but when accusing Plaintiff Mr. Sweeney also threatened Plaintiff of "an accident" – a person cannot accidentally take a computer from someone when they have their own bag with computer to carry and that someone is watching them leave the classroom; in this case, the teacher seeing someone taking their computer at the end of class would have stopped them or said something. This false accusation was only a few weeks after Plaintiff' had requested the assignment, The World of Jupiter" that had been found to be missing from Plaintiff's lafilm.edu student email, be returned to him. This part of Plaintiff's assignment being the creation myth - "The World of Jupiter" - that was used to create "Prometheus".

159. On 11-5-13, 8 days after the completion of the **first draft** to Plaintiff's *Basile v The Los Angeles Film School* complaint was saved to Plaintiff's computer, Plaintiff's sister, Elizabeth Basile, was attacked by Beverly Hills Police in a staged accident that could have been much worse than it was.

160. The Sony security liason announced the B.H. attack the day before it was carried out by Beverly Hills Police in the mass email he sent to all Sony employees which contained a phrase, "notes / advice/ thoughts" that was used as a reference to the email by Sony executive Amy Pascal and Etan Cohen in later discussion noting that WB wasn't going to let something go, also noting a miss or reference to "Prometheus" in the email with the subject labeled "promise". The way the attack was spoken about by Sony executive Amy Pascal and MIB3 co-writer Etan Cohen indicated that the objective was not achieved.

161. DEFENDANT, The Beverly Hills Police Department, engaged in "racketeering" activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961 - relating to 18 U.S.C. § 1503(a) and §1512 by first carrying out the attack on Plaintiff's sister on 11-5-13, then writing a "threatening communication" in the police report making reference to the text of Plaintiff's assignment that was requested to be returned when Robert Sweeney threatened an "accident".

162. The accident was captured on Saks Fifth Avenue cameras.

(1)DEFENDANTS, Warner Bros., Christopher Nolan, Jonathon Nolan, and the set designer Nathan Krowley in his position with the production of "The Dark Knight Rises" placed the **Saks Fifth Avenue** sign in the background of a scene while Bane is saying that he is killing someone in "The Dark Knight Rises" to convey a

"threatening communication" in violation of 18 U.S.C. 1503(a).  *(See* Complaint, Exhibits - Volume III. - Exh. 16 - p. 47 and p. 158)

**(2)**  The Metrolink attack took place at the corner of **Fifth** and Rice in Oxnard Ca.

**(3)**  The names of the Officers used to attack Plaintiff's sister in Beverly Hills, Officers **Sholley**(reference to **Sweeney**) and Officer **Weir**(reference to either Kurz**weil**-character from Plaintiff's stolen material used in "Prometheus" - or - a reference to the teacher who stole and sold Plaintiff's material,  Peter J Abrahams(**Peter Weir**). Regardless, Officer Weir was hired by Amy Pascal to carry out the Beverly Hills attack on 11-5-13. **(Exhs. 3, 3a. and 3b. - appended)**

163.   There is no doubt that Plaintiff's material was being referenced by the Beverly Hills Police in their report after the attack to convey the threat. The Officer used the word  ("illuminate") from text in Plaintiff's short "The World of Jupiter", so the threat from Robert Sweeney at The Los Angeles Film School would be remembered and it would be clear that the threat was also from Twentieth Century Fox who had purchased and used this short in the rewrite of "Prometheus", sold to them by Peter J. Abrahams at the school.

*(See* Complaint, Non-Paper Exhibits - Volume I. - Disk 1 - Folder 2 - Decl., Exh. 4 - [Second Amended Complaint, Exh. 52])

*(See* Complaint, Non-Paper Exhibits - Volume IV. - Disk 1 - Folder 1 [Complaint, Exh. 3]

164. DEFENDANT, Twentieth Century Fox Film Corporation (Alexander "Sam" Moreno and Mark Haufman - Fox Security) May – April 2013, engaged in "racketeering" activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961 - relating to 18 U.S.C. § 1503(a), 18 U.S.C. § 2339A, a few months after settlement discussion between Plaintiff and Jenna Langer of The Los Angeles Film School. Fox Security sent LinkedIn views to Plaintiff's LinkedIn account as a "threatening communication" a few months after it was admitted by Jenna Langer during settlement conversation on 1-14-13, that everyone knew that Plaintiff's submitted material had been stolen and sold by staff and a cover up put in motion by the staff of The Los Angeles Film School leading up to the false accusation of theft.

165. DEFENDANT Jams Arbitration (Judge Diane Wayner (ret.) engaged in "racketeering" activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961 - relating to 18 U.S.C. § 1503(a), on 2-13-15 during a telephonic JAMS hearing when Judge Diane Wayne shouted **"Mr Basile off with your head!"** Judge Wayne was noticeably angry that Ms. Levy had been fired because she had lied to the Magistrate Judge Wilner when arguing Plaintiff's Motion to Compel Compliance with Subpoena of Peter J. Abrahams on 1-14-15 - this motion was deemed necessary due to Mr. Abrahams having ripped up the subpoena when served.

(*See* Complaint, Exhibits - Volume I. - Exh.10 - Deposition of Sarah Thompson)
(*See* Complaint, Non-Paper Exhibits - Volume I. – Disk 1 - Folder 6 - [Decl., Exh.21]

166.    DEFENDANT, Scott Free Films, LLC. - (Ridley Scott),  engaged in "racketeering" activities" in violation of "RICO" laws as defined in 18 U.S.C. § 1961 - relating to  18 U.S.C. § 1503, 18 U.S.C. § 2339(A) and 18 U.S.C. § 1992, by engaging in the following activities. After having willfully and maliciously infringed Plaintiff's works in "Prometheus", DEFENDANT had been sued for copyright infringement prior to this claim with its writers and Twentieth Century Fox. Ridley Scott then collaborated with Sony Pictures and Will Smith on a film called "Concussion". This production went to film in Oxnard Ca. - the town where Plaintiff lives with his family and where the Metrolink attack occurred on **2-24-15**. Scott Free Films, LLC, Sony Pictures Entertainment, and TMZ issued a "threatening communication"  on **1-21-15,** in an online news website TMZ - owned by Warner Bros. -  by releasing an article with photos of a buffet arranged to look like a train, and an additional photo of a girl eating pink cotton candy.

These photos were attached to an article with discussion of there being confusion as to whether Sony or Will Smith had paid for the lunch – "the lunch" was a reference to the Metrolink train attack that occurred a few weeks later. *(See* Complaint, Exhibits - Volume III., Exh. 16 - pp. 48-49 and pp. 59-78)

167.    DEFENDANT, Ford Harrison - counsel for The Los Angeles Film School - engaged in "racketeering" activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961 by sending as a "threatening communication" in violation 18 U.S.C. §1503(a), and 18 U.S.C. § 2339. This threat was sent as an email with a threat disguised as an "Offer to Compromise" on **2-19-15** for the amount of $1001.01, in the case *Basile v. The Los Angeles Film School,* that damages sought were an accumulated 1.6 Billion dollars. This threatening communication was realized to be "a threat of an attack by its reference to a car accident Plaintiff had in 1999" while driving a Jeep **Grand** Cherokee on Sunset

Blvd. and the reference to Plaintiff's father's business address, 7701. This threat was received 6 days after Plaintiff had been threatened by Judge Wayne and after Plaintiff's defamation was not dismissed and was to proceed to trial 4-27-15.

169.    DEFENDANT Daniel Kohler of Mitchell, Silberberg, & Knupp - counsel for Sony Pictures Entertainment, Inc., engaged in "racketeering" activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961 - relating to 18 U.S.C. §1503(a) and 18 U.S.C. § 2339A - by sending Plaintiff an email on 2-23-15 containing references to the train attack that occurred the very next morning. (*See* Complaint, Non-Paper Exhibits – Volume IV. - Disk 1 - Folder 1 - [Complaint, Exhs. 29 and 30])

170.  On 2-24-15, the Metrolink train that Plaintiff's father has taken to work every day for several years, was attacked. The actions of those DEFENDANTS who conveyed threats by email, online media, or reference in infringing footage, or who engaged in the planning or carrying out of the attack, and all "Defendants to the copyright claims" as noted in this Complaint, are in violation of virtually ALL "RICO" laws pursuant to 18 U.S.C. § 1961, §§ 1962(a) – § 1962(d) and numerous Federal Statutes.

171.  Articles released online reporting the train attack conveyed threats to coincide with Daniel Kohler's email, 2-24-15.

172.  DEFENDANT, Alston & Byrd, LLC -  Cassondra Ruga - counsel for Twentieth Century Fox in *Basile v. Twentieth Century Fox* - engaged in "racketeering" activities in violation of "RICO" laws as defined in violation of

18 U.S.C. § 1961 - relating to 18 U.S.C. § 1503(a), on 6-27-14 when Ms. Ruga filed a personal declaration with "threatening communication" by reference to a car accident, referencing the B.H. attack that occurred on 11-5-13, in an inappropriate reference to a story about a woman who is killed in a car accident. ( See Complaint, Exhibits - Volume  II., Exh. 4)

(*See* Complaint, Exhibits - Volume IV. - Exh. 9, p. 8 (footnote) - "threatening communication" from Warner Bros. counsel in its Reply Brief  that noted that Plaintiff had been warned)

(*See* Complaint Exhibits - Volume I. - Exh. 13 [Second Amended Complaint, Exh. 3. pp. 69-73])

(*See* also Complaint, Non-Paper Exhibits - Volume IV. - Disk 1 - Folder 1 [Complaint, Exh. 24])

173.   DEFENDANT, Sony Pictures Television produced a television show entitled  "Timeless". The show contains elements similar to Plaintiff's works enough to deduce that Sony Pictures Entertainment had passed the Plaintiff's material to the television show's creators after their having fused all of the time travel elements from Plaintiff's works into "MIB3". Even though the show itself is episodic and the story different in each episode, the synopsis online of the show "Timeless" references a scientist, a soldier, and the time travel appears to be constant in all episodes, identical to Plaintiff's "Crisis on Jupiter".. DEFENDANT, NBC Universal who collaborated with Sony Pictures Television on "Timeless", also collaborated with DEFENDANT, Onza Partners SL – Onza Entertainment, - a

<u>production company in Madrid, Spain  - and released a Spanish version of the</u>
<u>show.</u>

174.   DEFENDANTS, Sony Pictures Television, Onza Partners - Onza Entertainment, created the Spanish version of the show, "Timesless" which is called, "El Ministario Del Tiempo". As a "threatening communication" in violation of "RICO" laws as defined in 18 U.S.C. § 1961 - relating to 18 U.S.C. § 1503(a) and 18 U.S.C. § 2339A; the show " El Ministario Del Tiempo" **was released on 2-24-15, the same day as the Metrolink attack** proving that the Metrolink attack - <u>which was found in the Leaked Sony Emails to have indeed been an exchange for</u> <u>campaign contributions from Sony Pictures to Nancy Pelosi - to have been carried</u> <u>out on an internationally coordinated date by DEFENDANTS,</u> as a terrorizing threat to Plaintiff and admission to the public, used in the same way as the **SAKS FIFTH AVENUE and Jos A Bank** sign in footage of "The Dark Knight Rises", when DEFENDANTS conveyed a "threatening communication" in footage, to be discovered later as a display of power by the parties evading liability for criminal copyright infringement damages.

One of the writers of the "El Ministario Del Tiempo" is named **Jose Ramon Fernandez,** as was the name of the man who intentionally derailed the Metrolink train, **Jose Alejandro Sanchez Ramirez,** clearly another "threatening communication" to be discovered later as the attack took place on the same day of the first episode of "El Ministario Del Tiempo". (*See* Complaint, Exhibits - Volume III. - Exh. 16 - pp. 73-76)

175.   This was part of what seems to have been a conspiracy that wasn't followed through with once Plaintiff had reported the efforts by Gold Coast Cab Company and Oxnard Police to create suspicious circumstances after having

threatened Plaintiff. (*See* Complaint, Exhibits - Volume IV. - Exh. 17, p. 69 at ¶ 3 – p. 74 at ¶ F.)

176.   The car accident that was referenced in the threat disguised as an "Offer to Compromise" sent to Plaintiff by Ford Harrison representing Los Angeles Film School on 2-19-15, was an attack that occurred on Sunset Blvd in 1999 while Plaintiff was driving a black and grey Jeep Grand Cherokee, 1 year after Plaintiff had acted in his first feature film in 1998; this was not coincidence and is the reason it was so quickly realized to have been a "threatening communication". Johnny Depp has been discovered to have ordered the attack on Plaintiff (***See* Complaint, Non-Paper Exhibits - Volume VI., [Decl., Exh. 28]** and in his Youtube video accepting his star on the Hollywood Walk of Fame, while wearing clothing that matched Plaintiff's Cherokee, referenced the accident that occurred 1-30-99; in the ceremony of his receiving the star November 1999, after the Sunset Blvd attack. All record of Plaintiff being attacked in his Cherokee has been changed everywhere (Cedars Sinai, LAPD traffic accident reports, and court records) All records have been forward dated to reflect 2000 as the year, to date the statement Johnny Depp made in the Youtube video of the ceremony that Plaintiff was "not dead", as having occurred before the attack on 1-30-1999.

Shortly before the attack on Sunset, Plaintiff was framed by LAPD for essentially having carjacked himself. (***See* Complaint, Exhibits - Volume VI. - Exh. 2)**

177.   When petitioning for dismissals during September 2016 – October 2016,  after the facts of the conspiracy were written, Johnny Depp appeared on Jimmy Fallon on 10-31-16, making reference to the Case No. BA196041, with a

package in his back pocket with a BA on it. ( **A true and correct copy of this photo is appended hereto as Exhibit 14)**

178. This case was the beginning of the conspiracy started by Hollywood Division LAPD who contrived evidence enough to fraudulently elicit a warrant from the D.A., after Plaintiff had been carjacked. Then after Plaintiff was attacked on Sunset Blvd on 1-30-99(00), within blocks of where Plaintiff was carjacked, Plaintiff's then counsel Fred Brown was enrolled to help the prosecution convict Plaintiff as part of the conspiracy as it began, by advising Plaintiff to plea to a felony charge in an excessive 6 felony indictment, Plaintiff's counsel stating that he was scared that the prosecution would contrive further false evidence, all the while arguing nothing and telling Plaintiff nothing about the contrived evidence and false statements relating to contrived events reported to the District Attorney by Detective Brower to fraudulently obtain an arrest warrant after having threatened Plaintiff.

179. Johnny Depp also seems to have had knowledge of the Metrolink attack that by his appearance on August 7th, 2012 at the PINK TACO for the Aerosmith concert - Steven Tyler being the lead singer - suggests that the attack was being planned against Plaintiff's father as far back as the date of the concert at the Pink Taco, the same date as Plaintiff's father's birthday, August 7th. At his arrival, Johnny Depp made reference to the car accident and his receiving the star on Hollywood, as a "threatening communication" to be discovered after the Metrolink attack had occurred. Coincidence or not, the man who went on the shooting spree on Hollywood and Vine on the day of the release of the "MIB3" trailer with added time travel elements from Plaintiff's copyright works, was also Tyler (Tyler Brehm). On 3-16-12, Barack Obama visited Tyler Perry's Tv and

COMPLAINT

Film studio for a pair of Atlanta fundraisers. (*See* **Complaint, Non-Paper Exhibits - Volume VI., [Decl., Exh. 28]**

180.   On **12-12-11**, DEFENDANT Sony Pictures Entertainment released its trailer of the film "MIB3" with the time travel elements from Plaintiff's works added, misappropriated by Peter J. Abrahams to Damon Lindelof who then resold vatrious elements of Plaintiff's works to the MIB3 writers; Etan Cohen and Michael Angelo Soccio who received them and fused the time travel story and character "Cifer" from Plaintiff's works into the MIB3 film. (A true and correct copy of this "MIB3" trailer released on the website with the article appended as Exhibit 1a. has been manually filed on DVD as Exhibit 21)

- Note that the "MIB3" production had just begun to add the time travel elements from Plaintiff's works when a trailer was quickly cut for release.

181.   Kate Moss - who seems to have been threatened not to speak about what she knew of the attack on Plaintiff 1-30-99, was by no coincidence also involved in a car accident that took place on September 6th, 2001 involving another driver in a Montego. A reference for her memory of Montego Bay, a place she was familiar with and got married on Jun 31, 2011: Michael Bays - Plaintiff's stage name while acting in television in the late 80s early 90s, and while on an episode of 21 Jumpstreet with Johnny Depp. This name also appears on the police report of the car accident report covering up Plaintiff's attack on Sunset Blvd 1-30-99(00) as an A.KA.

*(See* **Complaint, Exhibits - Volume VI. - Declaration in Support of Plaintiff's Petition for Dismissal Pursuant to 1203.4, Exh. 2 [Declaration in Support of Plaintiff's Petition for Writ of Error Coram Nobis, Exh. 1])**

**On 12-15-11,** Kate Moss tweeted:

"Nine days till Christmas! WOW, time flies…."

The reference clearly to the fact that Plaintiff had not been shot as he didn't walk to school that day - "nine lives" - and possibly "Days of Our Lives", the show Plaintiff had worked on as an actor several years when he met and worked with Johnny Depp in 1989 on 21 Jump street. Kate Moss has not tweeted since.

182.   On August 11, 2011, when Plaintiff began attending The Los Angeles Film School, the press released a story noting in its headline,

" Johnny Depp is terrified that Kate Moss will tell-all in her alleged memoir."

The photo suggesting what he was terrified about her or Plaintiff talking about; Plaintiff having been shot in the eye:

(A true and correct copy of this article is appended hereto as Exhibit 15)
(A true and correct copy of the Tweet made by Kate Moss is appended hereto as Exhibit 15a.)

183.    When Plaintiff had submitted its assignments 9-8-11 and 9-18-11, to Los Angeles Film School with marketable concepts completely original and the

possibility arose that he would soon have the financing to investigate the conspiracy against him after having healed from the car attack and having just come back to Hollywood, it appears Ridley Scott was then enrolled to also conspire and convey this in "Prometheus", (*See* Complaint, Non-Paper Exhibits - Volume VI. - Exh. 30) after Damon Lindelof had been sold Plaintiff works by the school and fused it into the rewrite of "Prometheus".

184.   <u>The fact that Johnny Depp would actually convey a threatening communication by reference to the same Sunset Blvd. attack on Plaintiff in 1999</u> that was referenced by Ford Harrison - The Los Angeles Film School's counsel in the threat disguised as an "Offer to Compromise"( 1000 - Grand)  and  (.01 - 7701) Plaintiff father's business address), <u>shown in the background when arriving at the PINK TACO on Plaintiff's father's birthday - Plaintiff's father having been a victim on the Metrolink attack -</u> confirms the reality of the efforts made by Johnny Depp to sabotage Plaintiff's life and career after having ordered or manipulated the unknown government agency into carrying out Plaintiff 's attack on Sunset Blvd. in 1999(00). (*See* Complaint, Non-Paper Exhibits - Volume VI. - Exh. 28 - Johnny Depp greeting fans when arriving at THE PINK TACO)

185.   Therefore, confirmed by the threat from Judge Wayne on 2-13-15, "Mr. Basile Off with your head!", and in Ridley Scott's film created entirely from Plaintiff works - "Prometheus" , "Get John" said by Noomi Rapace in the opening sequence when something was discovered, it becomes clear that these DEFENDANTS, Ford Harrison, Twentieth Century Fox Film Corporation, and Scott Free Films, LLC, are in violation of 'racketeering' activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961 18 U.S.C. § 1503(a) - relating to obstruction of justice and 18 U.S.C. § 2339A "providing material support" for

issuing " threatening communications ", in furtherance of 18 U.S.C. § 2319 - criminal infringement of a copyright.

186.    Ridiculously, after so many years of conspiring to have Plaintiff oppressed by false arrest using corrupt LAPD and government as noted in **Complaint, Exhibits – Volume VI.**, Plaintiff is being targeted and conspired against now by Johnny Depp and Ridley Scott who have together sabotaged Plaintiff's future yet again. Apparently, Plaintiff's material was stolen by the Los Angeles Film School staff;  sold to Damon Lindelof and Ridley Scott; Johnny was called before or during filming and told that the person who he had attacked in 1999, now had a viable short that they were stealing and using in "Prometheus".

Plaintiff was then falsely accused him of a crime (stealing a computer from as teachers classroom) on 8-13-12,  as a threat to not pursue a claim in court for their having stolen Plaintiff's works and conspired to prevent him from finishing his degree;  only a few days after Johnny Depp arrived at the PINK TACO  on 8-7-12 referencing the car accident he order attacking Plaintiff in 1999 - **the same attack that Los Angeles Film School referenced as a threat to Plaintiff in the few days before the Metrolink**. ( See Complaint, Exhibits - Volume VI. - Declaration in Support of Plaintiff's Petition for Dismissal Pursuant to P.C. 1203.4, Exh. 2 [Declaration in Support of Plaintiff's Petition for Writ of Error Coram Nobis, Exhs. 1 and 29]

***(See also* Complaint, Exhibits – Volume IV. - Exh. 3 - pp. 74-76**

187.    On 11-21-14, Plaintiff refiled a corrected Motion to Compel Compliance with Subpoena for Peter J. Abrahams,  that was filed a few days

before with error. This subpoena was for the teacher who had sold Plaintiff's works as his own, Peter J. Abrahams.

After first granting Plaintiff's request to obtain depositions of several involved parties to the copyright claims in the JAMS Arbitration of *Basile v. The Los Angeles Film School* because Defendants did not provide timely rebuttal, Judge Wayne changed her mind and granted Plaintiff a subpoena for only Peter J. Abrahams' deposition. , Plaintiff had filed a Motion to Compel Compliance in this Court 11-21-14 because of Peter J. Abrahams' behavior when served his subpoena. Judge Wayne then changed her mind again in December 2014 and withdrew the subpoena previously granted erroneously and intentionally to obstruct the process of Plaintiff receiving Peter J. Abrahams' deposition.

Peter J. Abrahams obstructed and left no doubt as to his position of having no intention of providing his deposition.

188.  When the subpoena was served on Peter J. Abrahams on 11-8-14,  he ripped it up saying that he had been getting a lot of them from the school and that he wasn't going and they couldn't do anything about it, Plaintiff was forced to motion the Court to compel. After Plaintiff filed the Motion to Compel Compliance with Subpoena on 11-21-14,  Judge Wayne then cancelled the order granting the "one" subpoena for deposition and documents in December 2014, ignoring that Mr. Abrahams ripped up the subpoena when served the month before, not knowing if Judge Wilner would grant the Motion to Compel or not. Elizabeth Levy of  Ford Harrison who opposed the motion in District Court, stated as her argument to deny Plaintiff's request due to him not having properly served Mr. Abrahams' counsel with the subpoena, which was not at all the circumstance.

COMPLAINT

189.   It wasn't  until after the Mr. Abrahams had been served and ripped up the subpoena, that Plaintiff or Judge Wayne had been told that Mr. Abrahams wasn't  with the school anymore or that he was now represented by his own counsel Rahul Sethi who should be served.

190.   Plaintiff explained this to Judge Wilner but the Motion to Compel Compliance with Subpoena was denied and Ms. Levy was not even sanctioned. Judge Wilner's order erroneously citing the reason to be that the motion was moot,

> "for reasons stated at hearing and in light of Plaintiff's plan to set a new date for the witness's deposition consistent with Judge Wayne's order."

Judge Wilner's decision and order is obstructionist for several reasons:

(1)There was no part of Plaintiff having already served Mr. Abrahams with subpoena that was in error when it was served on 11-8-14, after the subpoena for deposition was granted by Judge Wayne in JAMS hearing October 2014, noted in Plaintiff's Motion  to Compel Compliance with Subpoena and Motion to Vacate Arbitration Award. ( *See* **Complaint, Exhibits - Volume I. - Exh. 10**)

(2) The serving of the subpoena was proper and the server and Plaintiff encountered obstruction by Mr. Abrahams indicating in no way at all that he had any intention to comply and appear for deposition, in fact he made clear his position was quite the opposite.

(3) Judge Wayne and Judge Wilner both knew that there is not any law in the state of California relating to arbitration that would prevent Mr. Abrahams from not

appearing for deposition unless he was compelled to do so by subpoena issued by the District Court.

(4) At hearing with Judge Wilner 1-14-15, Judge Wayne had already changed her order from granting the subpoena in October 2014 to having then denied it after Plaintiff motioned the District Court to compel, shutting off the subpoena <u>after Mr. Abrahams adamantly stated he would not go to any deposition.</u> Judge Wayne did so knowing  Mr. Abraham did not have to comply and appear for deposition unless the district court compelled the subpoena for the deposition, which at the time that she changed the order, the hearing with Judge Wilner had not taken place yet.

191.   It was not agreed to by Mr. Abrahams  that the deposition was taking place when Judge Wilner denied the subpoena on 1-14-15, only Judge Wayne had changed her order only a few weeks earlier to state the subpoena for deposition was denied,   after the filing of the Motion to Compel Compliance on 11-21-14, not dissimilar to a one way conversation.

Judge Wilner denying the Motion to Compel the Subpoena was unjust due to Mr. Abrahams not having to comply with deposition by any law or rule of the State of California, unless compelled to do so by the District Court. Judge Wilner denying the subpoena was also obstructionist due to him having had knowledge of what had occurred already relating to the Plaintiff's sister being attacked by B.H. Police on 11-5-13, after Los Angeles Film School threatened Plaintiff of an "accident".

192.   The deposition of Mr. Abrahams could have prevented future violence by exposing who it was he reported to when Plaintiff approached him about seeing the trailer for Prometheus in March 2012, when made privy to the fact that his

COMPLAINT

works had been stolen and sold;  Plaintiff did not yet know that the LAFILM staff member who had sold the material to Damon Lindelof and had received payment enough to stop teaching and move from a small apartment on Delongpre to a house in Hollywood Hills immediately after, was Peter J. Abrahams, the teacher Plaintiff had approached for help.

193.   DEFENDANT, Jams Inc. (Judge Diane Wayne ret. - engaged in "racketeering" activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961 as part of conspiracy to obstruct and prevent the deposition of Peter. J. Abrahams resulting in violation of 18 U.S.C. § 1503(a) and 18 U.S.C. § 2339A.

194.   DEFENDANT, United States District Court – Central District of California – Western Division,( Magistrate Judge Michael Wilner) denied Plaintiff's Motion to Compel Compliance with Subpoena in what cannot be allowed to pass as error. Plaintiff clearly noted in its motion that The Los Angeles Film School had threatened Plaintiff when he inquired about his assignment that was missing from his student lafilm.edu email, Plaintiff even provided the recording of the threat as exhibit. This missing emailed assignment was necessary to establish submission and creation dates to pursue a complaint for copyright infringement. When threatened, Plaintiff was falsely accused of theft so the circumstances clearly indicated it was as part of a conspiracy by the school's staff, to have Plaintiff removed from school after having been stolen from.  Due to the circumstances, Judge Wilner having had knowledge of a prior threat Plaintiff had received from The Los Angeles Film School-who followed through with their threat conspiring with other parties including the B.H. Police Dept. who after the attack conveyed an additional written threat in the police report, to deny Plaintiff' Motion to Compel Compliance with the route of the problem exceeds error.

195.   DEFENDANT, United States District Court - Central District of California - Western Division, ( Magistrate Judge Michael Wilner) engaged in "racketeering" activities in violation of 18 U.S.C. §1503(a) – (obstruction of justice) - and 18 U.S.C. § 2339A - providing material support, particularly since DEFENDANT, The Los Angeles Film School's counsel – Elizabeth Levy, was caught in hearing as having provided intentionally false information regarding the service of the subpoena of Peter J. Abrahams.

196.   On 2-13-15, in JAMS telephonic hearing for DEFENDANT Ford Harrison's Motion for Continuance of trial dates to change counsel due to Elizabeth Levy leaving the firm and needing time to appoint another member of their firm, Judge Wayne shouted at Plaintiff when he objected to the continuance , "Mr. Basile Off with your head!"

197.   DEFENDANT, Jams Inc., (Judge Diane Wayne ret.) engaged in "racketeering" activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961.  This was "threatening communication" in violation of predicate laws 18 U.S.C. § 1503(a) - obstruction of justice - and 18 U.S.C. § 1512 - intimidation of a victim, and seems to have a been a threat to coincide with the Metrolink attack that occurred only 11 days later that was threatened by Los Angeles Film School and Sony Pictures' counsels the few days before.

198.   On 2-19-15, only a few weeks after hearing in Judge Wilner's courtroom denying the Motion to Compel the Compliance with Subpoena for Mr. Abrahams,  Plaintiff received a second  "threatening communication"  from The Los Angeles Film School through their counsel Ford Harrison, threatening another accident by reference to the attack on Plaintiff in 1999, which was followed a few

days later by the Metrolink attack to which references were made the night before in an email Sony Pictures' counsel Daniel Kohler sent to Plaintiff that was discovered the next day to be a very serious threatening communication of what was to occur the next day.

199.  Judge Wayne granting all subpoenas for several parties, then denying all but the subpoena for deposition of Peter J. Abrahams in October 2014, then even though she knew that  Mr. Abrahams had ripped up the subpoena when properly served , and her having then cancelled his subpoena for deposition after Plaintiff motioned the district court to compel the subpoena for deposition, is also obstructionist:

200.  DEFENDANTS, JAMS, Inc. -  (Judge Diane Wayne ret.) "corruptly influenced, obstructed, and impeded and endeavored to influence obstruct and impede the due administration of justice" in furtherance of 18 U.S.C. § 2319 (criminal infringement of copyright) therefore has engaged in "racketeering" in violation of "RICO" laws as defined in 18 U.S.C. § 1961 - related to 18 U.S.C. § 1503(a) (relating to obstruction of justice) and 18 U.S.C. § 2319 (relating to criminal infringement of copyright).

201.  DEFENDANT, Ford Harrison -  (Elizabeth Levy) endeavored to influence obstruct and impede the due administration of justice therefore has engaged in "racketeering" activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961 – relating to 18 U.S.C. § 1503(a) - (obstruction of justice) in furtherance of 18 U.S.C. § 2319 - (criminal infringement of copyright) by lying to Judge Wilner about Plaintiff not having properly served Mr. Abrahams with subpoena for deposition and production of documents, with intention to persuade

Judge Wilner to deny the Motion to Compel Compliance with Subpoena for the deposition of Peter J. Abrahams.

202.  On 6-10-15, after several obstructions during JAMS Arbitration of *Basile v. The Los Angeles Film School,* and an attack that was threatened by DEFENDANTS, JAMS Inc.; Ford Harrison; Mitchell Silberberg & Knupp; then discovered to have been plotted by DEFENDANTS, Nancy Pelosi; Sony Pictures Entertainment – Amy Pascal; and bragged about in footage and online media by DEFENDANTS, Warner Bros, TMZ, and Scott Free Films, LLC, and Sony Pictures Entertainment, DEFENDANT, United States District Court - Central District of California - Western Division – ( Clerk of the Court with initials AP, possibly Andres Pedro) received a 2049 page Declaration in Support of Plaintiff's Motion to Vacate Arbitration Award filed on 6-10-15 with a Memorandum and several Notices of Lodging with non-paper exhibits attached to motions filed in JAMS, this Declaration covering everything that occurred during JAMS Arbitration of *Basile v. The Los Angeles Film School,* was received then lost by the clerk or other employee responsible for taking the document to be scanned and to the Judge's chambers.

203.  This declaration included threats received before the Metrolink attack, and analysis of how they related to the attack which required immediate review by the court, and showed that Judge Diane Wayne was not a nonbiased party to oversee a fair and unbiased trial of the claims at issue. It wasn't until after Plaintiff had contacted the clerk for several weeks and followed up with a visit to the clerks' window that the 2049 page declaration was even looked for.

After appearing at the clerk's window that morning to find what was going on with the document, Plaintiff was told to wait by the court for a few hours by a

clerk on duty and they would call when they had any information. Plaintiff received a phone call at the end of the day from Kane Tien saying that they had found the missing declaration, Kane Tien didn't say where, and that it would be scanned to Pacer and then given to the judge. The Pacer shows that the opposing documents to the Motion to Vacate Arbitration Award filed by Ford Harrison were already posted to Pacer indicating that Judge Gee had already read the rebuttal without seeing the Plaintiff's declaration. Her order denying the motion to vacate even emphasized that she didn't believe that Judge Wayne had threatened Plaintiff though she had been provided a recording of the hearing with accompanying documents. The Declaration in Support of Plaintiff Motion to Vacate Arbitration Award, was not scanned to Pacer until 6-30-15, 20 days after its filing.

204.   DEFENDANT, United States District Court  - Central District of California - Western Division - (clerk Andres Pedro and/or other employees) having taken and hidden the 2049 page declaration causing it not to be properly and timely scanned and forwarded to Judge Gee or even looked for until several weeks after its filing,  have violated 18 U.S.C. § 2076 and other Federal Statutes including several "RICO" laws relating to "racketeering" as defined in 18 U.S.C. § 1961 - 18 U.S.C. 1503(a) – (relating to obstruction of justice) and 18 U.S.C. § 2339 A - (relating to "providing material support").

205.   DEFENDAANT, Gold Coast Cab Company, Owner - Jim Carmona, engaged in "racketeering" activities as defined in 18 U.S.C. § 1961 - related to 18 U.S.C. § 1503(a) - (obstruction of justice) and 18 U.S.C. § 2339 - relating to (providing material support) by engaging in the following activities:

Gold Coast Cab company is a cab company that Plaintiff had used for the several years during litigation of these copyright claims for transportation to and

from the Oxnard train station where Plaintiff would then take the train to Downtown Los Angeles US District Court. In collaboration with the Oxnard Police Department and a retired LAUSD Police Chief named Larry (last name unknown) who lives next door to Plaintiff's family, attempted to create suspicious circumstances around Plaintiff and endeavored to influence, intimidate, obstruct, and impede the due administration of justice.

206.   On or around 2-6-15, Plaintiff went to ITT Tech for an orientation to begin classes to obtain forensic evidence for use in all copyright claims. Once checked in to the hotel across the street from ITT Tech in Oxnard, Plaintiff needed to get Office supplies and called and requested a cab from Gold Coast Cab Company. The cab company dispatch sent one of its cab drivers to pick Plaintiff up at the hotel. <u>This driver was named Jose, he was mid-thirties, very athletic shape.</u> He befriended Plaintiff while driving and invited Plaintiff out for the night when dropping Plaintiff off at the hotel after Plaintiff was driven back to his hotel from getting Office supplies. Plaintiff later went out with him that night to a restaurant bear the hotel, and later was dropped off at the hotel early because orientation was the next morning. The next morning when Plaintiff went to leave the hotel for the orientation at ITT Tech, a person was standing in front of the elevator to the lobby and actually told Plaintiff that he was not to go to the orientation. Plaintiff didn't know what was happening so he went back to his parent's house and decided to just forget about ITT Tech and continue with the litigations.

In the next few weeks, this cab driver Jose called Plaintiff to go out again, they went out again for food in Oxnard with some of the driver's girlfriends. Plaintiff had not spoken to this man again after. This man's last name is unknown, <u>but it is not coincidence that the Gold Coast Cab Company dispatch sent a man</u> <u>with the first name Jose to drive Plaintiff on 2-6-15. Here is the reason why.</u>

COMPLAINT

What was discovered a few weeks later, the man who intentionally left the Ford-F450 on the tracks to derail the Metrolink train in Oxnard on 2-24-15, was named Jose Alejandro Sanchez Ramirez. The fact that he had four names was one of the references made by Mitchell Silberberg & Knupp in the email the day before the attack. **This man, Jose Alejandro Sanchez Ramirez, is not the same man as the cab driver Jose,** the photo of the man who derailed the train show his appearance to be much older and much different description. The only commonality, that appears intentional, is that they both had a mustache.

The fact that Jim Carmona sent this particular cab driver with the same name to drive Plaintiff when at ITT Tech on 2-7-15, is perceived as a "threatening communication" to Plaintiff due to what happened on 2-19-15, when Jim Carmona followed Plaintiff to the DMV.

207.    Plaintiff had lost his driver's license while traveling. The morning of 2-19-15, Plaintiff went to the DMV in Oxnard to get a replacement license. Plaintiff had called Gold Coast Cab for a ride earlier and the driver did not show up, so Plaintiff called dispatch and complained, then called a different cab company. After Plaintiff finished in the DMV, he walked out to find that the owner of Gold Coast Cab, Jim Carmona, had followed him. Jim Carmona approached Plaintiff and began saying that he had to call the dispatch and apologize or he would not send him a cab which was a strange request seeing that he had followed Plaintiff to the DMV. Plaintiff's cell was out of battery and there not being many cab companies in Oxnard so he walked to the nearest gas station to call for a cab, the owner of the gas station allowed Plaintiff to use his business phone. Plaintiff called Gold Coast dispatch to apologize for absolutely nothing and told him to send a cab. The cab came and drove Plaintiff to his house. This was the same day that

Plaintiff received the threat disguised as an "Offer to Compromise" from Ford Harrison representing The Los Angeles Film School.

208.   This visit from Jim Carmona was a "threatening communication" due to the emailed threat from Ford Harrison on the same day, and for several other reasons that indicate that Gold Coast Cab had been partly involved in the planning of the attack on the Metrolink train or just the conspiracy to create suspicious circumstances around Plaintiff afterwards as part of the suspected scheme that was hatching within the Oxnard Police Department:

(1) On or around  2-6-15, the day before orientation, when Plaintiff was at the hotel near ITT Tech, Gold Coast Cab sent a young man in his thirties with the name Jose, last name unknown, to drive to Office Depot for supplies.

(2) The owner of Gold Coast Cab company, the same company, followed Plaintiff to the DMV on 2-19-15, only a few days before the attack, and approached Plaintiff in a threatening manner telling him to apologize for complaining to the dispatch earlier because the cab didn't arrive on time.

(3) Ford Harrison sent the threat disguised as an Offer to Compromise for 1000.01 making reference to both Plaintiff attack in 1999 and Plaintiff father's business address.

(4) Plaintiff reported to Judge Wayne who did not answer his email.

(5) On 2-23-15, Plaintiff emailed the Rejection to the Offer to Compromise to both Ford Harrison and JAMS Arbitration - who had threatened Plaintiff shouting Mr. Basile Off with your head on 2-13-15.

(6) On the evening of 2-23-15, Daniel Kohler or Mitchell Silberberg & Knupp emailed the threat making references to the details of the attack that occurred the nest day.

COMPLAINT

(7) The Metrolink attack on 2-24-15, was caused by an old man with the same first name as the cab driver that Gold Coast Cab had sent to drive Plaintiff on 2-6-15.

(8) The local Oxnard Police staged a break in into Plaintiff's family's home to then respond and threaten Plaintiff's mother, around 7-20-15, when Plaintiff went to refile the 2049 page declaration that was concealed after its filing on 6-10-15, the declaration which had information about the threats received from Ford Harrison and Mitchell Silberberg & Knupp in the few days before the train attack, and certainly the reason for the break in and threat by the Oxnard Police was their failure to investigate and disregard for the NTSB's report that clearly stated the man who derailed the train had intentionally applied the emergency brake on the truck when he left it on the tracks, which was noted in the documents Plaintiff had filed that were concealed. (*See* **Complaint, Exhibits - Volume I. - Exh. 1 - p. 16 - (2049 page Declaration filed 6-10-15, not posted until 6-30-15)**

(9) Months later, Plaintiff checked his voicemail on his cell phone which he doesn't usually check and found that Jose the mid-thirties cab driver that Gold Coast Cab Company had sent to drive Plaintiff to get Office supplies on or around 2-6-15, had left Plaintiff a message to see if he wanted to go get something to eat at 10:19pm on 2-19-15. The same day Jim Carmona followed Plaintiff to the DMV, the same day that Ford Harrison sent the emailed threat. Jose the cab driver from Gold Coast cab intentionally left his name on Plaintiff' s voicemail between 2-7-15 and 2-24-15. This certainly was intended to be used later by conspiring parties to either give an excuse to Oxnard Police and other authorities to illegally arrest Plaintiff or worse, or convince Plaintiff's parents by use of Larry the retired LAUSD Chief who lives next door to Plaintiff, to make false statements to coerce Plaintiff's parents into helping them have Plaintiff falsely arrested and protect ALL

DEFENDANTS who conspired to carry out the attacks on Plaintiff's sister and father.

209.   It appears that the only reason Plaintiff was not framed in some way is that he reported everything to the press and the Pentagon as soon as it appeared that a frame up was being constructed between November 2015 through January 201The retired LAUSD Police Chief who lives in the same gated community as Plaintiff's family, began telling Plaintiff's father that he believes that his son is the problem, relating to the Metrolink attack. These activities are in violation of 18 U.S.C. 2339A, relating to providing material assistance and 18 U.S.C. 1503(a), relating to obstruction of justice).

210.   DEFENDANT, United States District Court - Central District of California - Western Division – (clerk - Andres Pedro) engaged in "racketeering" activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961 by committing the following crimes.  Andres Pedro received a Manual Filing of non-paper exhibits to Plaintiff's Complaint for the related case for copyright infringement - *Basile v. Warner Bros.*, after receiving and stamping Plaintiff' copy of the exhibits, Andres Pedro or another employee noted the receipt of **(Complaint,  Exhibits 1, 2, 4, 5, 8, 9, 10, 11, 12, 13, 14, 14a., 14b., 16, 16a., 16b., 16c., 17, 18, 18a., 19, 20, 23 on DVD)** on the  Pacer website but then did not properly forward the exhibits  to Judge Gee, who stated in her order erroneously dismissing this copyright infringement case, that the Court had never received the exhibits. The theft of these exhibits is a violation of 18 U.S.C. § 2076 and "RICO" laws relating to racketeering as defined in 18 U.S.C. § 1961 - 18 U.S.C. § 1503(a) - (relating to obstruction of justice) and 18 U.S.C § 2339A – (relating to "providing material support").

*(See* **Complaint, Exhibits - Volume IV. -**

Exh. 1 - (Pacer Docket # 4)

Exh. 2 - (Andres Pedro receiving the *Basile v. Warner Bros.* filing); and

Exh. 10 - (Photo of the stamped copy of the exhibits Plaintiff kept for his records)

211.    These non exhibits included e.s.i. of the email from Daniel Kohler of Mitchell, Silberberg, & Knupp – counsel for Sony Pictures Entertainment, which had previously been concealed from Judge Gee for 20 days when filed in the concealed 2049 page declaration in *Basile v. The Los Angeles Film School* - possibly to remove exhibits. This exhibit provided as e.s.i here was related to the evidence just discovered at that time, from the Leaked Sony Emails appended to the Complaint, *Basile v. Warner Bros. Entertainment,* relating to the Metrolink attack that the Kohler email was threatening the day before with his references to details not discovered until the press released an article immediately after.

*(See* Complaint, Exhibits - Volume I. - Exh. 1 (Pacer - Docket # 96) concealed from the judge was Volume I. - Exh.13 [Declaration in Support of Plaintiff's Motion to Vacate Arbitration Award, which included Exhs. 24-28);

also outright stolen and concealed from the judge completely with the same email from Daniel Kohler of Mitchell, Silberberg & Knupp was
Complaint, Non-Paper Exhibits - Volume IV. – Disk 1- Folder 1- [Complaint, Exhs. 1, 2, 4, 5, 8, 9, 10, 11, 12, 13, 14, 14a., 14b., 16, 16a., 16b., 16c., 17, 18, 18a, 19, 20, and 23]

212.    During briefing of *Basile v. Sony Pictures Entertainment* in The Ninth Circuit Court of Appeals after the erroneous dismissal of the case in District Court,

Plaintiff filed a Motion to Transmit Physical Exhibits Pursuant to Rule 27-14. The motion was granted and Plaintiff filed with the Ninth Circuit Court clerk the "Requested Replications of the Exhibits" that were originally manually filed in District Court to its Declaration in Support of Plaintiff's Motion Opposing Defendant's Motion to Dismiss, Exhibits 1,3,6,9. (**See Complaint, Exhibits - Volume III., Exh. 5 - Notice of Manual Filing, Decl., Exhs. 1, 3, 6, 9)**

213.    The Motion to Transmit Physical Exhibits Pursuant to Rule 27-14 filed in the Ninth Circuit Court listed Declaration in Support of Plaintiff's Motion to Dismiss, Exhibits 1,3,6,9; the copy of the stamped package Plaintiff managed to keep with DVD identical to the package manually filed with the Ninth Circuit clerk lists Exhibits 1,3,6,9, - but when preparing this complaint Plaintiff found that the Pacer website now only reflects that Exhibits 1,3,and 9 were received by the Court.

(*See* Complaint, Exhibits - Volume III. - Exh. 10 - Motion to Transmit Physical Replications of Exhibits and photo of the stamped package filed with the Replications of Exhibits)

(*See* Complaint, Exhibits - Volume III. - Exh. 7 - (Docket # 19 – Posting by the clerk of the Ninth Circuit Court of Appeals indicating that the court only received Replications of Exhibits 1, 3, 9)

214.    The Exhibit 6 was the DVD of the film "MIB3". It appears that since the dismissal of this copyright claim by the District Court and the Ninth Circuit Court disregards copyright law, the DVD Plaintiff provided the Court was removed from the package by someone and not posted as received by the Court, so the only copy of the "MIB3" DVD provided to the judges was the copy manually

COMPLAINT

filed by DEFENDANT, Sony Pictures Entertainment. This leads to the probable suspicion that the "MIB3" DVD that they filed was edited. Nonetheless, the removal of the "MIB3" DVD filed by Plaintiff; its exclusion from the Pacer posting as received by the court and it not having been properly forwarded to the judges, DEFENDANT, The Ninth Circuit Court of Appeals (unknown clerk) is in violation of Federal statutes including 18 U.S.C. § 2073 for not fulfilling his/her duty of keeping records, and making a fictitious entry to note that the Exhibit 6 had not been filed or received by the Ninth Circuit Court clerk; this act is a violation of "RICO" laws as defined in 18 U.S.C. § 1961 – (18 U.S.C. § 1503(a) - relating to obstruction of justice); also a violation of ( 18 U.S.C. § 2319 - relating to criminal infringement of copyright).

215.    During briefing of *Basile v. Twentieth Century Fox Film Corporation* in The Ninth Circuit Court of Appeals after the erroneous dismissal of the case in District Court, Plaintiff filed a Motion to Transmit Physical Exhibits Pursuant to Rule 27-14. The motion was granted and Plaintiff filed with the Ninth Circuit Court clerk the "Requested Replications of the Exhibits" that were originally manually filed in District Court to its Declaration in Support of Plaintiff's Motion Opposing Defendant's Motion to Dismiss, Exhibits <u>1, 2, 7, 10, 15, 22, 24, 26</u> <u>(See Complaint, Exhibits - Volume II. - Exh. 1 [Pacer - Docket #s 24, 25, 27, 28,</u> <u>29, 30, 31, 33]</u>

216.    The Motion to Transmit Physical Exhibits Pursuant to Rule 27-14 filed in the Ninth Circuit Court listed Declaration in Support of Plaintiff's Motion to Dismiss, Exhibits 1,2,10,15,22,24,26. (Exhibit # 7) was removed from the Motion to Transmit itself, and Plaintiff cannot find in his records his stamped copy of the exhibits from when they were manually filed at the Ninth Circuit Court.

Plaintiff did not exclude Exhibit 7 - Prometheus Trailer cut footage - from the list of exhibits requested to transmit or from the package with DVD manually filed with the clerk. Because the "MIB3" DVD was stolen by an unknown clerk, its very probable that with the removal of this exhibits they were able to change out the Motion to Transmit from the Pacer as well, either before the first scanning of the document after filing, or sometime between then and now. When the non-paper exhibits for *Basile v. Warner Bros. Entertainment* were stolen from Plaintiff's briefcase when kidnapped in Las Vegas, 10-31-15, this Motion to Transmit Replications of Exhibits and accompanying DVD could probably also have been removed. (*See* Complaint, Exhibits - Volume II. - Exh. 9 [see Docket # 17] and (Complaint, Exhibits - Volume II. - Exh. 12 [Motion to Transmit Physical Exhibits])

217.   All appeals: *Basile v. The Los Angeles Film School, LLC; Basile v. Twentieth Century Fox Film Corporation; Basile v. Sony Pictures Entertainment; Basile v. Warner Bros.* all of which were supported by substantial amounts of direct evidence were dismissed all on the same day, 2-27-17, shortly after the filing of Plaintiff's Corrected Reply Brief in *Basile v. Sony Pictures Entertainment* - filed after Plaintiff was threatened by the FBI not to brief the court any further about Nancy Pelosi having been caught conspiring with Sony Pictures and other DEFENDANTS. The court  requested this brief be filed as a Corrected Reply Brief.

*Basile v. The Los Angeles Film School, LLC* had a Motion to Transmit Physical Exhibits granted and pending but deemed moot on the day of the dismissals indicating that there was an executive order of some kind  to dismiss all cases in the Ninth Circuit Court. This disregard for Federal Statutes and copyright laws, in itself is a violation of "racketeering" laws as defined in 18 U.S.C. § 1961

§ 1962(a), § 1962(b), § 1962(c), § 1962(d), by violation of predicate crimes **18 U.S.C. § 1503** (relating to obstruction of justice); **§ 1512** (relating to tampering with a witness, victim, or an informant); **§ 1832** (relating to economic espionage); **§ 1957** (relating to monetary transactions in property derived from specified unlawful activity); **§ 2332b** (acts of terrorism transcending national boundaries) **§ 1958** (relating to murder for hire – attack by car accident and attack by train derailment);  **§ 2319** (relating to <u>criminal infringement of copyright)</u>

 All facts provided to the Ninth Circuit Court of Appeals are now supported by additional evidence.

218.  DEFENDANTS, F.B.I.- (Agent Conrad Byrd and other unknown agent who gestured to his gun when Agent Byrd threatened Plaintiff not to further brief the Ninth Circuit about what was found about Nancy Pelosi), engaged in "racketeering" activities in violations of "RICO' laws as defined in 18 U.S.C. § 1961 - relating to 18 U.S.C.§ 1503(a) - (obstruction of justice), 18 U.S.C. § 2339A - (providing "material support) and 18 U.S.C. § 1512 (intimidation of a victim). F.B.I. agents Conrad Byrd and the other unidentified agent, <u>came to Plaintiff's parent's home</u> and threatened Plaintiff at his door on 11-19-15, to not further brief the judges of The Ninth Circuit Court of Appeals with any information relating to Nancy Pelosi, <u>shortly after the Leaked Sony Emails with analysis were provided to the Court in Plaintiff' Motion for Leave to File a Brief in Support of  Plaintiff's Reply Brief</u> for forwarding to investigative authorities, <u>Agent Conrad Byrd and the other unnamed agent threatened to contrive evidence to reflect Plaintiff was threatening Nancy Pelosi or something to that effect by holding up a stack of papers when referencing the evidence that they lied about having had showing Plaintiff making threats to Nancy Pelosi, which does not exist and could not exist,</u>

the unnamed agent made a gesture threatening to shoot Plaintiff if he did; Plaintiff was at that time rewriting the already submitted Brief in Support as a Corrected Reply Brief as directed by the Ninth Circuit Court.

219.   This occurred only a few days after an Agent who only identified himself by his first name, and asked if Plaintiff had time to come to F.B.I. headquarters to talk about the Plaintiff's kidnapping that occurred one year earlier, which was already reported to the Magistrate Cam Ferenbach in the Nevada District Court who did nothing to help Plaintiff. Plaintiff had just come home from Las Vegas when Joe called found this very out of place so he referred the man who said he was an Agent to the documents detailing everything that had occurred up to that point.

220.   The cameras and motion detectors connected to the ADT home alarm system at Plaintiff's parent's home had been functioning properly in the days before Agent Byrd and the other unnamed Agent visited and threatened. When Agent Byrd and the unnamed agent came to Plaintiff's door and rang the doorbell, Plaintiff responded and walked to the front door that is mostly glass. The motion detector inside the home in the downstairs area near the front door picked up Plaintiff walking to the door; the indoor camera pointing towards the door took clips every few minutes while Plaintiff was standing at the door having the brief conversation through the glass, and during the time Plaintiff made the phone call to FBI HQ to the number that Agent Byrd had given when they had first arrived to call and verify they were indeed agents; however, the front door camera does not show any activity at all beginning from when Plaintiff walked from his room to the front door to answer the doorbell.

COMPLAINT

221.   The switch to turn off the camera is located to the left of the door, so if Plaintiff had shut off the camera when he walked to the door, the front door camera would still have taken a clip of the agents walking to the front door to ring the doorbell.

222.   Plaintiff contacted ADT and was told that the camera had been shut off, so because there was no clip taken from the front door camera of the agents walking to the door, the front door camera was either shut off by an FBI hacker or by someone at the ADT HQ. (A true and correct copy of the documents showing the motion sensors and indoor camera activity; and the Plaintiff's phone call to FBI HQ are appended hereto as Exhibit 16)

223.   DEFENDANT, The Nevada District Court (unknown employee(s)), have engaged in "racketeering" activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961 – 18 U.S.C. § 1503(a) – relating to obstruction of justice and 18 U.S.C. § 2339A – relating to providing material support, by violating 18 U.S.C. § 2076.

It was just noticed that during litigation of *Basile v. Southwest Airlines, Co,* Nevada District Court clerk received Plaintiff's non-paper exhibits filed concurrently with its Memorandum and Declaration to its Motion Opposing Defendant's Motion to Dismiss on 8-15-16, then concealed it. ( *See* **Complaint, Exhibits - Volume V.  - Exhs. 17 and 18).** Unknown Nevada District Court employee(s) did not list the non-paper exhibits as received on Pacer indicating at that some point after the exhibits were manually filed with the clerk, the exhibits were taken and concealed from Judge Boulware.

This concealment and theft possibly caused the erroneous dismissal of all claims to Plaintiff's First Amended Complaint but this can't be confirmed as Judge

Boulware did not mention anything about not having had the DVD with non-paper exhibits to the declaration during hearing or state that it was reason that his decision was to dismiss the claims that were proven with those exhibits. Judge Boulware's order was to dismiss a claims to Plaintiff's First Amended Complaint with the exception of Plaintiff's claim for defamation which was not dismissed. The previously noted "RICO" violations and the Nevada Court's failure to acknowledge these obstructions confirms the Nevada District Court's participation in the existing conspiracy.

224.    In addition to <u>the admission by Southwest Airlines employees</u> in depositions on April 18th and 19th , 2018, of having intentionally contrived a scene that did not occur and report to LVMPD making false statements from the plane intending to result in Plaintiff's violent false arrest, the supporting false irregularity reports given 10-31-15, the day Plaintiff was kidnapped in Vegas, contain references to the MIB production as admission that they had been put up to task by these parties affiliated with the MIB production, who had just been reported as suspects in the Ninth Circuit Court of Appeals:

Lynne Richardson of Ford Harrison - counsel for The Los Angeles Film School; Daniel Kohler of Mitchell, Silberberg, & Knupp - counsel for Sony Pictures Entertainment.

225.    DEFENDANT, Southwest Airlines, Co. (flight attendant Kathleen Gadberry), engaged in "racketeering" activities as defined in 18 U.S.C. § 1961 – relating to 18 U.S.C. § 1503(a) and 18 U.S.C. § 2339A. Ms. Gadberry contrived then reported a scene that did not occur, from the plane to ground crew in McCarran Airport in Las Vegas who relayed to LVMPD, shortly after Plaintiff had

been accused of leaving a suspicious bag in the originating airport gate in SFO at the beginning of his trip back to Los Angeles, when returning from filing in the Ninth Circuit Court the emails received from Sony Pictures' and Los Angeles Film Schools' counsels received as threats in the few days before the Metrolink attack, in its Reply Brief for *Basile v. Sony Pictures Entertainment.* The filing was made on the same day as the flight back to Los Angeles though Las Vegas, Nevada.

(*See* Complaint, Exhibits - Volume III. - Exh. 12 (*Basile v. Sony Pictures Entertainment* – Reply Brief)

(*See* Complaint, Exhibits - Volume V. - Exh. 14 (*Basile v. Southwest Airlines, Co.* - Complaint)

(*See* Complaint, Exhibits - Volume V. – Exhs. 35 and 36)

226.   DEFENDANT, Southwest Airlines, Co (flight attendant Kathleen Gadberry,- the initiating flight attendant aboard the plane who made the false statements) engaged in "racketeering" activities as defined in 18 U.S.C. § 1961 relating to 18 U.S.C. § 1503(a) and  § 2339A, 18 U.S.C. § 1512 - intimidation of a victim, by sending a Facebook friend request to Plaintiff on 3-17-17, after her having temporarily evaded deposition. (*See* Complaint, Exhibits - Volume V. - Exh. 33)

Plaintiff had just returned to his family's home after giving his deposition in Las Vegas. It was only a few minutes after Plaintiff arrived that the Friend Request was sent to his Facebook account. It appears someone working for Southwest was watching Plaintiff's house. Kathleen Gadberry's activities were received as "threatening communication" to provide material support or service by threatening

Plaintiff not to pursue investigation of Ms. Gadberry and other Southwest personnel put up to task of framing Plaintiff, and also to prevent investigation of the parties involved in litigation - Sony Pictures Entertainment who enrolled Southwest personnel to participate in conspiracy, after their having engaged in a conspiracy by plotting and carrying out of acts of terror targeting Plaintiff and his family, which had just been reported the same day as the attempted frame up.

227.  On 2-26-18, Craig Delk of Thorndal, Armstrong, Delk, Balkenbush & Eisinger, filed a completely false version of an original report Plaintiff had filed earlier in litigation on 11-10-15 as Statement in Support of Plaintiff's Motion Opposing Defendant's Motion to Dismiss - during the first phase of discovery with Magistrate Judge Cam Ferenbach (*See* Complaint, Exhibits - Volume V. - Exh. 29 [Exh. 6 - Original kidnapping report filed by Plaintiff]) which detailed the first time Plaintiff had been kidnapped, threatened and robbed in Las Vegas on 10-31-15 only a few hours after Plaintiff had arrived in town to file its Motion Opposing Defendant's Motion to Dismiss.

Mr. Delk filed this intentionally false version of the original kidnapping statement when motioning for protective order precluding the conspiring Southwest employees from depositions. (*See* Complaint, Exhibits - Volume V. - Exh. 29 [Exh. 8 - Violent and threatening version of kidnapping report filed then withdrawn by Southwest's counsel - Craig Delk]

228.  DEFENDANT, Thorndal, Armstrong, Delk, Balkenbush, & Eisinger (Craig Delk) has engaged in "racketeering" activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961 - related to 18 U.S.C. § 1503(a), 18 U.S.C. § 2339A, 18 U.S.C. § 2332b(a)(2) – having threatened to commit a violent kidnapping and/or murder which Plaintiff was victim of on 4-10-18, that occurred

almost the same way as what Mr. Delk falsely reported in the motion for protective order he filed then withdrew precluding the conspiring Southwest Airlines' employees' depositions. This was a serious and believable threat to Plaintiff at the time, before Plaintiff meeting with Dr. Leark on **4-7-18**. Plaintiff was violently kidnapped near the Nevada District Court in Las Vegas on 4-10-18 while waiting for an Uber. Plaintiff had just filed the report and recording of what had happened in meeting with Dr. Leark relating to obstructions, threats and alteration of evidence that Dr. Leark was supposed to review before the meeting. Dr. Robert A. Leark, also in violation of **18 U.S.C. § 1503(a) and 18 U.S.C. § 2339A.**

229.  On **11-12-15,** Craig Delk of Thorndal, Armstrong, Delk, Balkenbush & Eisinger, also previously threatened Plaintiff after the first kidnapping occurred on 10-31-15, when he emailed Plaintiff for scheduling of a meet and confer only a few weeks  after Plaintiff had been kidnapped. In his email, Mr. Delk made a reference to the email from Sony's counsel, received by Plaintiff on 2-23-15, the day before the Metrolink attack. Mr.Delk began his email with the same phrase, "**As you know…**"

This email had already been filed in this Court and been made public knowledge. It was this same email that was part of the presentation of evidence just reported in the Ninth Circuit Court when Southwest Airlines personnel attempted to first frame Plaintiff for a suspicious bag in SFO, then falsely reported a scene that did not occur from aboard the plane to have Plaintiff falsely arrested before returning home to LA. (*See* Complaint, Exhibits - Volume V. - Exh. 29 [Exh. 10]

230.   DEFENDANT, Thorndal, Armstrong, Delk, Balkenbush & Eisinger have engaged in "racketeering" activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961 - 18 U.S.C. § 1503(a) - (relating obstruction of justice),

18 U.S.C. § 1512 (intimidation of a victim),18 U.S.C. § 2339A – (providing material support). The false version of the kidnapping that Mr. Delk filed was completely different and menacingly violent, involving Plaintiff being bound and gagged, then thrown in the trunk of a car. This threat is a violation of 18 U.S.C. §§ 1512, 1513, and "RICO" laws relating to kidnapping: 19 U.S.C. § 1959(a), § 1959(a)(4) and § 1959(a)(5), § 1962(a) - § 1962(d), **for reason that Plaintiff had been kidnapped a second time on 4-10-18** while waiting for an Uber near the Court after lodging the recording of the first day of testing with Neuropsychologist Dr. Robert A. Leark, during which Dr. Leark admitted that documents were not properly forwarded to him by Craig Delk before the Rule 35 exam as had been ordered by the Court,  and then threatening to report Plaintiff as noncompliant to the Court if  Plaintiff  didn't continue with the exam right then without reporting to the Magistrate to ask for guidance as to what to do. Dr. Leark's behavior was very bazaar.

This second kidnapping occurred very similarly to the false kidnapping story described by Craig Delk in his intentionally false report summarizing what had been previously reported by Plaintiff in its statement. The  Motion for Protective Order was intended to fraudulently prevent Plaintiff from deposing the four flight attendants. This Motion for Protective Order was filed on **1-26-18,**  shortly before the Rule 35 Exam was scheduled to take place.

231.   The style of the second kidnapping was a confirmation that the fraudulent and false version of the details of the kidnapping that Mr. Delk reported to create a distorted picture of Plaintiff's mental state to the Neuropsychologist and the Nevada District Court, was indeed a "threatening communication" for Plaintiff to have been realized later after the second kidnapping. All acts relating to this obstruction of process are deliberate and are "racketeering" acts in violation of

"RICO" laws as defined in as 18 U.S.C. § 1961- relating to 18 U.S.C. § 1503(a) - (obstruction of justice),  § 1512  - (intimidation of a victim), § 2339A - (providing material support), § 1959(a), § 1959(a)(4), § 1959(a)(5) - (relating to kidnapping), and § 1962(d).

(*See* Complaint, Exhibits - Volume V. - Exh.  33 and 34)

(A true and correct copy of the photos of Plaintiff's injuries after being kidnapped the second time in Las Vegas, shortly after leaving the courthouse on 4-10-18, the day Plaintiff reported several issues and violations that occurred during the first day of testing which were all proven with a recording of Neuropsychologist – Robert A. Leark confirming the that Mr. Delk had not properly forwarded the complete PTSD report, are appended hereto as Complaint, Exh. 17)

232.   When Dr. Robert A. Leark was asked at the beginning of Rule 35 Exam on **4-7-18**, whether he had received specific important exhibits attached to Plaintiff PTSD Report that proved Plaintiff's claim against Southwest and how their personnel had engaged in conspiracy relating to the investigation of the Metrolink attack  - suspects of whom had just been reported when the Southwest incident was staged by its employees, <u>Dr. Leark admitted that Southwest's counsel – Craig Delk, had not forwarded the items Plaintiff had described to him that were attached to the PTSD report, these exhibits having been removed by Craig Delk before forwarding the document in violation of 18 U.S.C. §1519 and in violation of the Court's order</u>.

233.   Plaintiff was told by Judge Boulware in hearing on **2-6-18,** to write and forward to Mr. Delk this PTSD report so it could be forwarded to the

Neuropsychologist conducting the exam to ensure he would make an informed assessment of Plaintiff's condition from PTSD relating to the event with Southwest personnel. (*See* Complaint, Exhibits - Volume V. - Exh. 34a. - Judge Boulware's order for a PTSD to be prepared)

234.   DEFENDANT, Robert A. Leark, on the first day of scheduled testing 4-7-18, became obstructionist by evading simple questions relating to his receipt of the PTSD Report that was ordered by the Court to be prepared by Plaintiff then forwarded to the doctor conducting the mandatory Neuropsychology Exam Pursuant to F.R.C.P. 35.

When asked necessary questions relating to the critical exhibits appended to the PTSD Report explaining what had occurred before Southwest personnel had attempted to frame Plaintiff - first in SFO for a suspicious bag then from on the plane by making false statements – Dr. Leark's behavior became very suspicious and unusual his repeating several times "I read what I received,", "This is not a deposition", "Are you refusing to cooperate?", "I'm starting the exam now". It's quite clear that this was an attempt to force Plaintiff to have to leave the appointment and seek guidance on the discovery issue of Mr. Delk having violated 18 U.S.C. § 1519, in violation of "RICO" laws by destroying, altering, or falsifying the PTSD Report, but also the obstruction and threat to report Plaintiff as noncompliant to the Court.  Plaintiff stayed for the day of testing which included a two hour oral exam talking about Plaintiff life and background, then several written tests over the next several hours. Plaintiff then sought guidance from the Court and encountered several "RICO" violations by Magistrate Judge Cam Ferenbach.

235.   DEFENDANT, Robert A. Leark, engaged in "racketeering" activities as defined in 18 U.S.C. § 1961 - relating to 18 U.S.C. §1512 (intimidation of a victim), relating to 18 U.S.C. § 1503(a) (obstruction of justice), furthering a conspiracy to provide "material support" to those responsible for the Metrolink attack in violation of 18 U.S.C. § 2339(A).

(*See* Complaint, Exhibits - Volume V. - Exhs. 33, 34 and 42-49)

236.   DEFENDANT, Nevada District Court ( Magistrate Judge Cam Ferenbach) engaged in "racketeering" activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961, by violating 18 U.S.C. § 2073 when reporting in his order cancelling any further Neuropsychology Examination, that Plaintiff was to blame for the problems encountered on the first day of testing. The order written by Magistrate Judge Ferenbach, after review of Plaintiff's Motion to Compel the Cooperation with Discovery that included the recording of the 5 hours of testing and the introduction with Dr. Leark when the problems were discovered with the forwarded PTSD report and with Dr. Leark himself, completely contradicted the recording of the session. Judge Ferenbach even cancelled any further testing noting that Plaintiff would just behave the same way so there was no point to continue. Additionally noting that Plaintiff would only be due the presumed or assumed damages for the per se defamation that with good cause should proceed to trial.

237.   The discovery issues discovered at the meeting with Dr. Leark were not small issues <u>as there were several "RICO" violations</u> - 18 U.S.C. § 1519, 18 U.S.C. § 1512, 18 U.S.C. § 1503(a), and 18 U.S.C. § 2339A. To seek guidance from the Magistrate Judge overseeing discovery was appropriate. (*See* Complaint, Exhibits - Volume V. - Exhs. 33, 34, 35, and 36)

238.   Judge Ferenbach's order reflected that he took Mr. Delk's word as the truth, and disregards the obstruction discovered when Plaintiff met Dr. Leark as it was reported by Plaintiff, <u>with recording</u>. Judge Cam Ferenbach spoke inappropriately faulting Plaintiff as there was a recording having documented the inappropriate behavior and threats by the doctor conducting the exam. (*See* Complaint, Exhibits - Volume V. - Exh. 37)

239.   DEFENDANT Nevada District Court (Judge Richard F. Boulware II.) engaged in "racketeering" activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961, relating to 18 U.S.C. § 1503 (a)(obstruction of justice):

Judge Boulware dismissed Plaintiff's remaining claim for defamation contradicting what had been proven in previous record filed during litigation of the case and then further proven in the just obtained depositions of the four Southwest Employees. Evidence obtained in the defamations proved the false statements made by Southwest employees on the day of the incident to be per se defamations by knowingly false accusations of crimes and knowingly false follow up statements made by two of the four Southwest employees, 7 months after the incident which was later proven to have been a deliberate frame up to have Plaintiff falsely arrested. Judge Boulware's dismissal contradicted evidence proving that the <u>admissions by the Southwest employees of having made false statements and their contradictions of previous statements that they made in the depositions further proving that the incident was an attempted frame up,</u> and that in the follow up statements made by two of the four Southwest employees they had made deliberate references to the "MIB3" production and footage in the first MIB film, as threatening communications.

240.   Further obstruction by violation of  18 U.S.C. § 2339A - relating to (providing material support), Judge Boulware dismissed the case on the grounds that Plaintiff had failed to complete the Neuropsychology Examination pursuant to F.R.C.P. 35 that he had ordered after Southwest Airlines' counsel requested it in hearing., overlooking critical "RICO" violations by both Dr. Leark and Craig Delk, only discovered the morning of the first day of the Neuropsychological Exam.

241.   Judge Boulware had ordered that a PTSD Report be prepared by Plaintiff and forwarded to Southwest Airlines' counsel - Craig Delk -  describing the symptoms of the PTSD that Plaintiff is experiencing as a result of the attempted frame up by Southwest personnel that first included an accusation of having left a suspicious bag at the gate – strongly indicating a frame up for terror.

242.   All materials in the PTSD Report were extremely important for the doctor's review because contributing to the severity of the symptoms, the incident occurred when returning from opening an investigation into the Metrolink attack, that was threatened the day before by Sony Pictures counsel - who were referenced in the threatening follow up statements by Southwest personnel. After his receipt, Craig Delk was to then forward the report to the doctor conducting the Neuropsychological Exam - Dr. Robert A. Leark.

What was discovered at the first day of the Neuropsychological Exam on 4-7-18, is that Craig Delk had not forwarded the complete PTSD Report that he had from 2-6-18 to 4-7-18 to do, but had removed critical information relating to the circumstances under which Southwest Airlines personnel had attempted to frame Plaintiff for terror then have him falsely arrested on the day of the incident; that Southwest personnel had made false statements after the day of the incident , false statements which included threats; and that Craig Delk had even filed a

completely false and violent version of a kidnapping report Plaintiff had filed early on in litigation , then withdrew it, just before the Neuropsychological Exam was to take place. Mr. Delk then inappropriately told the doctor in the hour he met with him before the appointment that morning of the exam, that Plaintiff was crazy, having already removed the parts of the report that clearly proved that Plaintiff was not.

When kidnapped, as Plaintiff had truthfully reported in the original report, Plaintiff was threatened and robbed a few hours after arriving in Las Vegas to file its Motion Opposing Defendant's Motion to Dismiss.

243. The behavior of Dr. Robert A. Leark encountered by Plaintiff, was unreasonable and unusual; he evaded answering normal questions regarding his receipt of the PTSD Report then began to threaten Plaintiff repeating several times, " Are you refusing to cooperate?" in a very inappropriate and threatening manner. These acts were violations of "RICO laws as defined in 18 U.S.C. 1961 - relating to 18 U.S.C.§1503(a) and 18 U.S.C.§ 2339A, as Dr. Leark was deliberately obstructionist and obviously talking in circles covering up that he had not been given the complete report and making excuses as to why he had not read the complete report, then insisted that Plaintiff continue with the exam while threatening to report Plaintiff as noncompliant.

244. Even though he behaved this way, Plaintiff stayed for the complete day of examination which included several hours of oral examination and several hours of written tests lasting about 5 hours in total. At the end of the day, Dr. Leark even suggested that Plaintiff contact the court for guidance for any issues before proceeding.

COMPLAINT

245.   It's unfair and not in the pursuit of justice that Judge Boulware would then dismiss the case due to Plaintiff not having completed the examination when there were RICO violations that occurred at the first day of the exam and it was discovered that <u>Craig Delk had removed select items from the report that he didn't want the doctor to see, in violation of  18 U.S.C. § 1512, to intentionally mislead the doctor into making a false diagnosis relating to damages sought.</u> When an attorney's misrepresentations are egregious, courts will bend over backwards to correct the problem, as demonstrated in *Barlow v. Colgate Palmolive Co.*  F 3d. 2014 WL 6661086 (4th Cir. Nov. 25, 2014).

In *Barlow*, the Fourth Circuit relying on Rule 11 held the district court could consider vacating a fraudulently obtained remand order under Rule 11, despite the provision of the removal statute that prohibits "review" of the order of remand and the fact the case was already in state court. The same premise applies here but more severe.

246.   Judge Ferenbach deliberately made false statements in his order on Plaintiff's Motion to Compel Cooperation with Discovery, which was timely filed after the first day of Neuropsychological Exam where the "RICO" violations were discovered and occurred. His statements in his order **(Complaint, Exhibits – Volume - V. - Exh. 37)** are in violation of 18 U.S.C. § 2073 as the order on the Plaintiff's motion revealing the serious discovery issue, irresponsibly contradicts the facts as reported to the Court of what occurred, going even further and defaming Plaintiff by speaking of his behavior as "hostile" when the complete opposite is true;  among other things that happened during the course of litigation, Mr. Delk threatened to kidnap Plaintiff gangland style before the court.

247.   Judge Ferenbach intentionally presented Plaintiff in a false light because the order on the discovery issue would certainly be read by Judge Boulware when reviewing the Defendant's several Motions to Dismiss filed after. **(*See* Complaint, Exhibits - Volume V. - Exhs. 42-47)**

Since the facts of what had occurred at the exam were not mentioned by Judge Boulware in his order dismissing for reason that the Rule 35 was not completed, it's clear that he must have only read Judge Ferenbach's order cancelling any further testing and also simultaneously sabotaging Plaintiff's claim by preventing the exam from continuing after adjustment to the corrupted process, which ultimately resulted in Judge Boulware erroneously dismissing the case.

248.   These facts having been reported to the Court with evidence in Plaintiff's Motion to Compel Cooperation with Discovery with a recording clearly showing the obstructions and conspiracy, and the evidence in the deposition transcripts and videos with detailed analysis **(*See* Complaint, Exhibits - Volume V. - Exh. 42 (also Exh. 33-36))**  proving that the Southwest flight attendants at issue attempted to at the very least have Plaintiff falsely arrested by false statements proving the per se defamations as a matter of law, and Judge Boulware then having dismissed the case solely on the fact that the Neuropsychological Exam had not been completed, is obstruction. The Court had been provided evidence proving that the exam had been corrupted in several ways by acts violating RICO laws - 18 U.S.C. § 1503(a) and § 2339A.

249.   It's fair to say that it's possible that Judge Boulware took Judge Ferenbach's word of what happened at the corrupted exam to be true in his order cancelling any further examination, then dismissed based on that order without

then considering the facts discovered that prove the intentional frame up by the employees entitling Plaintiff to Summary Judgement as a matter of law, however, the fact would still remain if one was to take that to position that <u>Judge Ferenbach cancelled any further examination</u> when the guidance of the Court was properly sought after obstruction encountered on the first day of examination, so not to have hearing or reschedule the examination after Dr. Leark could be properly briefed and Craig Delk disciplined, or just granting summary judgment based on the findings during depositions that left no triable issues of material fact, is in violation of 18 U.S.C. 2339A by "providing material support" for all Southwest Airlines employees, their counsel, and Dr. Robert A. Leark.

250.   DEFENDANT Nevada District Court (Judge Richard F. Boulware II.) engaged in "racketeering" activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961 - relating to 18 U.S.C. § 1503 (a) and 18 U.S.C. 2339A.

During discovery hearing relating to Initial Disclosures after the Plaintiff's complaint had detailed what the current circumstances were relating to the false statements made by Southwest Personnel on the day of the incident.

On 3-28-17, Judge Boulware issued a Discovery Order denying Plaintiff the deposition of the first Southwest employee who began the series of per se defamations by false statements and false accusations of crimes, (*See* Complaint, Exhibits - Volume V. - Exh. 34b), who in SFO airport at the beginning of Plaintiff's trip back from the Ninth Circuit Court, had falsely accused Plaintiff of having left a suspicious bag at the gate after checking in. Due to Plaintiff then having been falsely reported relating to a scene that was contrived and that did not happen from aboard the planer, a reasonable person can only conclude that this was a part of the plan by Southwest employees to frame Plaintiff for having

something to do with a suspicious bag that in the airport context could have been a frame up for terror.

By preventing Plaintiff the deposition of this Southwest Airlines employee in SFO, Judge Boulware prevented Plaintiff from obtaining details of the conspiracy and protected the interests of DEFENDANT Southwest Airlines, Co. and the parties who put them up to the task of framing Plaintiff on the day of the incident, in violation of "RICO" laws as defined in 18 U.S.C § 1961 - 18 U.S.C. § 1503(a) and 18 U.S.C. § 2339A.

251.   DEFENDANT Nevada District Court – (Judge Richard Boulware, II) Plaintiff filed a refile of the Complaint to reflect that the jurisdiction was appropriate pursuant to 1332. When dismissing the Plaintiff Complaint on 7-12-16, requesting a refile with revision to jurisdiction, Judge Boulware noted in his order dismissing the reason to be that there was not any jurisdiction noted on the Complaint. (*See* Complaint, Exhibits - Volume V. - Exh. 13 and Exh. 4)

Plaintiff had already corrected the issue immediately after filing, therefore, basing his dismissal on there not having been a correction made was an unnecessary delay in the litigation and a violation of RICO laws as defined in 18 U.S.C § 1961 - 18 U.S.C. § 1503(a) and 18 U.S.C. 2339A.

252.   DEFENDANT,  Caesars Entertainment Corporation - RIO All-Suites Hotel and Casino security, first been approached Plaintiff in the lounge of the RIO Hotel, forced Plaintiff to sit in a wheelchair, pushed him through the casino, then once outside in a valet area Plaintiff was threatened by the armed RIO Hotel security to leave Las Vegas without filing what he was in Las Vegas to file, then when Plaintiff  said that he would be filing the opposing motion on that Monday, Plaintiff was forced into an awaiting ambulance, kidnapped, drugged,  then robbed

by ambulance personnel. Having committed the first kidnapping in concert with unknown ambulance personnel only a few hours after Plaintiff checked in to the hotel on 10-31-15, engaged in "racketeering" activities as defined in 18 U.S.C. § 1961 – in violation of "RICO" predicate laws 18 U.S.C. §§ 1503(a), 1512, 2332b, 2332b(a)(2).

253.   DEFENDANT, LVMPD whose detectives ( particularly Det. Burns) – engaged in "racketeering" activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961 - 18 U.S.C. §§ 1503(a) and 2339A - by refusing to retrieve camera footage of Plaintiff's kidnapping and robbery that could have resulted in Plaintiff's death by overdose - as when kidnapping Plaintiff ambulance personnel had rendered him unconscious with drugs while taking him off casino property before robbing him of the original stamped exhibits from his briefcase that had been lodged with Plaintiff's Motion Opposing Defendant's Motion to Dismiss, in *Basile v. Warner Bros.*. <u>These exhibits were later denied to have been received by Judge Gee of this Court several months later, even though the exhibits were posted as received by the clerk on Pacer.</u>
**(*See* Complaint, Exhibits - Volume IV. - Exh. 10)**

254.   On 10-31-17, Judge Michael Kellogg of the LA Superior Court – Van Nuys stated to Plaintiff when presented with a verbal summary of what Plaintiff had discovered through investigation into <u>the already dismissed</u> illegal arrest and two felony conviction, that he remembered the case and that he had dismissed ALL CHARGES in the case in September 2016 when Attorney Jeff Voll had presented the court with the request for dismissal noting the Plaintiff's findings that the arrest and conviction was achieved by frame up then corruption of Plaintiff's counsel.

He then only said that "they" changed the document referring to his employees. Judge Kellogg then ordered the employees in the courtroom to give Plaintiff a document that reflected that it had originally been dismissed in September 2016, and that it the record that was changed has now been corrected to reflect the original dismissal a year before. Plaintiff has this original document and it reflects that this obstruction was brought to the attention of the Court and corrected after being addressed.

255. DEFENDANT, LA Superior Court – Van Nuys – (unknown employees) violated 18 U.S.C. § 1519, 18 U.S.C. § 2076, 18 U.S.C. § 2073, and engaging in racketeering in violation of "RICO" laws as defined in 18 U.S.C. § 1961 - acts related to 18 U.S.C. § 1503, § 2339A, § 2319, (*See* Complaint, Exhibits - Volume VI. - Declaration in Support of Plaintiff's Petition for Dismissal Pursuant to P.C. 1203.4, Exh. 2 **[Decl., in Support of Plaintiff's Petition for Writ of Error Coram Nobis. Ex. 1 – 3]**) These acts were in furtherance of criminal infringement of a copyright - 18 U.S.C. § 2319 - as the Petitions for Writ of Certiorari for the several copyright claims to this Complaint, had been submitted to The United States Supreme Court for review after this illegal conviction had been brought to the Court's attention and removed from Plaintiff's record in September 2016, specifically for the reason of clearing Plaintiff's name after having been victim to a proven conspiracy that resulted in several illegal arrests and conviction.

**256.   Violations of 18 U.S.C. § 1512(a), § 1512(b), § 1512(c), and  § 1512(d) (relating to tampering with a witness, victim, or informant):**

**18 U.S.C. § 1512(a), § 1512(b), § 1512(c), and  § 1512(d)**

**(a)**

    **(1)** Whoever kills or attempts to kill another <u>person</u>, with intent to—

        **(A)** prevent the attendance or testimony of any <u>person</u> in an official proceeding;

        **(B)** prevent the production of a <u>record</u>, document, or other object, in an official proceeding; or

        **(C)** prevent the communication by any <u>person</u> to a <u>law enforcement officer</u> or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;

    shall be punished as provided in paragraph (3).

    **(2)** "Whoever uses physical force or the threat of physical force against any person, or attempts to do so, with intent to –

        **(A)** influence, delay, or prevent the testimony of any person in an official proceeding

        **(B)** cause or induce any **(i)** withhold testimony, or withhold a record, document, or other object, from an official proceeding; **(ii)** alter, destroy, mutilate, or conceal an object with intent to impair the integrity or availability of the object for use in an official proceeding; **(iii)** evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or **(iv)** be absent from an official proceeding to which that person has been summoned by legal process; or

**(C)**hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

shall be punished as provided in paragraph (3).

**(3)**The punishment for an offense under this subsection is—

**(A)**in the case of a killing, the punishment provided in sections 1111 and 1112;

**(B)**in the case of— **(i)**an attempt to murder; or**(ii)**the use or attempted use of physical force against any person; imprisonment for not more than 30 years; and**(C)**in the case of the threat of use of physical force against any person, imprisonment for not more than 20 years.

**(b)**Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

**(1)** influence, delay, or prevent the testimony of any person in an official proceeding;

**(2)** cause or induce any person to—

**(A)**withhold testimony, or withhold a record, document, or other object, from an official proceeding;

**(B)** alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

COMPLAINT

**(C)** evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

(D) be absent from a proceeding to which such person has been summoned by legal process;

**(3)** hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation [1] supervised release,,[1] parole, or release pending judicial proceedings; shall be fined under this title or imprisoned not more than 20 years, or both.

**(c)**Whoever corruptly –

    **(1)**alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

    **(2)**otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

**(d)**Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from—

    **(1)**attending or testifying in an official proceeding;

    **(2)**reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of

131

conditions of probation  supervised release, parole, or release pending judicial proceedings;

**(3)** arresting or seeking the arrest of another person in connection with a Federal offense; or

**(4)** causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding; or attempts to do so, shall be fined under this title or imprisoned not more than 3 years, or both.

## 18 U.S.C. § 2332b(a)(2)

**(a). -** Prohibited Acts

**(1)** Offenses - Whoever, involving <u>conduct transcending national boundaries</u> and in a circumstance described in subsection (b)—

   **(A)** kills, kidnaps, maims, commits an assault resulting in <u>serious bodily injury</u>, or assaults with a dangerous weapon any person within the United States; or

**(B)** creates a substantial risk of <u>serious bodily injury</u> to any other person by destroying or damaging any structure, conveyance, or other real or personal property within the United States or by attempting or conspiring to destroy or damage any structure, conveyance, or other real or personal property within the United States;

in violation of the laws of any <u>State</u>, or the <u>United States</u>, shall be punished as prescribed in subsection (c).

**(2)** -Treatments of threats, attempts, and conspiracies - Whoever threatens to commit an <u>offense</u> under paragraph (1), or attempts or conspires to do so, shall be punished under subsection (c).

257.   DEFENDANTS, The Los Angeles Film School, LLC. (Robert Sweeney); Twentieth Century Fox Film Corporation (Alexander "Sam" Moreno and Mark Kaufman – Fox Security, Charlize Theron); JAMS, Inc., ( Judge Diane Wayne- (ret.) ); The Beverly Hills Police Department; Michelle Obama; Blake Lively; Ford Harrison (Lynne Richardson); Mitchell, Silberberg & Knupp (Daniel Kohler); Warner Bros Entertainment (Christopher Nolan and Nathan Krowley); Sony Pictures Entertainment (Amy Pascal Etan Cohen and other employees) TMZ; Scott Free Films, LLC. (Ridley Scott); Southwest Airlines, Co. (Kathleen Gadberry, Brittany Mackley; Tony Powell; Ruben Murrieta and unknown SFO gate Employee); Thorndal, Armstrong, Delk, Balkenbush & Eisinger (Craig Delk and Madison N. Gregor); Caesars Entertainment Corporation (RIO All - Suites Hotel and Casino); Dr. Robert A. Leark; Oxnard Police Department; The Federal Bureau of Investigation(Agent Conrad Byrd and unknown Agent);  Onza Partners SL and Onza Entertainment; Kropke Entertprises; Sony Pictures Television; have engaged in "racketeering" activities described in the previous paragraphs and (Complaint, Exhibits - Volumes I. - VI.), in violation of "RICO" laws as defined in 18 U.S.C. § 1961 - relating to 18 U.S.C. § 1512 and 18 U.S.C. § 2332b(a)(2):

The Los Angeles Film School, LLC. (Robert Sweeney), acted in violation of §1512(a)(2)(A), §1512 (a)(2)(B), §1512 (a)(2)(C) and §2332b(a)(2);

Twentieth Century Fox Film Corporation  - Alexander "Sam" Moreno and Mark Kaufman(Fox Security), acted  in violation of §1512(b)(1), §1512(b)(2)(a) and

§2332b(a)(2); Charlize Theron, acted in violation of §1512(b)(1) and § 2332b(a)(2);

Alston & Bird, LLC (Casondra K. Ruga), acted in violation of §1512 (a)(2), §1512 (a)(2)(C), §1512 (b)(1), §1512 (b)(2)(A), §1512 (b)(2)(C), §1512 (b)(2)(D) and §2332b(a)(2);

Caldwell, Leslie Proctor (Linda M. Burrow), acted in violation of §1512 (a)(2), §1512 (a)(2)(C), §1512 (b)(1), §1512 (b)(2)(A), §1512 (b)(2)(C), §1512 (b)(2)(D) and §2332b(a)(2);

JAMS, Inc. - ( Judge Diane Wayne- (ret.), acted in violation of §1512(b)(1) and § 2332b(a)(2);

The Beverly Hills Police Department, acted in violation of §1512(a)(1)(B), §1512 (a)(2)(A), §1512 (a)(3)(B) and §2332b(a)(2);

Michelle Obama, acted in violation of §1512(b)(1) and §2332b(a)(2);

Blake Lively, acted in violation of §1512 (b)(1), §1512 (b)(2)(D) and §2332b(a)(2);

Ford Harrison (Lynne Richardson), acted in violation of §1512(d)(1), §1512(a)(2), §1512(a)(2)(B)(iii) and §2332b(a)(2);

COMPLAINT

Mitchell, Silberberg & Knupp (Daniel Kohler), acted in violation of §1512 (a)(2), §1512 (a)(2)(C), §1512 (b)(1), §1512 (b)(2)(A), §1512 (b)(2)(C), §1512 (b)(2)(D) and §2332b(a)(2);

Warner Bros Entertainment (Christopher Nolan and Nathan Krowley), acted in violation of §1512(a)(1)(A), §1512 (a)(1)(B), §1512 (a)(1)(C) and §2332b(a)(2);

Sony Pictures Entertainment (Amy Pascal Etan Cohen and other employees), acted in violation of §1512(a)(1)(A), §1512 (a)(1)(B), §1512 (a)(1)(C) and §2332b(a)(2);

TMZ, acted in violation of §1512 (a)(2)(A), §1512 (a)(2)(B), §1512 (b)(1), §1512 (b)(2)(A), §1512 (b)(2)(D),  §1512 (d)(1), §1512 (d)(2) and §2332b(a)(2);

Scott Free Films, LLC. (Ridley Scott), acted in violation of §1512 (a)(2)(A), §1512 (b)(1), §1512 (b)(2)(A), §1512 (d)(1), §1512(d)(2) and §2332b(a)(2);

Southwest Airlines, Co. (Kathleen Gadberry, Brittany Mackley; Tony Powell; Ruben Murrieta and unknown SFO gate Employee), acted in violation of §1512 (a)(2)(A), §1512 (a)(2)(C) and §2332b(a)(2);

Caesars Entertainment Corporation (RIO All - Suites Hotel and Casino); acted in violation of virtually all subsections of §1512 including  (a)(1)(A), (a)(1)(B) and (a)(1)(C),  and §2332b (a)(1)(A), §2332b (a)(2);

Thorndal, Armstrong, Delk, Balkenbush & Eisinger (Craig Delk and Madison N. Gregor), acted in violation of §1512(c)(1), §1512(c)(2), §1512(b)(2)(B) and §2332b(a)(2);

Dr. Robert A. Leark , acted in violation of §1512(b)(1) and §2332b(a)(2);

Oxnard Police Department, acted in violation of §1512 (b)(1), §1512 (b)(2)(A), §1512 (b)(2)(D); and § 2332b(a)(2);

The Federal Bureau of Investigation(Agent Conrad Byrd and unknown Agent), acted in violation of §1512(a)(2)(A), §1512(a)(2)(C) , §1512(b), §1512(d) and §2332b(a)(2);

Onza Partners SL and Onza Entertainment, acted in violation of §1512 (a)(1), §1512(a)(2)(A) and §2332b(a)(2);

Kropke Entertprises, acted in violation of §1512 (a)(1), §1512(a)(2)(A) and §2332b(a)(2);

Sony Pictures Television, acted in violation of §1512 (a)(1), §1512(a)(2)(A) and §2332b(a)(2);

**258.   Violations of 18 U.S.C. §  2332b(g)(5)(B)(i)  (relating to acts of terrorism transcending national boundaries) - 18 U.S.C. § 1992 (relating to terrorist attacks)** and other acts of violence against railroad carriers and against mass transportation systems on land, on water, and through the air:

**18 U.S.C. § 1992 – related codes (a)(1), (a)(8), (a)(9), (a)(10):**

**(a)**General Prohibitions – Whoever, in a circumstance described in subsection (c), knowingly and without lawful authority or permission –

**(1)** wrecks, derails, sets fire to, or disables railroad on track equipment or a mass transportation vehicle;

**(8)** surveils, photographs, videotapes, diagrams, or otherwise collects information with the intent to plan or assist in planning any of the acts described in paragraphs (1) through (6);

**(9)** conveys false information, knowing the information to be false, concerning an attempt or alleged attempt to engage in a violation of this subsection; or

**(10)** attempts, threatens, or conspires to engage in any violation of any of paragraphs (1) through (9),

shall be fined under this title or imprisoned not more than 20 years, or both, and if the <u>offense</u> results in the death of any person, shall be imprisoned for any term of years or for life, or subject to death, except in the case of a violation of paragraph (8), (9), or (10).

259.   DEFENDANTS, The Los Angeles Film School, LLC. (Robert Sweeney); Twentieth Century Fox Film Corporation (Alexander "Sam" Moreno and Mark Kaufman – Fox Security, Charlize Theron); JAMS, Inc., ( Judge Diane Wayne- (ret.) ); The Beverly Hills Police Department; Michelle Obama; Blake Lively; Ford Harrison (Lynne Richardson); Mitchell, Silberberg & Knupp (Daniel Kohler); Warner Bros Entertainment (Christopher Nolan and Nathan Krowley); Sony Pictures Entertainment (Amy Pascal Etan Cohen and other employees) TMZ; Scott Free Films, LLC. (Ridley Scott); Southwest Airlines, Co. (Kathleen Gadberry, Brittany Mackley; Tony Powell; Ruben Murrieta and unknown SFO gate Employee); Thorndal, Armstrong, Delk, Balkenbush & Eisinger (Craig Delk and Madison N. Gregor); Caesars Entertainment Corporation (RIO All - Suites

Hotel and Casino); Dr. Robert A. Leark; Oxnard Police Department; The Federal Bureau of Investigation(Agent Conrad Byrd and unknown Agent);  Onza Partners SL and Onza Entertainment; Kropke Enterprises; Sony Pictures Television; have engaged in "racketeering" activities described in the previous paragraphs and (Complaint, Exhibits - Volumes I. - VI.), in violation of "RICO" laws as defined in 18 U.S.C. § 1961 – relating to 18 U.S.C. § 2332b(g)(5)(B)(i) - <u>18 U.S.C. § 1992(a)(10).</u>

260.   DEFENDANT, TMZ, additionally in violation of 18 U.S.C. 1992(a)(8).

**261.   <u>Violations of § 2339B (relating to providing material support or resources to designated foreign terrorist organizations)</u>**

(a) Prohibited Activities,

(1) Unlawful conduct, - "Whoever knowingly <u>provides material support   or resources to a foreign terrorist organizations</u>, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 20 years, or both, and , if the death of any person results, shall be imprisoned for any term of years to life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization. (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity(as defined in section 212(a)(3)(B) or the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism ( as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

**In violation of § 2339B,**

262.   DEFENDANTS, Onza Partners SL - Onza Entertainment; Sony Pictures Entertainment, Sony Pictures Television; NBC Universal; and Nancy Pelosi, engaged in "racketeering" activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961 - 18 U.S.C. § 2339B, **by conveying an international threat** by release of "El Ministario Del Tiempo" on 2-24-15, the same day as the Metrolink attack in Oxnard, Ca.

This fact is supported by clear references to the Metrolink attack having been in the emails with discussions regarding the campaign contributions from Sony Pictures to Nancy Pelosi.

263.   DEFENDANTS, Onza Partners SL - Onza Entertainment, filed a confusing and possibly completely fraudulent Complaint against Sony Pictures Entertainment, NBC Universal, Sony Pictures Television, and Eric Kripke, with intent to mislead this Court and create confusion as to the origin of the material infringed by Sony Pictures Entertainment in "MIB3" - after MIB3 was already proven to have been created using the "time travel" elements from Plaintiff's works that were originally received by Michael Angelo Soccio and Etan Cohen and used in "MIB3" by Sony Pictures and Amblin Entertainment, sold to them by Damon Lindelof who Peter J. Abrahams and Marilyn Giardino-Zych from The Los Angeles Film School had sold Plaintiff's materials to. (A true and correct copy of the Joint Stipulation For Dismissal With Prejudice [F.R.C.P. 41(A)(1)(A)(ii)]by the parties is appended hereto as Exhibit 18)

264.   DEFENDANTS, Sony Pictures Entertainment (Amy Pascal - known to have been planning with Nancy Pelosi who noted in a not so difficult code

discovered in email, that she would contract ISIS for the Metrolink attack in exchange for campaign contributions);  and Onza Partners SL and Onza Entertainment (who appear to have planned the date of the attack – proven so by their show's <u>first episode</u> being released on the same day as the Metrolink attack - 2-24-15) ; are in violation of "RICO" laws relating to "racketeering" activities as defined in 18 U.S.C. § 1961, by engaging in acts to prevent litigation of the copyright claim *Basile v. Sony Pictures Entertainment,* by means of violent crimes to "aid in racketeering activities" defined in 18 U.S.C. § 1961 - 18 U.S.C. § 1959(a), 18 U.S.C. § 1959(a)(4), § 1959(a)(5), and 18 U.S.C. § 1992(a)(10), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, and 18 U.S.C. § 2339C, by conspiring to plot and carry out the Metrolink attack noted in detail in the above paragraphs for campaign contributions.

**265.   Violations of 18 U.S.C. § 2232b (g)(5)(B)(i) – § 2339C –prohibitions against the financing of terrorism)**

(a) Offenses

 (1) In General - Whoever, in a circumstance described in subsection (b), by any means, directly or indirectly, unlawfully and

willfully provides or collects funds with the intention that such funds to be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out -

  (A) an act which constitutes an offense within the scope of a treaty specified in subsection (e)(7), as implemented by the United States, or

  (B) any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the

hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act, shall be punished as prescribed in subsection (d)(1).

(2) Attempts and conspiracies-  attempts or conspires to commit an offense under paragraph (1) shall be punished as prescribed in subsection (d)(1)

266.   DEFENDANT, Sony Pictures Entertainment (Amy Pascal) and Nancy Pelosi, have been discovered in the Leaked Sony Emails to have engaged "racketeering" activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961 - relating to 18 U.S.C. § 2339C, Amy Pascal forwarded money received from her employers - Sony Pictures Entertainment - to Nancy Pelosi as campaign contributions in exchange for her service of contracting ISIS to plot an attack on the Metrolink train, with intention to prevent further litigation of *Basile v. Sony Pictures Entertainment*.  (***See*** Complaint, Exhibits - Volume III. - Exh. 16)

It becomes clear that Plaintiff's father was the intended target as the Sony Emails detail Sony executives discussing the surveillance on him before the attack; Eric Kripke was also found to have been discussing Plaintiff's father's license plate and Metrolink after in a later email reported immediately to the Pentagon.

## 267.   Violations of  18 U.S.C. § 1959  - (relating to violent crimes in aid of racketeering activity)

**(a)**Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged

in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished—

**(1)** for murder, by death or life imprisonment, or a fine under this title, or both; and for kidnapping, by imprisonment for any term of years or for life, or a fine under this title, or both;

**(2)** for maiming, by imprisonment for not more than thirty years or a fine under this title, or both;

**(3)** for assault with a dangerous weapon or assault resulting in serious bodily injury, by imprisonment for not more than twenty years or a fine under this title, or both;

**(4)** for threatening to commit a crime of violence, by imprisonment for not more than five years or a fine under this title, or both;

**(5)** for attempting or conspiring to commit murder or kidnapping, by imprisonment for not more than ten years or a fine under this title, or both; and

**(6)** for attempting or conspiring to commit a crime involving maiming, assault with a dangerous weapon, or assault resulting in serious bodily injury, by imprisonment for not more than three years or a fine of under this title, or both.

**(b)** As used in this section—

**(1)** "racketeering activity" has the meaning set forth in section 1961 of this title; and **(2)** "enterprise" includes any partnership, corporation, association,

or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce.

268.    DEFENDANTS, The Los Angeles Film School; Thorndal, Armstrong, Delk, Balkenbush & Eisinger; Michelle Obama; Jams, Inc.; TMZ; Scott Free Films, LLC; Sony Pictures Entertainment; Warner Bros. Entertainment;  Mitchell, Silberberg & Knupp; Onza Partners SL – Onza Entertainment; Ford Harrison; and Blake Lively have engaged in "racketeering" activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961 – relating to violent crimes in aid of racketeering - 18 U.S.C. § 1959 (a)(4),  - "threatening to commit a crime of violence".

269.    ALL DEFENDANTS, engaged in "racketeering" activities as defined in 18 U.S.C. § 1961 – related to 18 U.S.C. § 1959 (a)(5), 18 U.S.C. § 1959 (a)(6), plotting, execution and threatening of the attack on Plaintiff's sister using Beverly Hills police on **11-5-13** - this being the "accident" that was previously threatened by Robert Sweeney of Los Angeles Film School and then spoken about and admitted to by Amy Pascal and Etan Cohen in the Leaked Sony Emails - and the Metrolink attack.

270.    DEFENDANT , Blake Lively was enrolled by Twentieth Century Fox who she was working with in a film "Savages" at the time, to have Plaintiff falsely arrested after The Los Angeles Film School had already stolen and sold his submitted assignments and prevent his discovering this fact. Ms. Lively surprised Plaintiff at a restaurant / bar 504 near the The Los Angeles Film School that Plaintiff would frequent. She first drugged Plaintiff when he arrived at 504 bar then after a few minutes several times insisted that he go out with her - even

though Plaintiff and her brother Jason Lively had many years ago had a falling out over a night in the mid 90s. - Plaintiff felt the effects of what was in scotch she had given him after only a few sips as he was leaving with her. When leaving, several paparazzi began crowding and approaching as the two walked to get pizza – this seemed planned to cause a Plaintiff some type of problem as the paparazzi inappropriately crowded Plaintiff. On this night in the 90s causing Plaintiff and Jason Lively to stop talking, Jason Lively's promoting partner friend invited Plaintiff and his current girlfriend to a bar he and Jason Lively were promoting. When Plaintiff and his girlfriend were leaving that night, similarly to how the night with Blake Lively was staged, several men attacked Plaintiff and his girlfriend and Plaintiff's girlfriend's jaw was broken in 3 places – this history having been relied upon by the parties who planned to use Blake Lively to create an arrest situation hoping to draw some type of violent response after Blake Lively drugged Plaintiff at the beginning of the night when he arrived at 504 bar, then later spit in his face in front of paparazzi. At the entrance of a second bar the two had walked to on Hollywood Blvd., Blake Lively changed her disposition abruptly and spit in Plaintiff's face in front of paparazzi, after a night of spending time with Plaintiff - intending to have Plaintiff falsely arrested. Plaintiff was shocked and did absolutely nothing and was then physically manhandled by security; Plaintiff escaped and ran for safety.

271.    Blake Lively  has engaged in "racketeering" activities in violation of "RICO" laws as defined in 18 U.S.C. § 1961 –relating to 18 U.S.C §1503(a) for attempting to prevent Plaintiff from discovering that his works had been stolen and sold by The Los Angeles Film School, also in furtherance of 18 U.S.C § 2319 – criminal infringement of a copyright The "Prometheus" trailer was released the next month.

272.   After viewing the video of Michelle Obama's speech on **11-8-13**, three days after Plaintiff's sister Elizabeth Basile was attacked by Beverly Hills Police, it becomes clear that the parties who bragged about having ordered the attack on **11-5-13** - discovered in the Leaked Sony Emails to have been Amy Pascal and Etan Cohen -  also engaged in conspiracy to commit this attack with Michele Obama and the White House; Blake Lively having played her part in this conspiracy when she attempted frame Plaintiff in January 2012, one month after the shooting at The Los Angeles Film School which occurred on the same day as the release of the MIB3 trailer with time travel from Plaintiff's copyrighted works, 12-12-11. Her appearance at the White House 3 days after the Beverly Hills Police attacked Plaintiff sister, coupled with the threats and references in Michelle Obamas speech to Plaintiff's family's home on Shirley where Plaintiff had previously been poisoned then framed (*See* Complaint, Exhibits  - Volume VI.), this act is proven to be part of a conspiracy initiated by the studios who infringement Plaintiff works and supported by Michelle Obama, and possibly in collaboration with the District Attorney's office who had a few months before backdated an indictment for "resisting arrest", for an incident or non-incident that occurred two years earlier,  when Plaintiff was not arrested – relating to littering that did not occur. This case was investigated and dismissed.

273.   The conspiracy to carry out the attack on Plaintiff's sister on **11-5-13**, involving  Sony Pictures (Amy Pascal and Etan Cohen- the writer for MIB3) in collaboration with the parties who had  threatened Plaintiff after stealing and misappropriating his assignment (Robert Sweeney of The Los Angeles Film School whose threats were clear in the police reports - and the parties who had already at this time fused Plaintiff's copyrighted works into their films in production and later released the films theatrically - particularly Twentieth Century

Fox who Blake Lively was working with when surprising Plaintiff in January 2012; and Michelle Obama with whom Blake Lively sat while leveling a threat directly at Plaintiff and his family three days after Plaintiff's sister was attacked on **11-5-13,** is therefore proven to have been plotted, carried out and bragged about in online media by **DEFENDANTS,** The Los Angeles Film School, Sony Pictures Entertainment (Amy Pascal and Etan Cohen), Warner Bros. Entertainment (Christopher Nolan, Nathan Krowley), Beverly Hills Police Department, Blake Lively and Michelle Obama, to aid in racketeering with intention to prevent Plaintiff from further pursuing legal remedy for damages from the theft and use of his copyrighted works in violation of **18 U.S.C. § 2319, having violated 18 U.S.C. § 1959.**

274.   DEFENDANTS, The Los Angeles Film School (Robert Sweeney), Twentieth Century Fox Film Corporation , including– Security Alexander "Sam" Moreno, Mark Hauffman, Sony Pictures Entertainment (Amy Pascal, Sony Security), Michelle Obama, Blake Lively, Onza Partners SL– Onza Entertainment, Warner Bros. Entertainment, Christopher Nolan, Jonathon Nolan, Caesars Entertainment Corporation (RIO All Suites Hotel and Casino), Thorndal, Armstrong, Delk, Balkenbush & Eisinger, LVMPD, The Ninth Circuit Court of Appeals, the Federal Bureau of Investigation, JAMS Arbitration, Ford Harrison, Oxnard Police Department, Beverly Hills Police Department, and Gold Coast Cab Company – Jim Carmona, engaged in activities related to the planning and execution of the attack on Plaintiff's sister, Elizabeth Basile, by Beverly Hills Police 11-5-13; and the attack on Plaintiff's father on the Metrolink train on 2-24-15; and the threatening of such acts of violence.

275.   DEFENDANTS, John Doe and Jane Does 1-10, engaged in kidnapping and conspiracy to commit kidnapping in violation of "RICO" laws  - specifically 18 U.S.C. § 1959 – having committing a violent crime in aid of "racketeering" activity.

(North Vista Hospital, John Doe - tall, thin, white man with a beard, emergency room doctor)
( North Vista Hospital, Jane Doe - short, thin, white woman, red hair, emergency room doctor)
(Unknown ambulance drivers – John Does 1-10)

276.   On 4-10-18, Plaintiff was waiting for an Uber on the corner of Fremont and Las Vegas Blvd in front of Henessey's bar and restaurant. Plaintiff had just walked from Nevada District Court after filing the Motion to Compel Cooperation after the sabotaged meeting for neuropsychological exam with Dr. Leark. Plaintiff walked from the Nevada District Court to Fremont St to get something to eat then an Uber to his hotel, Plaintiff stopped in a restaurant. While sitting at their bar, Plaintiff took pictures of the filings that he had just brought to the Nevada District Court and emailed them for his records.

277.   After having some refreshment and dessert, Plaintiff left walking to an area where he had previously gotten an Uber and on the way grabbed a slice of pizza at Red Pizza. Plaintiff then called an Uber from in front of Henessey's bar. Plaintiff was wearing a charcoal grey suit and tie, and had a rolling briefcase with documents.
     As Plaintiff stood on the sidewalk, in lieu of an Uber car, an ambulance pulled up to the curb next to Plaintiff. Plaintiff looked around to see if someone

had been injured or something else was happening. Several men from the ambulance walked towards Plaintiff, several men came from behind Plaintiff and placed a board against his back then stunned Plaintiff somehow and wrapped Plaintiff up attaching him to the board then brought him down backwards onto the concrete telling Plaintiff not to speak. Plaintiff was unable to speak and was then carried into the ambulance.

278.   In the ambulance Plaintiff was smothered by several men and needles placed in several places on Plaintiff's arms and hands. Plaintiff awoke later at nighttime after an unknown amount of time had passed chained to a bed in a hospital. Plaintiff called for a nurse or someone to help and a short female doctor with red hair came into the hospital room. When Plaintiff notified her that he had just been kidnapping and abducted on the street she began yelling as if to create a scene for others to hear telling Plaintiff that he's being combative which was completely false, Plaintiff had been taken and rendered unconscious from the street. At that point, another tall thin male doctor with a beard came in and when asked to remove the chains, the doctor was also realized to be involved when he refused to take off the chains and left the room. Plaintiff was drugged and calm but terrified that he was being held captive, knowing it was a threat and possibly an attempt to steal the stamped copy of the filing just brought to the court or other items, which were in Plaintiff's locking briefcase.

279.   Plaintiff had his cell phone in his back pocket and managed to call 911. The Plaintiff called again after a few minutes to be sure that help was coming, briefly describing to the operator what had been done to him. A few minutes later, a uniformed police man or security officer came into the room and began threatening to arrest Plaintiff for calling 911, ridiculously threatening Plaintiff of

COMPLAINT

arrest saying he was committing 911 abuse. Plaintiff explained that he was very aware of his rights and had just left the courthouse after filing when kidnapped on the street while waiting for an Uber, which is without question kidnapping because Plaintiff was not engaged in any illegal activity and was clearly not a street vagrant wearing a suit with a briefcase. This was a targeted attack.

280.   The officer took Plaintiff's phone from his hand and locked it for 30 minutes then left the room. Several minutes later, after the doctors and policeman who had refused to stop kidnapping Plaintiff had become aware that Plaintiff had called 911, an unknown worker in the hospital came into the room and removed the chain attached to Plaintiff's wrist, and the chain attached to Plaintiff's ankle. He also told him to immediately leave the hospital. Plaintiff was drugged as he had been rendered unconscious from the time the men approached and kidnapooed him on the street until waking up in the hospital, possibly almost overdosed. Because Plaintiff's cell phone was locked by the police man, once outside the hospital Plaintiff asked one of the security guards outside for help calling an Uber or a taxi. While waiting, several other security guards walked in front of the hospital and threatened Plaintiff saying, " I told you not to go in there. " Plaintiff received this as a threat about pursuing the claim for defamation against Southwest Airlines because <u>he had been threatened not to file the Motion Opposing Defendants Motion to Dismiss when kidnapped the first time by RIO security on 10-31-15, and an unknown armed ambulance staff.</u>

281.   Back to Plaintiff having just escaped the hospital during the second kidnapping, after the taxi did not arrive, one security guard who Plaintiff had told what they had just done to him while waiting for an Uber, agreed that was kidnapping and offered to drive Plaintiff to his hotel. Plaintiff was brought to the

Golden Nugget where he was staying, and stayed in the casino for several hours to remain in cameras view in fear for his life. The hospital was later found through investigation to be North Vista Hospital because Plaintiff remembered a Del Taco in view from the ER exit.

282.   DEFENDANTS, Caesars Entertainment Corporation (RIO All- Suite Hotel and Casino) whose Security committed the first kidnapping with unknown ambulance personnel; and LVMPD detectives who refused to retrieve the camera footage in the days after the kidnaping being reported, are in violation of **18 U.S.C. § 1959(a)(5), 18 U.S.C. § 1959 (a)(6), and 18 U.S.C. § 1959 (a)(4) .**

283.   THE FIRST KIDNAPPING: On 10-31-15, RIO hotel security came to the Voodoo lounge where Plaintiff was socializing for a few hours after checking in, and told him that he needed to come with them. They knew Plaintiff's name and several armed guards approached Plaintiff and grabbed Plaintiff arms then walked him to the elevator. They surrounded Plaintiff into the elevator and forced him to sit in the wheelchair they had brought with them. Plaintiff was walked through the casino in this wheelchair telling people in the casino very calmly to please call 911 that he was being kidnapped. The guards pushed the chair out to the valet area that was empty then allowed Plaintiff to stand up. Once Plaintiff stood up he was told by a security guard, a short fat man with a and mustache that he was to leave Las Vegas right then and there, and also asked where his car was. Plaintiff told him he did not have a car and that he was in Las Vegas at their hotel and just arrived in town to file documents on that Monday for a case in the Nevada District court. The man scolded Plaintiff telling him no and that he was to leave Las Vegas right then and there or he would go into the ambulance that was parked and waiting right there with the back doors of the ambulance opened with several ambulance

personnel, some who were armed. Plaintiff said that he would not be leaving and that he had documents to file, the men then took his briefcases and put him in the back of the ambulance. One man immediately told Plaintiff while rendering him unconscious , "I'm killing you right now.".

284.   Plaintiff awoke in a white room with bright lights, someplace off casino property. Plaintiff was only awake for a few seconds and then rendered unconscious again, the next time Plaintiff awoke was in his hotel room back at the RIO Hotel.

285.   Plaintiff's papers were out of his briefcase and his briefcases near the door. Plaintiff felt pain all over his body as drug effects and went to get food outside of the hotel. Plaintiff then came back, knowing he must file the documents on Monday and was in danger, prepared the filing, filed on Monday and then left Las Vegas the next day.

286.   Plaintiff filed this report with LAPD when he arrived in Los Angeles knowing the LVMPD commonly worked as security in hotels, forwarded to the Nevada District Court, then later with the communications to LVMPD detectives in Las Vegas who refused to investigate and retrieve the camera footage even having been given exact times and places in the casino to find the footage.

(A true and correct copy of the recordings with Detective Burns is manually filed hereto as Exhibit 7)

**287.   Violations of 18 U.S.C. § 1958 (a) (relating to murder for hire – attack by car accident and attack of train);**

(a) Whoever travels in or causes another (including the intended victim) to travel in interstate or <u>foreign commerce,</u> or uses or causes another (including the intended victim) to use the mail or any <u>facility of interstate or foreign commerce,</u> with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined under this title or imprisoned for not more than twenty years, or both; and if death results, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both.

288.   DEFENDANTS, Sony Pictures Entertainment (Amy Pascal) and Nancy Pelosi, engaged in "racketeering" activities as defined in 18 U.S.C. § 1961 in violation of 18 U.S.C § 1958(a), used email communication to facilitate the transaction and request for campaign contributions in exchange for the attack on the Metrolink train.

**289.   Violations of 18 U.S.C. § 1832 (relating to economic espionage);**

**(a)** Whoever, with intent to convert a <u>trade secret,</u> that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that <u>trade secret,</u> knowingly—

**(1)** steals, or without authorization appropriates, takes, carries away, or
conceals, or by fraud, artifice, or deception obtains such information;

**(2)** without authorization copies, duplicates, sketches, draws, photographs,
downloads, uploads, alters, destroys, photocopies, replicates, transmits,
delivers, sends, mails, communicates, or conveys such information;

**(3)** receives, buys, or possesses such information, knowing the same to have
been stolen or appropriated, obtained, or converted without authorization;

**(4)** attempts to commit any <u>offense</u> described in paragraphs (1) through (3);
or

**(5)** conspires with one or more other <u>persons</u> to commit
any <u>offense</u> described in paragraphs (1) through (3), and one or more of such
persons do any act to effect the object of the conspiracy, shall, except as
provided in subsection (b), be fined under this title or imprisoned not more
than 10 years, or both.

**(b)** Any <u>organization</u> that commits any offense described in subsection (a) shall be
fined not more than the greater of $5,000,000 or <u>3 times the value of the</u>
<u>stolen trade secret to the organization,</u> including expenses for research and design
and other costs of reproducing the <u>trade secret</u> that the organization has thereby
avoided.

**In violation of 18 U.S.C. § 1832,**

290.   DEFENDANTS, The Los Angeles Film School, Twentieth Century
Fox, Scott Free Films, LLC., Sony Pictures Entertainment, Amblin Entertainment,
Warner Bros. Entertainment, Christopher Nolan, Jonathon Nolan, Legendary
Films, Andrew Wachowski, Lana Wachowski, engaged in "racketeering" activities

in violation of "RICO" laws as defined in 18 U.S.C. § 1961 – relating to 18 U.S.C. § 1832(a)(1) - § 1832(a)(5), by willfully and maliciously conspiring to infringe Plaintiff's copyrighted works, "The World of Jupiter" and "Crisis on Jupiter". These DEFENDANTS having also violated 18 U.S.C. § 1832(b), entitles Plaintiff to 3 times the dollar amount of the box office profits, (§ 1832(b) – "3 times the value of the trade secret to the organization").

**291.   Violations of 18 U.S.C. § 1957 (relating to monetary transactions in property derived from specified unlawful activity);**

**(a)**Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

292.   DEFENDANTS, The Los Angeles Film School, Twentieth Century Fox, Scott Free Films, LLC., Sony Pictures Entertainment, Amblin Entertainment, Warner Bros. Entertainment, Christopher Nolan, Jonathon Nolan, Legendary Films, Andrew Wachowski, Lana Wachowski, willfully and maliciously engaged in a monetary transaction in criminally derived property and conspired to infringe Plaintiff's copyrighted works, "The World of Jupiter" and "Crisis on Jupiter", therefore, the Court may impose an alternative fine to that imposable under paragraph (1) of not more than **"twice the amount of the criminally derived property in the transaction"**.

In this case, the amount of the criminally derived property is gauged by the box office profit by each infringing film and television show:

"Prometheus", "MIB3", "Timeless", "Jupiter Ascending", and excerpts of "The Dark Knight Rises"

## VI.  SECOND CAUSE OF ACTION

( For 42 U.S.C. § 1983, § 1985(1), § 1985(2), § 1985(3), § 1986, § 1988

Plaintiff hereby incorporates certain of the above paragraphs of this complaint as if fully set forth at length: To wit paragraphs **I - V**.

293.   Plaintiff alleges damages pursuant to 42 U.S.C. § 1983:

" Every person who, under color of statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia. "

294.   Plaintiff alleges damages pursuant to 42 U.S. Code § 1985: Conspiracy to interfere with civil rights:

295.   Plaintiff alleges damages pursuant to 42 U.S. Code § 1985(2) - Obstructing justice; intimidating party, witness, or juror:

COMPLAINT

" If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;"

296.    Plaintiff alleges damages pursuant to 42 U.S. Code § 1985(3) - Depriving persons of rights or privileges:

" If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of

Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators. "

264.    Plaintiff alleges damages pursuant to 42 U.S. Code § 1986 - Action for neglect to prevent:

" Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued"

297.   Plaintiff alleges damages pursuant to 42 U.S. Code § 1988 - Proceedings in vindication of civil right:

298.   Plaintiff alleges damages pursuant to 42 U.S. Code § 1988(a) Applicability of statutory and common law:

The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of titles 13, 24, and 70 of the Revised Statutes for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.

299.   Plaintiff's pursuit of civil remedy for damages due from "Defendants to the copyright claims", for their theft and use of Plaintiffs intellectual property and conspiracy which spiraled out of control immediately after, was thwarted by The US District Court, JAMS Arbitration, and The Ninth Circuit Court of Appeals, who did not properly apply copyright doctrine or established copyright case law or provide Plaintiff Constitutional rights, in fact, beginning with the United States Central District Court's decision to refer Plaintiff's first complaint - *Basile v. The*

*Los Angeles Film School* - to JAMS Arbitration based on an extremely unconscionable "Binding Arbitration Agreement":

---

### "BINDING ARBITRATION AGREEMENT" EXCERPTS:

*NOTICE OF ARBITRATION AGREEMENT*

The accompanying Binding Arbitration Agreement and Waiver of Jury Trial provides that all disputes between you and the Los Angeles Film School will be resolved by **BINDING ARBITRATION**.

- You thus GIVE UP YOUR RIGHT TO GO TO COURT to maintain any court action (EXCEPT for claims for relief of $7,500, or less, or any claim that could be brought in a small claims court or other court if competent jurisdiction for claims not exceeding $7,500)

- Your right s will be determined by a NEUTRAL ARBITRATOR and NOT a judge or jury, and you are expressly and knowingly waiving your right to a trial before a judge or jury.

- You are entitled to a FAIR HEARING, BUT the arbitration procedures may be SIMPLER AND MORE LIMITED THAN RULES APPLICABLE IN COURT.

- You agree that, by entering into this Arbitration Agreement, you are waiving the right to trial by jury or to participate in a class action or class arbitration. Arbitrator decisions are as enforceable as any court order and are subject to VERY LIMITED BY THE COURT.

**FOR MORE DETAILS:**

Carefully READ the Binding Arbitration Agreement and Waiver of Jury Trial.

Contact the Arbitration forum, JAMS, at www.jamsadr.com or 1-800-352-5267, or local JAMS office.

## **Binding Arbitration Agreement and Waiver of Jury Trial**

This Agreement is hereby entered into by and between the following parties:

"Student" (Please print)

      Name: Constantino Basile          Last for digits of SSN#: 6213

      Address: 1555 N. Vine St., #275, Hollywood, Ca. 90028

"School" or "LAFS" : The Los Angeles Film School, 6363 Sunset Blvd, Hollywood , Ca. 90068

(1)    LAFS and you agree to arbitrate all disputes, controversies and claims between us. This Agreement to arbitrate is intended to be part of your Enrollment Agreement and to be broadly interpreted. It includes but is not limited to:

- Claims arising out of or relating to any aspect of the relationship between us, whether based on contract, tort, statute, fraud, misrepresentation or any other legal theory, including without limitation, claims relating to (i) the Enrollment Agreement; (ii) the recruitment of you and/or your enrollment, attendance, or education at LAFS; (iii) financial aid or career service assistant by LAFS; (iv) any claim by either party, no matter how described, pleaded or styled, relating, in any manner, to any act or omission regarding your relationship with LAFS, its employees, or with externship sites or their employees;
- claims that arose before this or any prior agreement (including , but not limited to, claims relating to advertising);
- claims that are currently the subject of purported class action litigation in which you are not a member of a certified class;

- any objection to arbitrability or the existence, scope, validity, construction or enforceability of this Agreement; and
- claims that may arise after the termination of this Agreement.
Reference to "LAFS", "you" and "us" include its respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized, users or beneficiaries of services under this or prior Agreements between us.

(2)   Notwithstanding the foregoing, either party may bring an individual (not class) action in small claims court. **This arbitration agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies, including for example, The Federal Trade Commission. Such agencies can, if you the law allows, seek relief against us on your behalf**.

YOU AGREE BY ENTERING INTO THIS AGREEMENT, YOU AND LAFS ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION.

(3)   .......**The arbitrator and not any federal state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, scope, enforceability or formation, and/or effect of this Agreement, including, but not limited to any claim that all or any part of this Agreement is void or voidable.** This arbitration provision shall survive termination of this **Agreement.**

300.   Once referred to JAMS Arbitration, Plaintiff encountered bias and did not receive the fair hearing he was entitled to. Decisions throughout litigation in JAMS, and briefing of the following related copyright claims after in the District

Court, were followed by severely flawed dismissals of the four copyright claims by The Ninth Circuit Court of Appeals, decisions which contradicted established copyright doctrine - depriving Plaintiff of his right to his property or compensation for its use by any "Defendants to the copyright claims". Plaintiff's works were used in Defendants' films that were indeed infringing and derivative works, but if similarity is argued as reason for dismissal, at the very least, Defendants to the copyright claims' use of Plaintiff's copyrighted works or segments of, prevents Plaintiff from ever selling any original concept or idea from his own works or using them in his own production; ALL DEFENDANTS have deprived and continue to deprive Plaintiff of the right to use his own property to generate profit, a conspiracy furthered by ALL OTHER DEFENDANTS.

Plaintiff was provided biased and unfair circumstances to which Plaintiff's claims were heard, in JAMS Arbitration, United States District Court – Central District Court – Western Division, and The Ninth Circuit Court of Appeals, never receiving a jury trial in any of the four cases, all of which were presented with argument at the very least providing many triable of issues of material fact warranting jury trials in each case.

(*See* **Paragraphs 42-300**, all referenced documents [Complaint, Exhibits - Volumes I. - IV.], [Complaint, Non-Paper Exhibits on DVD and Thumbdrives - Volumes I. – VI.) and exhibits appended hereto)

301.   Furthermore, the court's disregard for established case law relating to copyright infringement and the federal statutes violated by both defendants and the court's employees during litigation of the copyright claims, is a violation of the fifth amendment and due process clause of the fourteenth amendment and therefore

Plaintiff is entitled to recover damages pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985(2) and § 1985(3), 42 U.S.C. § 1986, and 42 U.S.C. § 1988.

302.   All other Defendants who engaged in "racketeering" activities as defined in 18 U.S.C. § 1961 – in violation of 18 U.S.C. § 1962(a) - 18 U.S.C. § 1962(d), relating to serious federal crimes committed to aid and abet "Defendants to the copyright claims", furthered the conspiracy to evade liability for copyright infringement with blind faith in the system having been corrupted all the way to the top by the "Defendants to the copyright claims", with whom they've conspired.

303.   These Defendants who have not been held accountable, have engaged in violations of the Patriot Act and other Federal Statues relating to "racketeering" and  terror which are punishable by life in prison. The corrupt few in political positions who have supported these DEFENDANTS' activities are similarly liable for their participation even though they have been protected by their office or position and its abuse of power while conspiring with Defendants to the copyright claims, by among other things illegally targeting Plaintiff and his family with violence.

304.   DEFENDANTS, The Los Angeles Film School, Gold Coast Cab Company (Jim Carmona and his employee - Taxi Cab Driver named Jose (last name unknown), Ford Harrison (Lynne Richardson and Elizabeth Levy) Oxnard Police Department, Jams Inc, United States District Court, The Ninth Circuit Court of Appeals, acted in violation of 42 U.S.C. § 1983, 42 U.S.C. § 1985(2) and § 1985(3), 42 U.S.C. § 1986, and 42 U.S.C. § 1988 - by participating in activities related to events that occurred before, after, and throughout litigation of *Basile v. The Los Angeles Film School* ". *(See* Paragraphs 42-304, all referenced documents

[Complaint, Exhibits - Volumes I. - IV.], [Complaint, Non-Paper Exhibits on DVD and Thumbdrives  - Volumes I. – VI.) and exhibits appended hereto)

305.   DEFENDANTS, Twentieth Century Fox Film Corporation, Scott Free Films, LLC, United States District Court, The Ninth Circuit Court of Appeals, acted in violation of 42 U.S.C. § 1983, 42 U.S.C. § 1985(2) and § 1985(3), 42 U.S.C. § 1986, and 42 U.S.C. § 1988 - by participating in activities related to events that occurred before, after, and throughout litigation of *Basile v. Twentieth Century Fox Film Corporation, et al*. (*See* Paragraphs 42-305, all referenced documents [Complaint, Exhibits - Volumes I. - IV.], [Complaint, Non-Paper Exhibits on DVD and Thumbdrives  - Volumes I. – VI.) and exhibits appended hereto)

306.   DEFENDANTS, Sony Pictures Entertainment, Mitchell, Silberberg & Knupp (Daniel Kohler), Amblin Entertainment, NBC Universal, Sony Pictures Television, TMZ, Onza Partners SL and Onza Entertainment, Kripke Enterprises, Federal Bureau of Investigation (Agent Conrad Byrd and unknown agent who threatened to shoot Plaintiff), United States District Court, The Ninth Circuit Court of Appeals, acted in violation of 42 U.S.C. § 1983, 42 U.S.C. § 1985(2) and § 1985(3), 42 U.S.C. § 1986, and 42 U.S.C. § 1988 - by participating in activities related to events that occurred before, after, and throughout litigation of *Basile v Sony Pictures Entertainment, et al.* (*See* Paragraphs 42-306, all referenced documents [Complaint, Exhibits - Volumes I. - IV.], [Complaint, Non-Paper Exhibits on DVD and Thumbdrives  - Volumes I. – VI.) and exhibits appended hereto)

COMPLAINT

(*See* Complaint, Exhibits - Volume III - *Basile v Sony Pictures Entertainment, et al.*

307.   DEFENDANTS,  Warner Bros. Entertainment, Christopher Nolan, Jonathan Nolan, Lana Wachowski, Andrew Wachowski, US District Court, The Ninth Circuit Court of Appeals, acted in violation of 42 U.S.C. § 1983, 42 U.S.C. § 1985(2) and § 1985(3), 42 U.S.C. § 1986, and 42 U.S.C. § 1988 - by participating in activities related to events that occurred before, after, and throughout litigation of *Basile v Warner Bros. Entertainment, et al.* (*See* Paragraphs 42-307, all referenced documents [Complaint, Exhibits - Volumes I. - IV.], [Complaint, Non-Paper Exhibits on DVD and Thumbdrives  - Volumes I. – VI.) and exhibits appended hereto)

(*See* Complaint, Exhibits - Volume IV- *Basile v Warner Bros. Entertainment*

308.   DEFENDANTS, Southwest Airlines, Co., Thorndal, Armstrong, Delk, Balkenbush & Eisinger, Nevada District Court, Dr. Robert A. Leark, Caesars Entertainment Corporation (RIO All-Suite Hotel and Casino), Las Vegas Metro Police Department,  acted in violation of 42 U.S.C. § 1983, 42 U.S.C. § 1985(2) and § 1985(3), 42 U.S.C. § 1986, and 42 U.S.C. § 1988 - by participating in activities related to events that occurred before, after, and throughout litigation of *Basile v Southwest Airlines, Co.* (*See* Paragraphs 42-308, all referenced documents [Complaint, Exhibits - Volumes I. - IV.], [Complaint, Non-Paper Exhibits on DVD and Thumbdrives  - Volumes I. – VI.) and exhibits appended hereto)

*(*See* Complaint, Exhibits - Volume V. - *Basile v Southwest Airlines, Co.*)
*(*See* Complaint, Exhibits - Volume III - Exh. 16)

309.   DEFENDANTS, LA SUPERIOR COURT - Van Nuys (unknown clerks) acted in violation of 42 U.S.C. § 1983, 42 U.S.C. § 1985(2) and § 1985(3), 42 U.S.C. § 1986, and 42 U.S.C. § 1988 - by participating in activities related to events that occurred before, after, and throughout litigation of *Basile v. Sony Pictures Entertainment, et al.* and *People of the State of California v. Constantino Basile. (See* Paragraphs 42-309, all referenced documents [Complaint, Exhibits - Volumes I. - IV.], [Complaint, Non-Paper Exhibits on DVD and Thumbdrives - Volumes I. – VI.) and exhibits appended hereto)

(A true and correct copy of the 3 booklets – Petitions for Writ of Certiorari: *Basile v. The Los Angeles Film School; Basile v. Twentieth Century Fox Film Corporation; and Basile v. Sony Pictures Entertainment*, have been lodged as **Exhibit 22)**

310.   ALL OTHER DEFENDANTS, Michelle Obama, Blake Lively, and Beverly Hills Police Department; acted in violation of 42 U.S.C. § 1983, 42 U.S.C. § 1985(2) and § 1985(3), 42 U.S.C. § 1986, and 42 U.S.C. § 1988 - by participating in activities related to events that occurred before, after, and throughout litigation of  all cases included in this Complaint.

*(See* **Paragraphs 42-310,** all referenced documents [Complaint, Exhibits - Volumes I. - IV.], [Complaint, Non-Paper Exhibits on DVD and Thumbdrives - Volumes I. – VI.) and exhibits appended hereto)

*(See* Complaint, Exhibits - Volume I. ,Volume III - Exh. 16, and Volume VI.))

311.   ALL DEFENDANTS acted with no regard for Plaintiff's rights guaranteed to him and all citizens of The United States of America under the United States Constitution, more specifically,

**Fifth Amendment** - "...nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation"; and

**Fourteenth Amendment** - "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the law".

## SUPREME COURT BRIEFING

312.   Plaintiff submitted three Petitions for Writ of Certiorari to the United States Supreme Court, also providing the requested 40 copies of each document filed in each case. Per discussion with someone at the Supreme Court before submission of each case began, due to the documents having been stolen and concealed in the lower court, there was a danger for the documents to be altered so Plaintiff requested to send the record also, the Supreme Court representative agreed. At no time during the conversation with this representative was it ever stated that the record to each case would have to be presented in 6.125 x 9.25 format same as the Petition booklets. It's understood that if the record is requested by the Supreme Court, it would not be presented to them in this format by the lower court it would be provided as it was previously filed, 8.5 x 11.

313.   After submitting Petitions in three of the cases,

*Basile v. The Los Angeles Film School, LLC;*
*Basile v. Twentieth Century Fox Film Corporation;*
*Basile v. Sony Pictures Entertainment;*

with case record from the lower courts - U.S. District Court and The Ninth Circuit Court of Appeals - several times between April 2017 and July 2017, and receiving the shipments back with a vague letter from the Supreme Court clerk - Scott Traverse, each time only noting the rules that the Petitions must comply with, which Plaintiff's submissions already complied with, Plaintiff would make very small changes to the format of the booklets of each submission correcting any coloring or printing imperfections, reprint and resend the submissions.

The petitions would then come back again noting petition format rules of The Supreme Court but the last submission had the additional note:

" The materials contained in the appendix have been photo reduced which is prohibited. The size of the print must comply in all respects with Rule 33.1 (b) "

314.   Plaintiff again re-submitted the Petitions for Writ of Certiorari - *Basile v. Sony Pictures Entertainment,* also including a letter with analysis of the photos attached to the appendix of the petition , noting the photos had not been photo – reduced and had been submitted in the original digital size showing the size of the digital photos attached to the original submitted assignment. **(*See* Appended Exhibit 11)** Plaintiff received this shipment of Petitions back with the 11 boxes of previous case record from the lower courts, <u>with no letter telling</u>

Plaintiff whether or not his Writ for Certiorari had been granted; all that was in the shipment returned was the $300.00 check Plaintiff had submitted to the Supreme Court with this shipment of Petitions for *Basile v. Sony Pictures Entertainment.*

Plaintiff realized that even though the all three petitions complied with the rules after small correction the first time they were sent back, all three had still been returned twice after only vaguely noting the rules of the Supreme Court.

315.   Plaintiff contacted The Supreme Court clerk, Scott Traverse, and was told that he was referring to the record and that now the court wants the record to be submitted in 6.125 x 9.25 format, which was not how the Supreme Court would receive it from the lower court, and also relatively impossible in the amount of time allotted.

Plaintiff explained to Scott Traverse why the record was being submitted with the briefs as he was told to do so by a different court employee and after brief conversation, it was realized that the claims needed to be combined and resubmitted as one conspiracy claim.

## VII.  THIRD CAUSE OF ACTION

( For **17 U.S.C. § 106(a)** - *Copyright Infringement* )

Plaintiff hereby incorporates certain of the above paragraphs of this complaint as if fully set forth at length: To wit paragraphs **I – VI.**

316.   DEFENDANTS, Sony Pictures Television and NBC Universal continue to infringe  Plaintiffs works , Crisis in Jupiter " and " The World of Jupiter " in a derivative work  "Timeless" in violation of 17 U.S.C. § 106 by use of the same of Plaintiffs works that were used to creative MIB3, which is also a derivative work in violation of 17 U.S.C. § 106, Plaintiff's previous claim for

copyright infringement against Sony Pictures Entertainment and other "Defendants to the copyright claims" have now become "collectively" criminal infringement of a copyright in violation of 17 U.S.C. § 2319.

317.   Sony Pictures Entertainment has facilitated the infringement by sharing with its writers in their television division and NBC Universal, Plaintiffs same copyrighted works, "The World of Jupiter" and "Crisis on Jupiter" , that Sony Pictures Entertainment previously infringed in "MIB3" that continues to infringe Plaintiffs works. (***See* Appended Exhibit - 19, p. 10)  (*See also* Complaint, Exhibit - Volume III. - Exhs. 2 and 8)**

318.   Plaintiff's works are protected pursuant to17 USC § 102(a) "tangible medium of expression" beginning 9-8-11 and 9-18-11:

**319.   "Crisis in Jupiter"**

Story synopsis of "Crisis on Jupiter" and descriptions of characters' functions within the story clearly outline that <u>there are two time machines</u>, one of which is stolen by the "insane soldier scientist", and the remaining time travel technology is used by the entity who regulates all time travel to chase the character through time.

**320.   Excerpts from Plaintiff's "Crisis on Jupiter" infringed in "MIB3" and "Timeless":**

**Complaint, Exhibits - Volume III. - Exh. 2[p. 10, exh. 1a.]**
Excerpt from SYNOPSIS

" Now, one man can potentially give himself brain power of a god.
The only way to stop him would be to find where he is in time, detain him, and
destroy the duplicate machine. A man named Earth and his brother Mars are the
only living descendants of the first humans first created by Supreme Being Jupiter
and are decorated soldiers in the military. They are chosen to hunt for the machine.

**Complaint, Exhibits - Volume III. - Exh. 2[p. 11, exh. 1b.]**
EARTH - Being the only descendants of the first humans ever created by the
Supreme Being Jupiter, Earth and his brother Mars, are asked by the Global
Military of Jupiter to find a secondary time machine and the scientist who stole it
before any more damage can be caused to the planet.

**Complaint, Exhibits - Volume III. - Exh. 2[p. 12, exh. 1c.])**
CIFER - The  insane soldier scientist that stole the technology used for time
travel."

***(See* Complaint, Exhibits - Volume III. - Exh. 2**
**[pp. 10, 11, 12 - exhs. 1a., 1b.,1c.])**

**321.  "Timeless"**

Story synopsis  of "Timeless" encompasses all aspects of Plaintiff's works,
broken into several separate elements but still one very specific description of the
story evolving around two time machines and on having been stolen, and another
being used to chase the thief through time, virtually identical to Plaintiff works.

(A true and correct copy of the Timeless synopsis and article discussing its cancellation and NBC's intention <u>to now produce a film</u> as its finally is appended hereto as Exhibit 19 – synopsis of "Timeless" on page 10)

---

**Deadline Hollywood**

**6-22-2018**

**Timeless Canceled by NBC After 2 Seasons, Might Get Series Finale**

Created by Erik Kripke & Shawn Ryan,

> "Timeless launched with a mysterious criminal stealing a secret state-of-the-art time machine, intent on destroying America as we know it by changing the past. It then was up to a soldier (Lanter), a history professor (Spencer) and a scientist (Barett) to use the machine's prototype to travel back in time to critical events."

322.   Plaintiff has proven that the infringement of Plaintiff's works in "MIB3" was a willful and malicious infringement **(*See* Complaint, Exhibit Volume III. - Exh. 3 [p. 4, line 12 - p. 12, line 24 ]** Plaintiff alleges same for "Timeless".

323.   Plaintiff has proven access and substantial similarity between "Crisis on Jupiter" and "The World of Jupiter" and "MIB3" the film and "MIB3 -Alien Crisis" the video game. Since the infringement of Plaintiff's works in "Timeless" is obvious by comparison of the two works and it's clear that  DEFENDANTS, Sony Pictures Entertainment, *et al.,* who previously infringed Plaintiff's works, shared the Plaintiff's works with their television division to then make a television version based on the same of Plaintiff's works, Plaintiff establishes his copyright

claim by proving that Sony Pictures Television, NBC Universal and Erik Kripke (Kripke Enterprises) had more than a reasonable opportunity to view or copy Plaintiff's works and by comparison of the two works.

"A plaintiff establishes access, as an element to a copyright infringement claim, based on circumstantial evidence, when she establishes that the defendant had an opportunity not view or copy her work." ( *See Innovative Legal Marketing, LLC. V. Market Masters-Legal,* 852 F. Supp.2d. 688 (E.D. Va. 2012)

324.    The Copyright Act vests the copyright owner with the exclusive right to reproduce, distribute copies of, and prepare derivative works based on the copyrighted work, 17 U.S.C. § 106. Violation of any of these granted under section 106 constitutes infringement. (*See Teleprompter Corp. v. Columbia Broadcasting System, Inc.* 415 U.S. 394, 398, n.2(1974).

325.    Plaintiff, therefore is entitled to general, actual and punitive damages for infringement of its copyrighted works by DEFENDANTS, Sony Pictures Television, NBC Universal, and Kripke Enterprises.

## VIII.  FOURTH CAUSE OF ACTION

( For **17 U.S.C. § 102(a), 17 U.S.C. § 106-** *Contributory Copyright Infringement* )

Plaintiff hereby incorporates certain of the above paragraphs of this complaint as if fully set forth at length: To wit paragraphs **I - VII.**

326.    **Contributory copyright infringement** is a way of imposing secondary liability for infringement of a copyright. It is a means by which a person may be held liable for copyright infringement  though he or she did not directly

engage in the infringing activity.  In the United States, the Copyright Act does not itself impose liability for contributory infringement expressly. It is one of the two forms of secondary liability apart from 'vicarious liability'. Contributory infringement is understood to be a form of infringement in which a person is not directly violating a copyright but, induces or authorizes another person to directly infringe the copyright.

This doctrine for "contributory copyright infringement" is a development of general tort law and is an extension of the principle in tort law that in addition to the tortfeasor, anyone who contributed to the tort should also be held liable.

Contributory infringement leads to imposition of liability in two situations. First situation is when the defendant, through his conduct, assists in the infringement, and the second situation is when the means for facilitating the infringement such as machinery is provided by the defendant.

**Knowledge**

327.   The knowledge requirement for contributory infringement is an objective assessment and stands fulfilled if the defendant has actual or constructive knowledge of an infringement, i.e., if he or she has reason to believe that an infringement is taking place.

In the United States of America, the doctrine of contributory infringement is based on the 1911 case of *Kalem v. Harper Brothers.* The ingredients of contributory infringement were laid down in the Second Circuit Court of Appeals decision in *Gershwin Publishing Corp v. Columbia Artists Management Inc.* in which the court stated that contributory infringement is said to happen when someone, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another. This doctrine was developed in the

context of the 1909 Copyright Act which did not have any reference to contributory infringement. But, the 1976 Act recognized the exclusive right of a copyright owner 'to do and to authorize' the rights attached to a copyright enumerated in the Act.

The words 'to authorize' were meant to bring contributory infringements within the purview of the Act. But still, the Act did not specify the requirements of such forms of infringement and left its application to the discretion of courts.

328.   In the previous complaints Plaintiff has filed for copyright infringement, related to the infringement of Plaintiff's original works "The World of Jupiter" and "Crisis on Jupiter", Plaintiff provided the court with evidence showing substantial similarity in his and Defendants works, and access specifically noting how and when the Plaintiff's works were sold by The Los Angeles Film School to Damon Lindelof, and who the several writers and productions were that Damon Lindelof then shared all elements of Plaintiff's works with.

Plaintiff also provided the dates that his works were announced to be being used by the different writers and studios. *Erroneously,* the District Court disregarded established copyright law, failed to acknowledge threats by opposing counsel and the JAMS arbitrator when Plaintiff reported what was encountered in JAMS to seek the order vacating the JAMS dismissal of *Basile v. The Los Angeles Film School* arbitration; the District Court overlooked obstruction by its employees - as noted in Paragraphs to Plaintiff's "RICO" claim - before rendering its decisions to dismiss Plaintiff's three related copyright claims. These four complaints' erroneous dismissals having then been affirmed in The Ninth Circuit Court of Appeals, after attacks had been

proven to have been plotted by "Defendants to the copyright claims" and several other DEFENDANTS, clearly illustrates that all parties have engaged in "racketeering" in violation of "RICO" laws as defined in 18 U.S.C. § 1961, 18 U.S.C. § 1962(a) – § 1962(d), with intention to deprive Plaintiff of his constitutional rights to "due process" under the Fifth and Fourteenth Amendment of the U.S. Constitution, in violation of 42 U.S.C. § 1983, § 1985(2), and § 1985(3), § 1986, and § 1988, which are all contributing to criminal infringement of a copyright (Plaintiff's works) in violation of 18 U.S.C. § 2319.

329.    The gross misappropriation of Plaintiff's works continued from Damon Lindelof (Twentieth Century Fox Film Corporation -"Prometheus"), to Michael Angelo Soccio and Etan Cohen (Sony Pictures Entertainment - "MIB3" - film, "MIB3 - Alein Crisis" - game), to Andrew Wachowski and Lana Wachowski (Warner Bros. Entertainment "Jupiter Ascending")  to Christopher Nolan, Jonathan Nolan and David S Goyer at Warner Bros. - "The Dark Knight Rises"), and to Sony Pictures Television, NBC Universal and Erik Kripke by Sony Pictures Entertainment  - who has already been established to have infringed Plaintiffs works in "MIB3". (*See* Complaint, Non-Paper Exhibits - Volume III. - Disk 1 - Folder 1 [Exhs. 1 and 9] and Disk 1 - Folder 2 - [Exhs. A,B,C,E]

(*See also* Complaint, Non-Paper Exhibits 4, 7, and 21[Exh. 21 - "MIB3 trailer"]

330.    Although "Timeless" was cancelled in June 2018 presumably in anticipation of a lawsuit after Plaintiff's claim for copyright infringement - *Basile v. Sony Pictures Entertainment* had been submitted to The U.S. Supreme Court, the pilot episode of "Timeless" is still airing many places online and will continue

to be available everywhere online. Sony Pictures Television, NBC Universal, Erik Kripke continue to infringe Plaintiffs works in "Timeless".

331. Plaintiff has proven access and substantial similarity in all previously filed copyright claims, and that only by the District Court and Ninth Circuit Court of Appeal's failure to properly consider facts and evidences, in violation of Plaintiff's right to "due process", and only by negligent application of copyright law and established copyright case law were Plaintiff's claims for copyright infringement dismissed in the District Court and in The Ninth Circuit Court of Appeals, particularly *Basile v. Sony Pictures Entertainment*.

332. Plaintiff's works are protected pursuant to 17 USC § 102(a) "tangible medium of expression" beginning 9-8-11 and 9-18-11. DEFENDANT, The Los Angeles Film School, sold Plaintiff's works to Damon Lindelof, Twentieth Century Fox Film Corporation, et al., (Damon Lindelof) facilitated Plaintiff works being infringed by Sony Pictures Entertainment (Michael Angelo Soccio and Etan Cohen); Sony Pictures Entertainment then shared the works with their television Division resulting in "Timeless".

333. When Plaintiff's works were sold to "MIB3" writer, Michael Angelo Soccio and Etan Cohen, who while on hiatus in November 2011, fused the "two travel devices" and several specific supporting story elements relating to time travel from Plaintiff's "The World of Jupiter" and "Crisis in Jupiter" into "MIB3", as the character "Boris the Animal". "Boris the Animal", stole the time travel technology in "MIB3", similarly to "Cifer" from "Crisis in Jupiter", and "Agent J and Agent K" - working for the MIB who regulated time travel - used the remaining time travel technology to chase "Boris" through time, which blatantly

infringed "Earth and Mars" from Plaintiff's "Crisis on Jupiter" having used the remaining time travel technology - time travel having been regulated by The Global Military - to chase "Cifer" through time to destroy the duplicate time machine in "Crisis on Jupiter".

**Related Claim**

334.   *Onza Entertainment SL v. Sony Pictures Television et al.* is a false claim to create the illusion that the specific and protectable elements of time travel from Plaintiff's "Crisis on Jupiter" and "The World of Jupiter",  as infringed by Sony Pictures Entertainment in MIB3",  came from Onza Partners SL while in discussion with NBC Universal for a television show. These are false facts.

Proven false by (1) the admission of V.P. of Operations at The Los Angeles Film School of the theft and conspiracy that followed, beginning 9-18-11 when Plaintiff's assignments were submitted; (2) the release of statements in the press by Damon Lindelof -the original writer who purchased the Plaintiff's material - on 9-27-11 through 9-30-11 dating the creation myth as his - (3) Wachowskis receipt of the Jupiter assignments 10-20-11 and 10-22-11; (4)  and the shooting that was intended probably to target Plaintiff when walking to school, 3 days before the trailer of MIB3 was released with added time travel elements from Plaintiff's works. The comparison of the works and timeline of addition to the "MIB3" production prove beyond a doubt access and substantial similarity.

(A true and correct copy of the false complaint *Onza Entertainment SL v. Sony Pictures Television et al.*, is appended hereto as Exhibit 20)

335.   It must be brought to the attention of this Court, that Onza Entertainment SL- Onza Partners (whose  involvement in the Metrolink was detailed in the Corrected Reply Brief- *Basile v Sony Pictures Entertainment*-Complaint, Exhibits-Volume III. - Exh. 16) filed this lawsuit against Sony Pictures Television and NBC Universal, as a smoke screen seemingly to coincide with erroneous dismissal of Plaintiff's copyright claim for infringement of his works that were created 9-8-11 and 9-18-11, and admitted to have been stolen and sold by Jenna Langer, V.P. of Operations at The Los Angeles Film School.

Strangely, an agreement to stipulate to dismissal of the claim was entered by the parties on 5-24-17.  (A true and correct copy of the Joint Stipulation to Dismissal between Onza Partners SL and Sony Pictures Entertainment, *et al.* is appended hereto as Exhibit 18)

336.   DEFENDANTS, Sony Pictures Television and NBC Universal continue to infringe  Plaintiffs works , Crisis in Jupiter " and " The World of Jupiter " in a derivative work  "Timeless" in violation of 17 U.S.C. § 106 by use of the same of Plaintiffs works that were used to creative MIB3, which is also a derivative work in violation of 17 U.S.C. § 106, Plaintiff's previous claim for copyright infringement against Sony Pictures Entertainment and other "Defendants to the copyright claims" have now become "collectively"  criminal infringement of a copyright  in violation of 18 U.S.C. § 2319.

337.   Sony Pictures Entertainment has facilitated the infringement by sharing with its writers in their television division and NBC Universal, Plaintiffs same copyrighted works, "The World of Jupiter" and "Crisis on Jupiter" , that Sony Pictures Entertainment previously infringed in "MIB3" that continues to infringe Plaintiffs works.

338.    In violation of 17 USC 501(a), which defines " any person " to also be  a governmental entity, DEFENDANT , The LA Superior Court,  (court employees know to Judge Michael Kellogg) have acted in violation of established case law that acts as the doctrine to contributory copyright infringement, *Kalem v. Harper Bros.*, by facilitating the infringement by DEFENDANTS, The Los Angeles Film School, Twentieth Century Fox Film Corporation, *et al.,* and Sony Pictures Entertainment, *et al.,* against whom Plaintiff has claims for copyright infringement that had been previously erroneously dismissed and the affirmed requiring submission to The U.S. Supreme Court. LA Superior Court employees referred to by Judge Michael Kellogg in hearing on 10-31-17 as "they", changed the court's record of an illegally procured 2 felony conviction on Plaintiffs record that had already been investigated and dismissed in September 2016, having maliciously done so with intent to sabotage Plaintiff from being heard by the United States Supreme Court, changing the court's record to reflect that the two felonies were not a part of a discovered conspiracy as noted in Plaintiff's Petitions for Writ of Certiorari. This change occurred sometime between when Plaintiff's attorney, Jeff Voll had petitioned for the dismissal of ALL CHARGES in the illegally procured conviction - which they immediately were - in September 2016 - and when the Petitions for Writ of Certiorari: *Basile v. The Los Angeles Film School, Basile v. Sony Pictures Entertainment, and Basile v Twentieth Century Fox Film Corporation*, were submitted to the U.S. Supreme Court between May 2017 – July 2017.

339.    The change made to the court's website and record by the Los Angeles Superior Court's employees could have consequentially caused the refusal by the Supreme Court not to grant Plaintiff Certiorari it  even provide Plaintiff with a letter stating that the Certiorari was denied, as Plaintiff only received back after the

last submission the Petitions for Writ of Certiorari, without a stamped copy, and no letter stating why.

340.   As also noted in the "RICO" paragraphs of this Complaint,, DEFENDANT , Los Angeles Superior Court is also in violation of 18 U.S.C. § 2319 - criminal infringement of a copyright. The probability of Plaintiff having been heard by The United States  Supreme Court would certainly have been much greater had the conspiracy that was noted in Plaintiff's Petition for Writ of Certiorari as exposed and resulting in the cases being dismissed, not shown as still on Plaintiff's record in the court's computer. For the contribution and participation in conspiracy by The LA Superior Court to aid "Defendants to the copyright claim" in evading liability as did the District Court employees by concealment and theft of exhibits and documents. Plaintiff is entitled to consequential damages relating to these three copyright claims.

## IX.   FIFTH CAUSE OF ACTION

( For Defamation - 28 U.S.C. § 4101 )

Plaintiff hereby incorporates certain of the above paragraphs of this complaint as if fully set forth at length: To wit paragraphs **I – VIII.**

341.   BACKGROUND TO PLAINTIFF'S PREVIOUS CLAIM FOR DEFAMATION - *Basile v. Southwest Airlines, Co.,*

After the Plaintiff had been granted the depositions of the four Southwest flight attendants who conspired to have Plaintiffs falsely arrested when Plaintiff was returning from filing its Reply Brief for Basile v Sony Pictures Entertainment

in the Ninth Circuit Court of Appeals - reporting the threats Plaintiff had received from LAFILM School and Sony Pictures' counsels in the few days before the Metrolink attack - Craig Delk of Thorndal, Armstrong, Delk, Balkenbush & Eisinger filed a Motion for Protective order to prevent the depositions making knowingly false statements that Plaintiff was delusional; Mr Delk then reported a false version of what Plaintiff had previously truthfully reported relating to Plaintiff having been kidnapped.

342.   Mr Delk changed the story of what Plaintiff had reported into a false and murderous version involving statements of Plaintiff being bound and gagged and thrown in the trunk of a car, the first time Plaintiff was kidnapped did not occur this way and Plaintiff did not report any of these false details.

343.   Because the kidnapping that occurred on 10-31-15 did not occur this way, this  was a threatening communication as Plaintiff was kidnapped a second time, much in the same way Mr Delk had falsely stated in Motion for Protective order, only a few hours after Plaintiff had reported with recording to the Nevada District Court, the obstructions in violations of "RICO" laws that Plaintiff encountered at the Neuropsychological Exam on 4-7-18.

344.  Mr. Delk withdrew the Motion for Protective order shortly after filing it. (*See* Complaint, Exhibits - Volume V. - Exh. 1[see Pacer Docket #101])

345.   At the Neuropsychological Exam, when discussing the fact that Plaintiff had been kidnapped on 10-31-15, Dr Leark told Plaintiff that Mr. Delk said he was crazy.

346.   This was disclosed during interview by Dr. Leark after his having threatened Plaintiff after it was discovered that Mr. Delk had violated "RICO" laws by removing material from the PTSD report Plaintiff had written to be forwarded to Dr Leark before the exam, as ordered by Judge Boulware, Mr. Delk having removed evidence proving Plaintiff was not crazy, and all other evidence giving the background of what had occurred the day the Southwest flight attendants had made false statement to result in Plaintiff's  false arrest.

**(*See* Complaint, Exhibits - Volume V. - Exhs.  33-37 and 42-47)**


### 347.   Plaintiff's Alleges Defamation Pursuant to 28 U.S.C. § 4101

The elements for a defamation claim are: (1) publication of a statement of fact; (2) that is false; (3) unprivileged; (4) has natural tendency to injure or which causes "special damage," and (5) the defendant's fault in publishing the statement amounted to at least negligence.

**(1)**Publication, which may be written or oral, means communication to a third party who understands the defamatory meaning of the statement and its application to the person to whom reference is made.

Mr. Delk first filed a Motion for Protective Order to preclude Plaintiff from obtaining the depositions of the Southwest employees who attempted to have Plaintiff violently falsely arrested on 3-19-15, after one employee made false statements accusing Plaintiff of having left a suspicious at the gate in SFO., suspiciously a frame up for terror.

The false statements Mr. Delk wrote in the Motion for Protective Order relating to the kidnapping report depicted a murderous scene that was a threat, and

also intended to create the appearance to the Nevada District Court of Plaintiff be crazy for having reported such a thing. The truth known to Mr. Delk at that time was that Plaintiff had been kidnapped on 10-31-15, and Plaintiff reported every detail of what occurred in a statement to the Nevada District Court Judge Ferenbach, and to the authorities. The version Mr. Delk wrote of Plaintiff's kidnapping report was intentionally false and defamatory per se as it was an accusation of filing a false report in violation of 18 U.S.C. § 1001 and § 1038.

The statements made by Mr. Delk that are per se defamations were written in his Motion for Protective Order, his defamatory statements to Dr. Leark about Plaintiff being crazy, specifically relating to the reported kidnapping, is oral communication to a third party who understood the meaning of the statement and its application to whom the reference was made, the Plaintiff. Publication need not be made to the "public" at large; communication to a single individual other than the Plaintiff is sufficient.

**(2)** In cases involving matters of purely private concern, the burden of proving truth is on the defendant. The previously filed report makes the statement knowingly false and written with malice.

**(3)** The filing of the false and threatening version of the previously reported kidnapping was not protected from public disclosure; Mr. Delk filed it with the Nevada District Court and verbally conveyed false information regarding Plaintiff having been kidnapped when meeting with Dr. Robert A. Leark in the hour before Plaintiff's Rule 35 Neuropsychological Exam began.

**(4)** Plaintiff need not show "special damages" if the statement is defamation per se. A statement is defamation per se if it defames the Plaintiff on its face, that is

184

without the need for extrinsic evidence to explain the statements defamatory nature.

Statements are <u>defamatory per se</u> where they falsely impute to the plaintiff one or more of the following things:

- Allegations or imputations "injurious to another in their trade, business, or profession"
- Allegations or imputations "of loathsome disease" (historically <u>leprosy</u> and <u>sexually transmitted disease</u>, now also including <u>mental illness</u>)
- Allegations or imputations of "unchastity" (usually only in unmarried people and sometimes only in women)
- Allegations or imputations of criminal activity (sometimes only crimes of <u>moral turpitude</u>)

Therefore, the allegation made by Mr. Delk that the Plaintiff was guilty of the crime of 18 U.S.C. § 1001 or 18 U.S.C. § 1038 by filing a false statement with both the LAPD, LVMPD, and the Judges of The Nevada District Court , knowing this to be false and that the original report Plaintiff had filed was completely different to what he had alleged in his Motion for Protective Order, which Mr. Delk verbally shared with Dr Robert A. Leark before the Neuropsychological Exam, these false statements are defamatory on their face and per se defamations.

**(5)** Mr. Delk is more than at fault in "publishing" the statement in Court relating to the Plaintiff's kidnapping report previously filed.

348.    Mr. Delk knew full well that the statements he alleged Plaintiff to have made in his report of the kidnapping  that occurred 10-31-15, that Mr. Delk made a

mockery of and used to level a threat to Plaintiff with the villainous version in his Motion for Protective Order, describing a violent kidnapping very much in the same way that a second kidnapping occurred on 4-10-18, were untrue. Mr. Delk also knew the that telling Dr. Leark that Plaintiff was crazy was defamatory and false.

Damages:

349.   Once a Plaintiff has successfully proven defamation, "general damages" are presumed. The Plaintiff is not simply limited to damages reflecting his or her economic losses but the mental anguish and other emotional harm that the law presumes to result from having his reputation harmed, punitive damages may also be awarded.

350.   The acts of the Defendant were willful, wanton, and in reckless disregard for the financial and emotional well-being of Plaintiff, were oppression, fraudulent, and malicious so as to justify an award of damages.

## X.  SIXTH CAUSE OF ACTION

( For Recklessness )

Plaintiff hereby incorporates certain of the above paragraphs of this complaint as if fully set forth at length: To wit paragraphs **I – IX.**

351.   "Recklessness" refers to a subjective state of culpability greater than simple negligence, which has been described as a "deliberate disregard" of the "high degree of probability" that an injury will occur (BAJI No. 12.77 [defining

"recklessness" in the context of intentional infliction of emotional distress action]); see also Rest.2d Torts, § 500.) Recklessness, unlike negligence, involves more than "inadvertence, incompetence, unskillfulness, or a failure to take precautions" but rather rises to the level of a "conscious choice of a course of action ... with knowledge of the serious danger to others involved in it." (Rest.2d Torts, § 500, com. (g), p. 590.) fn. 5.

352.   The requirements to establish a claim for recklessness are that the statement was made with a "deliberate disregard"  for another's safety, that there is a high probability that it would result in the other person's injury, and that the person guilty of recklessness took a conscious course of action"

The treatment of Recklessness in the *Restatement(Second)* is different from that of intent, the only general definition appears in Section 500, entitled **" Reckless Disregard of Safety Defined."**

" The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead to a responsible man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent."

*George v. Sonoma County Sheriff's Dept..,* 732 F. Supp. 2d 922 (N.D. Cal. 2010) District Court, N.D. California. (quoting *Delaney,* 20 Cal.4th at 31, 82 Cal. Rptr.2d 610, 971 P.2d 986).

353.    Recklessness refers "`to a subjective state of culpability *943 <u>greater than simple negligence,</u> which has been described as a "deliberate disregard" of the "high degree of probability" that an injury will occur.'" *Id.* Oppression, fraud and malice involve intentional or conscious wrongdoing of a despicable or injurious nature.

354.    ALL DEFENDANTS, engaged in activities and committed tortious and criminal acts that require "a conscious course of action" to be taken at the time the act was committed, as the acts committed were deliberate and in many acts there was "intent to cause injury" to Plaintiff. The acts committed that were not intended to cause injury to Plaintiff, had a very high probability that any reasonable could certainly see, that would result in Plaintiff being injured. ***See Paragraphs 42-354<u>, all referenced documents [Complaint, Exhibits - Volumes I. - IV.], [Complaint, Non-Paper Exhibits on DVD and Thumbdrives  - Volumes I. – VI.) and exhibits appended hereto)</u>***

(*See* Complaint, Exhibits - Volumes I. - VI.)

## XI.   SEVENTH CAUSE OF ACTION

( For Intentional Infliction of Severe Emotional Distress - Outrageous Conduct)

Plaintiff hereby incorporates certain of the above paragraphs of this complaint as if fully set forth at length: To wit paragraphs **I – X.**

**Excerpts from:**

Marquette Law Review: Article 3

Volume 90

Issue 4 Summer 2007

The Four Faces Of Tort Law: Liability for Emotional Harm

John J. Kircher

The tort of intentional infliction of emotional distress first appeared in the **Restatement of Torts in a 1948 supplement**. It was there stated that one who intentionally causes severe emotional distress to another is liable "(a) for such emotional distress, and (b) for bodily harm resulting from it." *Restatement of Torts § 46 (Supp. 1948).* The California Supreme Court considered that development four years later when it decided the landmark case of *State Rubbish Collectors Ass'n v. Siliznoff.* 240 P. 2d. 282 (Cal.1952). After considering the evidence, the court concluded:

> [T]hat a cause of action is established when it is shown that one, in the absence of any privilege, intentionally subjects another to the mental suffering incident to serious threats to his physical well-being, whether or not the threats are made under such circumstances as to constitute a technical assault. *Id.* at *284-285*

**In 1965, the second Restatement refined that rule further**. According to its section 46, a cause of action for intentionally infliction of emotional distress exists when:

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

(2) Where such conduct is directed at a third person, the actor is subject to

liability if he intentionally or recklessly causes severe emotional distress.

(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

(b) to any other person who is present at the time, if such distress results in bodily harm. *Restatement (Second) of Torts § 46 (1965)*

355.   As stated previously, the term "intent" is used throughout the Restatement to mean "that the actor desires to cause consequences of his act, or… believes that the consequences are substantially certain to result from it. *Id* § 8A. It should be noted however, that although the rule is dubbed "Intentional Infliction," recovery also will be allowed when the defendant's conduct is not intended to cause emotional distress, but the defendant is merely reckless in doing so.

356.   The Restatement does not require proof of any physical symptoms to recover for Intentional Infliction of Emotional Distress. *Restatement (Second) of Torts § 46 cmt. k (1965).* The defendant's extreme and outrageous conduct alone tends to prove the severity of the distress.

356.   ALL DEFENDANTS, engaged in activities that intentionally and maliciously caused Plaintiff and his family harm. The conspiracy began with the theft and sale of Plaintiff's copyrighted works by The Los Angeles Film School, followed by the infringement of the works by DEFENDANTS, *Twentieth Century Fox Film Corporation, et al,  Sony Pictures Entertainment, et al, Warner Bros. Entertainment et al, and Sony Pictures Television, et al.*

COMPLAINT

357.   During litigation of all previous claims and *Basile v. Southwest Airlines, Co.* which occurred as a result of Southwest Airlines personnel being enrolled to conspire ( their actions would function as a means to prevent  further investigation of the DEFENDANTS, Mitchell, Silberberg & Knupp - Ford Harrison  - who with other Defendants are proven to have been involved in the planning and carrying out of the Metrolink attack ). Plaintiff's life has been threatened several times and he has been kidnapped twice receiving no help from any authorities. Plaintiff's family has been also been threatened and attacked twice.

358.   ALL DEFENDANTS, engaged in activities before, during, and after litigations of these cases, that any "reasonable person" would understand to result in causing harm to Plaintiff directly and causing harm to his family.

## OUTRAGEOUS CONDUCT

359.   Because section 46 fails to offer a concise definition of outrageous conduct, courts have had difficulty formulating clear standards as to what conduct is prohibited. Despite the numerous elements provided in section 46, critics have argued that in practice, the tort is reduced to a single element – the outrageousness of the defendant's conduct. *Id.* at 46. In turn, courts may assume that severe emotional distress resulted anytime there is evidence of outrageous conduct. *Id.*

360.   In general, four categories of conduct support a finding of outrage when the defendant intentionally inflicts emotional harm. (1) abusing a position of power; (2) emotionally harming a plaintiff known to be especially vulnerable; (3) repeating or continuing conduct that may be tolerable when committed once but becomes intolerable when committed numerous time; and (4) committing or

threatening violence or serious economic harm to a person or property in which the plaintiff is known to have a special interest." *Restatement (Second) of Torts* § 46 , DOBBS, *supra note 37*, at 827.

**361.   ALL DEFENDANTS,** engaged in activities and committed acts found to be supporting of a finding of Intentional Infliction of Emotional Distress – Outrageous Conduct when considered with the necessary elements described herein. ***See* Paragraphs 42-361,** all referenced documents [Complaint, Exhibits - Volumes I. - IV.], [Complaint, Non-Paper Exhibits on DVD and Thumbdrives - Volumes I. – VI.) and exhibits appended hereto)

Plaintiff is entitled to recover damages for its claims for Intentional Infliction of Severe Emotional Distress – Outrageous Conduct.

## XII.  EIGHTH CAUSE OF ACTION

(for Civil Conspiracy)

Plaintiff hereby incorporates certain of the above paragraphs of this complaint as if fully set forth at length: To wit paragraphs **I – XI.**

362.   There is widespread consensus on the elements of civil liability for conspiracy under the federal common law. It generally requires: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; and (4) the overt act was done pursuant to and in furtherance of the common scheme. *Halberstam v. Welch,* 705 F. 2d. 472, 477 (D.C. Cir. 1983) *See also In re Sumitomo Copper Litigation,* 120 F Supp. 2d. 328

(S.D.N.Y. 2000); *Kashi v. Gratsos,* 790 F. 2d. 1050, 1055 (2d. Cir. 1986)(*Winter, J.).Cabello,* 402 F. 3d. at 1157-58; *In re Terrorist Attacks September* 11,2001, 392 F. Supp. 2d. 539,554 (S.D.N.Y. 2005)("Conspiracy and aiding and abetting are varieties of concerted-action liability: <u>conspiracy requires an agreement to commit a tortious act</u> … aiding and abetting requires that a defendant have given substantial assistance or encouragement to the primary wrongdoer…In order to be liable for acting in concert with the primary tortfeasor under either theory, the defendant must know the wrongful nature of the primary actor's conduct.")

### Liability for conspiracy requires a showing that :

(1) two or more persons agreed to commit a wrongful act, (2) [the defendant] joined the conspiracy knowing at least one of the goals of the conspiracy and intending to help accomplish it, and (3) one or more of the violations was committed by someone who was member of the conspiracy and acted in furtherance of the conspiracy.

363.   A conspirator is liable for the acts of his co-conspirators if they are the reasonably foreseeable consequences of the unlawful scheme. *Halberstam*, F 2d. at 487. *See also Ungar v. Islamic Republic of Iran,* 211 F. Supp. 2d. 91, 100 (D.D.C. 2002), *citing Pinkerton v. United States,* 328 U.S. 640, 647 – 48 (1946); *SEC  v. Yun,* 148 F. Supp. 2d. 1287, 1292 (M.D. Fla. 2001);  *Williams v. Feder*, 69 F. Supp. 2d. 649, 666 (M.D. Pa. 1999) The defendant need not be the perpetrator of the tortious conduct. "As to the extent of liability, once the conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy. A conspirator need not participate actively in or benefit from the wrongful action in order to be found liable. He need not even have

planned or known about the injurious action" *Halberstam* at 482. " It is only where means are employed, or purpose are accomplished, which are themselves tortious, that the conspirators who have not acted but have promoted the act will be held liable" *Halberstam* 477, citing W. Prosser, Law of Torts § 46, at 293 (4th ed. 1971) (footnote omitted) Proof of a tacit, as opposed to explicit, understanding is sufficient to show agreement. *Halberstam* at 477, citing *Prosser, supra,* at 292: 16 Am Jur. 2d. *Conspiracy* § 68 (1979).

The mens rea of civil conspiracy is reflected in the defendant's knowledge of the unlawful act and his or her agreement to participate in the act. *Moore v. Brewster,* 96 F 3d. 1240, 1245 (9th Cir. 1996) ("The indispensable elements of civil conspiracy include a wrongful act and knowledge on the part of the alleged conspirators of [the conspiracy's] unlawful objective."); *Jones v. Chicago,* 856 F. 2d. 985, 992 (7th Cir. 1988) (a defendant need not agree to the details of the conspiratorial scheme or even know who the other conspirators are, so long as he understands the general objectives of their scheme, accepts them, and agrees to do his part to further them);( *United States v. Andolschek,* 142 F 2d. 503, 507, (2d. Cir. 1944) (L. Hand J.)(same); *Ingar,* 211 F Supp. 2d. at 100 (same).

**364.  ALL DEFENDANTS,** engaged in activities and <u>committed deliberate acts</u> in furtherance of the conspiracy that was initiated by The Los Angeles Film School immediately after their theft and sale of Plaintiff's submitted copyrighted works. All acts discussed in Paragraphs 42 - 364 of this Complaint, particularly the "RICO" claim, detail the conspiracy as it occurred and how each Defendant participated and agreed to commit a tortious and/or criminal act. Further supporting facts outlining all aspects of Plaintiff's claims for civil conspiracy are described in detail in Complaint, Exhibits - Volumes I. - VI.

## XIII.   Plaintiff Requests a Federal and State Grand Jury Be Convened For Review of These Facts and Evidences

365.   Plaintiff respectfully directs these issues and evidences to the District Attorney's Office of Los Angeles and U.S. Attorney's Office for Federal and State Grand Jury Investigations.

## XIV.   ANALYSIS OF DAMAGES

366.   Due to the Plaintiff's recovery of damages for copyright infringement from all "Defendants to the copyright claims", having been thwarted by corruption and violation of Plaintiff's Fifth and Fourteenth Amendment rights to due process, and the profit by "Defendants to the copyright claims" has collectively exceeded $1,000,000,000.00, Plaintiff should recover damages for copyright infringement from "Defendants to the copyrights claims" and all other Defendants who engaged in conspiracy and "racketeering" to collectively aid the " Defendants to the copyright claims" in evading liability for copyright infringement, conservatively in the amount of 3,000,000,000.00, whether the damages be labeled Actual, General, Exemplary (punitive) or Consequential damages.

367.   The contributory infringement by the LA Superior Court by having participated in conspiracy by engaging in "racketeering" in violation of "RICO" laws, which including 18 USC section 1503(a)- relating to obstruction of justice, obstructing by having changed the court's record after the investigation and dismissal of Case No. BA 196041 from 1999(00), knowingly placing false information on the court's record during that time that Plaintiff was submitting three Petitions for Writ of Certiorari to the US Supreme Court, is "racketeering" in

violation of "RICO" laws, particularly 18 U.S.C. § 1519 and also defamation/libel and recklessness for the Courts employees having not only presented Plaintiff in a negative light to intentionally sabotage its copyright claims, but intentionally placing Plaintiff in danger of imprisonment if this illegal conviction from 1999(00) wasn't shown as removed in the court's records, and if Plaintiff was victim to another frame up before his having been being able to investigate the conspiracy against him that began faster the attack in 1999(00) and alert the court.

368.   This obstruction was a criminal obstruction by preventing review of evidence by the United States Supreme Court for the copyright claims,

*Basile v. The Los Angeles Film School, LLC;*
*Basile v. Twentieth Century Fox Film Corporation;* and
*Basile v. Sony Pictures Entertainment*

previously erroneously dismissed then affirmed, and obstruction of correction of the court's record relating to the dismissal of an illegal conviction proven to have been part of a conspiracy after plaintiff was attack in 1999. **(*See* Complaint, Exhibits- Volume VI.)**

369.   The Los Angeles Superior Court's employees have fused the current studio copyright cases and the conspiracy currently being expunged on Plaintiffs record that began in 1999(00), Plaintiff should recover consequential, exemplary and general damages from the LA Superior Court.

370.   Because the United States Supreme Court did not include a letter denying Plaintiffs request to be heard on the three case submitted, when the

Plaintiffs last submission from 7-17-17 was submitted, it's unclear if that was the result of the changes to the Plaintiffs background, however, the intent was to achieve this very result, therefore plaintiff should recover **consequential damages.**

371.    Plaintiff should recover damages for recklessness, defamation, by LA Superior Court and ALL DEFENDANTS for violations of "RICO" laws.

372.    Plaintiff is entitled to recover damages for all acts of "racketeering" by all defendants who engaged in conspiracy by committing these acts in violations of "RICO" laws as defined in 18 USC sections 1961 , 1962(a) -(d). ALL DEFENDANTS have contributed to the "Defendants to the copyright claims" efforts in evading liability for copyright infringement.

**WHEREFORE, Plaintiff prays for damages as follows:**

Liability of "DEFENDANTS TO THE COPYRIGHT CLAIMS":

The Los Angeles Film School, LLC

Twentieth Century Fox Film Corporation

Scott Free Films, LLC

Sony Pictures Entertainment

Amblin Entertainment

Sony Pictures Television

NBC Universal

Onza Entertainment SL and Onza Partners SL

Kripke Enterprises

Warner Bros

Legendary Pictures

Christopher Nolan

Jonathon Nolan,

Lana Wachowski

Andrew Wachowski

(1)   DEFENDANTS, Twentieth Century Fox Film Corporation, *et al,* infringed Plaintiffs copyrighted works and profited $273,000,000,.00 in the box office with Prometheus;

(2)   Defendants, Sony Pictures Entertainment, *et al*, infringed Plaintiffs copyrighted works and profited $399,000,000.00 in the box office with MIB3,

(3)   According to Box Office Mojo, DEFENDANTS, Warner Bros. Entertainment and Andrew and Lana Wachowski, only profited $5,000,000.00 in the box office with Jupiter Ascending, however, Jupiter Ascending is also a very brazen infringement and derivative work encompassing all protectable elements of Plaintiffs works, visually expressed the exact same way.

It's also suspected that the film had time travel elements that were cut as after subpoena; the Wachowskis cancelled release for close to a year to make edits. The result was that certain aspects of the final film did not make sense.

Accumulatively, box office profits of "Prometheus" and "MIB3" equal $672,000,000.00.

(4)    DEFENDANTS, Warner Bros, Christopher Nolan and Jonathan Nolan, profited an excess of $1,000,000,000.00 in the box office with "The Dark Knight Rises", which did infringe Plaintiffs works with the character "Bane" and many background elements of "Bane's backstory", the infringement was minimized by editing after the first screenings on Warner Bros. lot, and some additional backstory relating to the Global Military as another Military faction in "The Dark Knight's Rises" that "Bane" had gone rogue from making him by definition a mercenary, remained in theatres but was cut before DVD. [The SAG Film Society who had cancelled Plaintiff's membership did so before Plaintiff could receive the Director's cut in DVD.]

A fair assessment of damages for the use of Plaintiffs works in "The Dark Knight Rises" is $100,000,000.00.

(5)    **Total Actual Damages** for copyright infringement of Plaintiffs works in "Prometheus", "MIB3" , and "The Dark Knight Rises" totals **$773,000,000.00** of accumulative box office earnings.

Plaintiff is entitled to recover damages for 17 U.S.C. §§ 106, 102(a), 501(b), 104 and Contributory Copyright Infringement **in threefold** in a civil "RICO" claim **- 18 U.S.C. § 1964(c) -** applicable here to the damages from the infringement of Plaintiffs works in "Prometheus", "MIB3", "The Dark Knight Rises", and "Jupiter Ascending", and the "RICO" violations including criminal infringement of a copyright **- 18 U.S.C. § 2319**, as well as the new copyright infringement claim for "Timeless".

(6)  **Actual, General, Exemplary (Punitive) and Consequential Damages**

For all copyright infringement of Plaintiffs works, for all conspiracy including Plaintiffs claims for 42 U.S.C. § 1983, § 1985(2) and § 1985(3); 42 U.S.C. § 1986, and § 1988, and for Defendants having engaged in "racketeering" activities in violation of "RICO " laws  - 18 U.S.C. § 1961, §§ 1962(a) - 1962(d), and for Plaintiffs claims for defamation, recklessness, intentional infliction of emotional distress and civil conspiracy ;

(7).  Plaintiff prays for Actual, General, Exemplary(Punitive) Damages and Consequential Damages in the amount of **$3,000,000,000.00** from DEFENDANTS, The Los Angeles Film School, JAMS, Inc., Twentieth Century Fox, Sony Pictures Entertainment, Warner Bros. Entertainment, Christopher Nolan, Jonathon Nolan, Legendary Pictures, Lana Wachowski, Andrew Wachowksi, Sony Pictures Television, NBC Universal, Onza Entertainment and Onza Partners SL, Kripke Enterprises, Mitchell, Silberberg & Knupp, Ford Harrison, Nancy Pelosi, The Federal Bureau of Investigation, Beverly Hills Police Department, Oxnard Police Department, Gold Coast Cab Company, TMZ, Caesars Entertainment Corporation, Las Vegas Metro Police Department, Southwest Airlines, Co., Thorndal, Armstrong, Delk, Balkenbush & Eisinger, Dr. Robert A. Leark, Michelle Obama, Blake Lively, United States District Court - Central District - Western Division, The Ninth Circuit Court of Appeals, AND ALL OTHER DEFENDANTS TO THIS CLAIM.

(8)  **Speculative damages** that Plaintiff should recover, judging from profit of other infringing films that could have also incorporated the specific Jupiter elements from Plaintiffs works as "the Wachowksis" and Warner Bros.

Entertainment did, conservatively, Plaintiff prays for **$1,000,000,000.00** in Speculative Damages.

(9)   Plaintiff prays for other such relief as this Court seems just and proper.

*Previously Filed 10-5-18: Complaint: Central District Court, Western Division - 2:18-cv-08604*

**ADDITIONAL VIOLATIONS BY NEW AND EXISTING DEFENDANTS: OCCURRING 10-17-19 THROUGH 10-31-23 COMPRISING "the New RICO Complaint":**

*continued from* **V.   FIRST CAUSE OF ACTION**

**DAMAGES PURSUANT TO RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT [RICO] AS AGAINST ALL DEFENDANTS – VIOLATION OF 18 U.S.C. § 1961, 18 U.S.C. § 1962(a) 18 U.S.C. § 1962(b), § 1962(c), § 1962(d) Against all Defendants and John/Jane Does 1-10**

Plaintiff hereby incorporates certain of the above paragraphs of this complaint and *related documents and exhibits manually filed on DVDS* as if fully set forth at length: To wit paragraphs **1-373 and Compl., Exh. 1 -** previously 2:18-cv-08604 **(1)** *scanned* complaint w/appended color exhibits; **(2)** complaint, exhs. 4,7,21, *manually filed on dvds* **(3)** *scanned* complaint, exhs Vol. I-VI and **(4)** complaint, non-paper exhs.,VOL. I-VI, *manually on dvds*; **Compl., Exh. 2 - pdf record**

**documents #1-48,** *manually filed on dvds*; **Compl., Exh. 24,** *manually filed on dvds*; **and Compl., Exh. 23(a)-(e)- *appended.***

**<u>Additional Jurisdictional Statement:</u>**


On 7-24-23 Plaintiff filed in the Nevada District Court its Motion to Recuse Judge Richard F. Boulware II. and Magistrate Judge Cam Ferenbach Pursuant to 28 U.S.C. § 455(a) concurrently motioning for the order to be removed with its Motion to Set Aside Judgement and for Appropriate Relief Pursuant to F.R.C.P. 60(d)(3) due to Magistrate Judge Ferenbach's report of the Rule 35 exam being "fraud upon the court" contradicting the already filed 4-10-18 Plaintiff's Motion to Compel Cooperation with Discovery.

It was denied by Judge Boulware himself stating that "the issue" had been already to the Ninth Circuit as reason for denial; as it's irrelevant where the claims have been encountering continued obstruction, and the review by the Ninth Circuit not thorough as "the RICO Complaint" including Southwest Airlines, Co. as Defendants was filed 10-5-18, the mention of a now proven conspiring Ninth Circuit is obstructive, preventing management of the claims appropriately now brought to Nevada. ***See* Compl., Exh. 2 #s 1-48).**


After obstructions beginning with Central District Court Judge Carney's **10-17-19 dismissal** of the *all encompassing* "the RICO complaint" *filed **10-5-18** -* which was inclusive of All Nevada Defendants and the Nevada District Court – ***the obstruction***s continued by Ninth Circuit panels under <u>4 different Chief Judges</u> and <u>twice the Supreme Court Justices.</u>

All resources of the courts have obstructed in violation RICO laws, Constitutional Provisions, and Civil Rights Statutes to which **ALL EXISTING DEFENDANTS** are already in violation of, set forth in "the RICO Complaint" - 42 U.S.C. **§1983**; **§1985(2)**; and **§1985(3)**, 18 U.S.C. § 1961, First , Fifth and Fourteenth Amendments, and there are many new violations of RICO laws as defined in 18 U.S.C. § 1961 by existing and newly added Defendants to this ongoing RICO and conspiracy claim obstructed since 10-17-19.

**The attached and referenced documents to "the New RICO Complaint" Compl., Exhs. 1 and 2 *manually filed on dvds*, Compl., Exh. 24, *manually filed on dvds*; and Compl., Exh. 23(a)-(e) *appended*, are important for review in sequence** to understand the conspiracy issues as they have unfolded and progressed into a murder of Plaintiff's brother by Defendants after other violent "RICO" violations during litigation of the claims,  and reference to exhibits manually filed on DVDs for "the RICO Complaint" and new documents are important for review of the case record to understand that <u>the claims were a matter of law</u> warranting summary judgement minimally as to "Defendants to the Copyright Claims", regardless of the claims being spoken of *as if frivolous* or having already been to trial. The vexatious litigant order is a disgrace to a litigation professional and the U.S. Court system.

As no parties have been to trial, and the cases properly filed and presented leaving little or no room for argument by Defendants, Plaintiff is entitled to jury trial after such abuse and conspiracy by upper courts rendering U.S. District Courts the only remedy.

<u>The failure of all briefed courts</u> before this third "Motion for Appropriate Relief" filed in Central District Court after Supreme Court obstruction of 500M donation which appears to be clear bribery, without question led to the <u>murder of</u>

COMPLAINT

Plaintiff's brother Alexander Basile by Sony Defendants and *newly amended parties,* which when reported in Plaintiffs **second** Petition for Writ of Certiorari to Judge Carney's obstructive order by failure to read documents, encountered a botched by admission of conspiracy and bias Supreme Court conference, **5-11-23 –** conspiracy admitted by two Justices: Thomas and Alito; Justice Clarence Thomas having released information to the press for several weeks prior to conference date of his collaborating and enrichment by billionaires while seated; after the first Supreme Court filing of ***first*** Petition for Writ of Certiorari **a year before encountered a 500M check from Defendant Michelle Obama**, after distributions of the petitions.

Accordingly, Plaintiff requests that The Nevada District Court **provide immediate emergency relief** by managing this Complaint in its entirety as Judge Carney in the Central District Court refuses to stop intercepting documents and filings preventing resolution of the claims, once even ***providing his own review*** of a failure to review his illegal affirmation by Judge Stanton, who suggested he didn't mismanage anything by ***failing to provide determination of his own*** of a magistrate's report and recommendation, obstructing and providing material support to Defendants.

***THEFT:*** Judge Carney now again to the **5-31-23** post Supreme Court filing, refused to even consider the status of the claims and ***refused to read the motion which includes the details of Alexander Basile's murder and further Metrolink attack related materials*** - the Metrolink attack being the reason for the murder to conceal what Alexander knew – Judge Carney now also stealing all three packages of exhibits not sending to Plaintiff a stamped copy of the motion and declaration, or a stamped package of exhibits also in violation of RICO, 18 U.S.C. §1503(a), 18 U.S.C. §1519, 18 U.S.C. §2339A. Plaintiff checking status of the return stamped materials, the clerk refused to answer the phone for several weeks, sending only

the first page of each of the documents to the motion – a cover sheet - printed from scanned Pacer not originals, and no exhibits package; Plaintiff received this manilla envelope two weeks after the filing.

Included in the motion package Plaintiff shipped to the clerk for filing, 5-31-23, was **a sticker for return shipping of 5 lb for a complete package with exhibits** on DVD, VOL I-VI.. This sticker was used on an envelope with the four pages only. (*see* **Compl., Exh. 2 # 45, decl., exh 3a.)**

After 30 days of phone calls to several authorities who don't respond, the U.S. Attorney's Office and even the White House in letter to President Biden and messages to U.S. Attorney Jack Smith, about Judge Carney's order and theft, "a package" was shipped to Plaintiff with only the infringing films, three packages indicating deliberate robbery of the Vol. I-VI. Exhibits on DVDs, all three packages. The week before Plaintiff spoke to clerk **Deborah Lumen who said she checked with Judge Carney 's office** who told her they had shipped everything back the Friday before that conversation three weeks into the search.

The obstructions by affirming false reports by Magistrate Judges began in this Central District Court but continued in Nevada District Court  leading to RICO violations and inclusion of the Nevada District Court to "the RICO complaint" in Central District Court, **all Defendants remain unresolved** due to *circular pattern of obstructive dismissal and affirmation* in district courts and The Ninth Circuit, followed by corruption and failure in the Supreme Court;  therefore venue is appropriate where the terror portion of "the RICO Complaint"  began, beginning with these existing "Defendants to the copyright claims" brought through Las Vegas engaging Southwest personnel to conspire,  these Defendants and the newly amended  Defendants **responsible now for murder,** all occurring after the Nevada District Court's unjust dismissal of *Basile v Southwest Airlines, Co.*

*See* Opening Brief - *Basile v. Southwest Airlines, Co.*(**Compl., Exh. 2, #s 47-48**)

Due to the recent murder of Plaintiff's brother Alexander Basile by Steven Spielberg, Will Smith, SMPD (***See* Compl., Exh. 23 (e)**), and other suspects currently under investigation - during obstructed review of the compressed "the RICO Complaint" comprised of the previously mishandled 4 Opening Briefs by affirmation **while the documents were prepared for summary judgement in Ninth Circuit *May 2017*** - and - Southwest Airlines, Co and new Nevada Defendants filings, as Judge Boulware's order in support of Magistrate Judge Ferenbach's false report was not set aside pursuant to *F.R.C.P. 60(d)(3) "fraud upon the court",* even though it began the obstructive sequence encouraging continuance of violence, jurisdiction for Nevada is proper.

Further supporting Nevada District Court **jurisdiction to the majority of new RICO violations** consistent in pattern and level of violence with the previous murder and attempts to murder, an attack took place at Plaintiff's parent's Las Vegas home 11-14-23 by conspiring LVMPD Officers suspiciously arriving with three cars and 6 Officers after Plaintiff was victim to an attack by the unknown neighbor and his large white truck - (**Nevada Plate 572-ZVD** *see* **Compl., Exh. 23(a) -** *appended*) - the truck following Plaintiff from grocery beginning the front of the street to community as he arrived home.

Plaintiff reported the incident as usual to all email addresses used for immediate reports of danger due to the threats made by the assaulting with vehicle neighbor. The neighbor followed too close and accelerated as Plaintiff turned onto Mariner, the man in truck appeared to have pulled behind at McDonalds, forcing Plaintiff to pull over to let him pass on Mariner first,  then Plaintiff pulled over again after

turning left as the man had passed on parked at entrance of community then pressed immediately behind after Plaintiff entered the community, then Plaintiff pulled over a third time driving into the community to his house, the second time the man yelling ridiculously after vehicular assault that "he's just trying to get home". When Plaintiff drove to his house and entered garage to put groceries away, at the driveway the man tailgating again and yelling drive at a very unusual fast speed passed to his house several houses away.

The instigator of a vehicular assault called 911, while Plaintiff entered disturbed and scared and after Plaintiff already had emailed all parties reported to for 9 years of litigation, because of the abusive a threatening way spoken to and assaulted. The neighbor conspired with a team of Police from LVMPD who "more than suspiciously" called Plaintiff on his Cell Phone first while Plaintiff was in his room after emailing authorities LVMPD having threatened Plaintiff by text messages, then LVMPD went to the door and began trying to coerce elderly to make a false statements and to allow them in the house even though Plaintiff had texted a report with instructions for the Officers; coercing elderly and having had Plaintiff's telephone number, and name - after an attack truck driven by neighbor who does not know Plaintiff, blocked and assaulted Plaintiff returning from grocery shopping, in front of home - is proven a threatening and retaliatory attack and conspiracy in violation of "RICO"; and as Plaintiff has been assaulted, battered, kidnapped and held hostage twice in Nevada during briefing, and brother murdered, all during terrorism investigation and counter strike, this staged LVMPD proves a clear conspiracy to commit kidnapping, engage Plaintiff in violence, or all of the above to steal exhibits and other counter terrorism related murder case related materials.  (*See* **Compl., Exh. 23(a)-** *appended* **- threatening Officer texts, Officer's phone number, and neighbor's truck)**

Therefore, these are newly amendable charges for LVMPD as all activities are related to the cover up of the assassination of Plaintiff's brother Alexander Basile obstructed thus far since 6-3-22.

The new presented facts of admission by Nancy Pelosi related to Plaintiff's 1999 bullet from Johnny Depp, further proving her involvement and involvement of many "Defendants to the copyright claims" in the Metrolink Attack, particularly SONY PICTURES *et al.* ***Horrifically timed as Plaintiff prepared " the New RICO Complaint" to include new violations of terror and terror murder related "RICO"laws, TMZ*** release the morning of 12-9-23, coverage of an event with unusual group of attendees; Defendants to these new and previously obstructed charges and violations.  (***See* Compl., Exh. 23(b) and 23(d)-*appended*)**

*See also* excerpt from **Compl., Exh. 22(e) - TMZ**

**JOE BIDEN FUNDRAISER INTERRUPTED BY PRO-PALESTINIAN MARCHERS ...**

**'No Votes For Mass Murderer'**
12/9/2023 6:39 AM PT

Protests Outside Joe Biden Fundraiser in Los Angeles
PROTESTS ERUPT

"Joe Biden's L.A. fundraiser was interrupted Friday by screaming pro-Palestinian demonstrators as police in riot gear stood guard, trying to keep the peace. The 46th Prez arrived by motorcade to last night's political event

COMPLAINT

in Holmby Hills, where dozens of demonstrators had gathered to voice their anger over what they see as the extermination of the Palestinians by Israel..."

"Among the notable attendees were Jill Biden, Steven Spielberg, Gavin Newsom, Karen Bass, Nancy Pelosi and Adam Schiff. Rock 'n' roll star Lenny Kravitz also showed up to perform for the crowd..."
"Meanwhile, Biden delivered a short speech at the celebrity-studded event, calling his 2024 Republican rival, Donald Trump, a threat to democracy. He also talked about his first-term economic successes and the federal judges he has confirmed to the courts..."

"Scores of Palestinians have been killed since the bloody Israel-Hamas war began in October. At the time, Hamas terrorists invaded the Jewish state and slaughtered 1,400 Israelis, triggering the deadly conflict. Hamas rules over the Palestinians in the Gaza Strip…"

Since the claims and issues comprising "the RICO Complaint" accumulating to 4 Billion dollars in damages, 1 Billion dollars in actual, **which included Southwest Airlines, Co. and other Nevada Defendants** have not been allowed to be managed in the Central District Court by an obstructive Judge Carney and Magistrate Spaeth with supported obstruction and conspiracy by Judge Stanton; and all other remedies for oversight tainted with **extraordinary judicial circumstance** in The Supreme Court , Plaintiff **requests immediate relief** and remedy and award for damages possibly even pursuant to 18 U.S.C. § 1964(c) if this Court deems it just and proper.

Nevada District Court was previously added as Defendant to "the RICO Complaint" as Judge Boulware failed to review <u>the content of the docket</u> basing his

dismissal of a terror related claim on a Magistrate's false report in violation of 18 U.S.C. § 2073 and 18 U.S.C. § 1961- [ §1519], contradicting the filing already available of Plaintiff's Motion to Compel Cooperation with Discovery for the *obstructed with several RICO violations* Rule 35 Exam. Judge Boulware now \ 10-31-23 Judge Boulware refused to recuse himself and provide documents to other judges to recuse forcing a time consuming and danger creating Complaint filing. In the interest of justice, the claims have been amended with new charges for existing "Defendants to the Copyright Claims" in "the RICO complaint ", and amended with parties as Defendants for furtherance of all previous and participation in new RICO violations as **"the New RICO Complaint".**

The disregard and indifference by all governmental entities to the violations of Federal Statues and copyright laws by Defendants, in itself is a violation of RICO; furthering and providing material support to Defendants engaging in violations of RICO laws as defined in 18 U.S.C. § 1961; **§**1962(a); **§**1962(b); **§**1962(c); **§**1962(d).

**ALL** *existing and newly added* **DEFENDANTS have engaged in violation of and participated in furtherance of:** "Racketeering" laws as defined in 18 U.S.C. § 1961.

**18 U.S.C. § 1503** (obstruction)
**18 U.S.C. § 1510 (relating to bribery)**
**18 U.S.C. § 1512** (relating to tampering with a witness, victim, or an informant)
**18 U.S.C. § 1513 (retaliating against a witness, victim**, or informant)
**18 U.S.C. § 1519** (relating to destruction, alteration or falsification of evidence, entering false information with intent to impede)

**18 U.S.C. § 1832** (relating to economic espionage)

**18 U.S.C. § 1957** (relating to monetary transactions in property derived from specified unlawful activity)

**18 U.S.C. § 2332b** (acts of terrorism transcending national boundaries)

**18 U.S.C. § 1958** (relating to murder for hire – attack by car accident and attack by train derailment and attack for murder by and supported by police and med exam)

**18 U.S.C. § 2319** (relating to <u>criminal infringement of copyright)</u>

**18 U.S.C. § 2339A** (related to providing material support to violations of 2332b- terrorism)

**18 U.S.C. § 2339B (**related to knowingly providing material support to a foreign terrorist organization)

*See* **Compl., Exh. 1 and 2** *manually filed on dvds*; **Compl., Exh. 24,** *manually filed on dvds*; **and Compl., Exh. 22(a)-(e)** *appended*

**DEFENDANT: CENTRAL DISTRICT COURT -** Judges Spaeth, Carney and Stanton - obstructive orders in violation of 18 U.S.C. § 1503; 18 U.S.C. § 1512; 18 U.S.C. § 1513; 18 U.S.C. § 1519; **18 U.S.C. § 2339A; 18 U.S.C. § 2339B** and in furtherance of all other violations engaged in by co-defendants, "RICO" laws as defined in 18 U.S.C. § 1961; §1962(a); §1962(b);§1962(c); §1962(d).

Compl., Exh. 2 -scroll item #2 (full district dkt. w/postings) and read items #3, and #8-*Judges Spaeth and Carney*

Compl., Exh. 2 - scroll item #2 (full district dkt. w/postings) and read items #12 through #16 - *Judges Carney and Stanton*: *see also* #17 through #19, and #23

Compl., Exh. 2 -scroll item #2 (full district dkt. w/postings) and read items #24 through #29 - *Judge Carney*: *see also* # 31 through #37, scroll item #38 (full Supreme dkt)

Compl., Exh. 2 -scroll item #2 (full district dkt. w/postings) and read items #39 through #43 - *Judge Carney*

**Order specifics:**

10-27-20 - Motion to Set Aside, ***Carney* rejected it citing:**

> "Judgment entered and case closed on October 17, 2019 and Formal
> Mandate issued by Ninth Circuit Court of Appeals on October 28, 2020",

even though Plaintiff's filing is an MAR filed 10-27-20 pursuant to 60(b) or 60(d) if it pleases the court for time restrictions;

11-17-20: Motion for Appropriate Relief Pursuant to 60d - stricken by *Stanton* with abusive verbiage as neither *Stanton or Carney* ever conducted a separate review of the Magistrate's Report and Recommendation, saying:

> "because there is nothing left to decide in the case", only looking to and
> referring to the docket;

12-8-20: Motion for Appropriate Relief Pursuant to 60d - Recuse *Stanton* Pursuant to § 455a and for Relief;

12-10-20 - *Carney* without review and also abusive verbiage:

COMPLAINT

"As such, there is nothing left to review. Accordingly, Plaintiff's basis for
appeal is frivolous, without merit, and does not present a substantial question
within the meaning of 28 U.S.C. § 753(f)";

10-29-21 - Motion for Appropriate Relief Pursuant to 60d - *Carney*, with abusive
verbiage again not conducting review:

" On this record, because there is nothing left to decide in this case, the
Court STRIKES Plaintiff's frivolous Motion to Disqualify the named
judicial officers and for Relief from the Court's Vexatious Litigant Order";

6-2-23 - Motion for Appropriate Relief Pursuant to 60d - *Carney*, with more than
abusive verbiage after murder and in furtherance of conspiracy:

**"Now, Basile files another motion for relief and for recusal that largely
rehashes the same frivolous theories as the previous filings. (See Dkt.
245.) There is nothing left to decide in this case. The motion is DENIED.
No further filings by Basile will be entertained in this closed case."**

**DEFENDANT: NEVADA DISTRICT COURT** –Judge Boulware

Compl., Exh. 2 -scroll item #46 (full Nev. District Court dkt. w/postings) and read
items #s 45,47,48 - *Judge Boulware*

7-24-23 - Motion for Appropriate Relief Pursuant to 60d(3) - *Boulware*, even
though the Ninth Circuit Court in Nancy Pelosi's 12th District was proven to be
conclusively purchased and closed to the Plaintiff, The Ninth Circuit totally
unavailable for resolution as noted and proven with perfected with direct evidenced
briefs, and in all pleadings, abusively *Boulware* states in his denial:

"As this Court's judgment has been affirmed by the United States Court of Appeals for the Ninth Circuit, It is hereby ordered that Plaintiff's Motion for Recusal is DENIED.

**DEFENDANT: NINTH CIRCUIT COURT OF APPEALS** - Panel #s 6 and 7, abusively speaking as if, contradicting what created the "fraud upon the Court",

Compl., Exh. 2 -scroll item #46 (full Nev. District Court dkt. w/postings) and read items #s 45,47,48 - *Boulware:*

"Because we affirm the district court's dismissal of Basile's action for failure  to comply with a court order, we do not consider his challenges to the district  court's interlocutory orders. See Al-Torki v. Kaempen, 78 F.3d 1381, 1386 (9th Cir. 1996) ("[I]nterlocutory orders, generally appealable after final judgment, are  not appealable after a dismissal for failure to prosecute, whether the failure to prosecute is purposeful or is a result of negligence or mistake." (citation and internal quotation marks omitted)

**Gov Gavin Newsom -** *see* Compl., Exh. 2 - read items #36 and *see* **Compl., Exh. 23(c)-*appended.***

**The Los Angeles Film School -** *see* Compl., Exh. 2 - Dkt #12 , line 5;  LAFILM IT CLOSING SERVER , *see also* Dkt 13, ex7, LAFILM I.T. to Plaintiff – emails

**City of Oxnard (Oxnard Police Department)**
*violations 10-17-19 and 10-18-19* - reported in Motion for Appropriate Relief Pursuant to F.R.C.P. 60d, (related to Oxnard Police stealing camera footage of

Plaintiff being beaten to death and robbed 10-17-19)  *see* Compl., Exh 2 , Dkt 12, exh 3 - additional threats by Oxnard Police (see excerpts of 7-23-20 amended Complaint) : *see* Compl., Exh 2 , Dkt 12 , p10, line 15 - Plaintiff's  mother's assault by neighbors (caught on available video)

**Las Vegas Metropolitan Police Dept** – *See* **Compl., Exh. 23(a)** - *appended*

**Pentagon desk at The White House** - *see* emails and letters - **Compl., Exh.23 (d)**-*appended.*

**"RICO" ADDITION:**

**Existing and newly added Defendants,** most recent violations mentioned and referenced more specifically in Compl., Exhs. 2 - #39-43 and 45; *filed 5-31-23 and 7-24-23*

**Nancy Pelosi** - Providing support to Metrolink Attack conspirators and conspirators to Alexander Basile's murder, by engaging in listed "RICO" violations.

**Will Smith** - Providing support to Metrolink Attack conspirators and conspirators to Alexander Basile's murder, by engaging in listed "RICO" violations.

**American Broadcast Company** - Providing support to Metrolink Attack conspirators and conspirators to Alexander Basile's murder, by engaging in listed "RICO" violations.

(*See* **Compl., Exh. 2, #s 36-37, and 39-46,** *manually filed on DVD*; **and Compl., Exh. 24,** *manually filed on DVD related to these three Defendants.*)

**Harrison Ford** - appearing with known Metrolink Attack conspirators gloating, 1-21-15 with staged mocked scene of Metrolink Attack on Defendants' worldwide WB Entertainment publication, TMZ, and by engaging in other listed "RICO" violations.

- Blade Runner 2049, working with Ridley Scott while ignoring Plaintiff
- Indiana Jones with Steven Spielberg while ignoring Plaintiff

**January 2012 conversation:**

Harrison Ford having instructions in conversation while Plaintiff at LAFILM, after Michele Obama had Blake Lively attempt what's now understood to have been public sacrifice, "to pursue to the fullest extent of the law", then hanging up ...before PLAINTIFF HAD REALIZED AND FOUND THAT HE HAD BEEN ROBBED OF MATERIAL SUBMITTED, see Complaint.

**December 2013 conversation:**

Harrison Ford having called Plaintiff in Oxnard returning his call after Plaintiff called to notify of the Michelle Obama 2013 attack on Plaintiff's sister in Beverly Hills. Harrison Ford responding only "I told you to go to the best psychiatrist!" after no conversation about anything just only telling him in a few sentences she had attacked us: Harrison then hung up.

*continued from* **VI.   SECOND CAUSE OF ACTION**

( For 42 U.S.C. § 1983, § 1985(1), § 1985(2), § 1985(3), § 1986, § 1988

Plaintiff hereby incorporates certain of the above paragraphs of this complaint and *related documents and exhibits manually filed on DVDS* as if fully set forth at length: To wit paragraphs **1-373 and Compl., Exh. 1 -** previously 2:18-cv-08604 **(1)** *scanned* complaint w/appended color exhibits; **(2)** complaint, exhs. 4,7,21, *manually filed on dvds* **(3)** *scanned* complaint, exhs Vol. I-VI and **(4)** complaint, non-paper exhs.,VOL. I-VI, *manually on dvds*; **Compl., Exh. 2 - pdf record documents #1-48,** *manually filed on dvds*; **Compl., Exh. 24,** *manually filed on dvds*; **and Compl., Exh. 23(a)-(e) -** *appended*

**ALL** *existing and newly added* **DEFENDANTS:  have engaged in violation of and participated in furtherance of:** 42 U.S.C. § 1983, § 1985(1), § 1985(2), § 1985(3), § 1986, § 1988

*See* **Compl., Exhs. 1 and 2** *manually filed on dvds*; **Compl., Exh. 23(a)-(e)-** *appended*

*continued from* **IX.   FIFTH CAUSE OF ACTION**

( For Defamation - 28 U.S.C. § 4101 )

Plaintiff hereby incorporates certain of the above paragraphs of this complaint and *related documents and exhibits manually filed on DVDS* as if fully set forth at length: To wit paragraphs **1-373 and Compl., Exh. 1 -** previously 2:18-cv-08604 **(1)** *scanned* complaint w/appended color exhibits; **(2)** complaint, exhs. 4,7,21, *manually filed on dvds* **(3)** *scanned* complaint, exhs Vol. I-VI and **(4)** complaint, non-paper exhs.,VOL. I-VI, *manually on dvds*; **Compl., Exh. 2 - pdf record**

**documents #1-48,** *manually filed on dvds*; **Compl., Exh. 24,** *manually filed on dvds*;and **Compl., Exh. 23(a)-(e) - appended**

**DEFENDANT** : Ninth Circuit Court of Appeals; Nevada District Court: Central District Court (Judge Carney; Judge Stanton; Magistrate Judge Spaeth) **have engaged in violation of and participated in furtherance of Defamation Pursuant to 28 U.S.C. § 4101**

**(See** Compl., Exhs. 1 and 2 *manually filed on dvds*; **and Compl., Exh. 23(a)-(e) – appended)**

The elements for a defamation claim are: (1) publication of a statement of fact; (2) that is false; (3) unprivileged; (4) has natural tendency to injure or which causes "special damage," and (5) the defendant's fault in publishing the statement amounted to at least negligence.

**(1)**Publication, which may be written or oral, means communication to a third party who understands the defamatory meaning of the statement and its application to the person to whom reference is made.

*continued from* **XI.   SIXTH  CAUSE OF ACTION**

(For Recklessness)

Plaintiff hereby incorporates certain of the above paragraphs of this complaint and *related documents and exhibits manually filed on DVDS* as if fully set forth at length: To wit paragraphs **1-373 and Compl., Exh. 1 -** previously 2:18-cv-08604 **(1)** *scanned* complaint w/appended color exhibits; **(2)** complaint, exhs. 4,7,21,

*manually filed on dvds* **(3)** *scanned* complaint, exhs Vol. I-VI and **(4)** complaint, non-paper exhs.,VOL. I-VI, *manually on dvds*; **Compl., Exh. 2 - pdf record documents #1-48,** *manually filed on dvds*; **Compl., Exh. 24,** *manually filed on dvds*; **and Compl., Exh. 23(a)-(e) -** *appended*

**ALL** *existing and newly added* **DEFENDANTS:** Central District Court (Judge Carney; Judge Stanton; Magistrate Judge Spaeth); ; Nevada District Court: Ninth Circuit Court of Appeals; The United States Supreme Court; Santa Monica Police Department (City of Santa Monica); The Pentagon-Pentagon Desk at The White House-President Biden Administration; Los Angeles Medical Examiner's Office; Oxnard Police Department (City of Oxnard); Nevada District Court (Judge Boulware and Magistrate Judge Ferenbach); Will Smith; Chris Rock; America Broadcast Company; and Harrison Ford,

**have engaged in violation of and participated in furtherance of:** Recklessness

**(***See* **Compl., Exhs. 1 and 2** *manually filed on dvds*; **Compl., Exh. 24,** *manually filed on dvds*;and **Compl., Exh. 23(a)-(e) –** *appended***)**

"Recklessness" refers to a subjective state of culpability greater than simple negligence, which has been described as a "deliberate disregard" of the "high degree of probability" that an injury will occur (BAJI No. 12.77 [defining "recklessness" in the context of intentional infliction of emotional distress action]); see also Rest.2d Torts, § 500.) Recklessness, unlike negligence, involves more than "inadvertence, incompetence, unskillfulness, or a failure to take precautions" but rather rises to the level of a "conscious choice of a course of action ... with

knowledge of the serious danger to others involved in it." (Rest.2d Torts, § 500, com. (g), p. 590.) fn. 5.

The requirements to establish a claim for recklessness are that the statement was made with a "deliberate disregard"  for another's safety, that there is a high probability that it would result in the other person's injury, and that the person guilty of recklessness took a conscious course of action"

The treatment of Recklessness in the *Restatement(Second)* is different from that of intent, the only general definition appears in Section 500, entitled **" Reckless Disregard of Safety Defined."**

" The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead to a responsible man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent."

*continued from* **XI.   SEVENTH CAUSE OF ACTION**

(For Intentional Infliction of Severe Emotional Distress - Outrageous Conduct)

Plaintiff hereby incorporates certain of the above paragraphs of this complaint and *related documents and exhibits manually filed on DVDS* as if fully set forth at length: To wit paragraphs **1-373 and Compl., Exh. 1 -** previously 2:18-cv-08604 **(1)** *scanned* complaint w/appended color exhibits; **(2)** complaint, exhs. 4,7,21, *manually filed on dvds* **(3)** *scanned* complaint, exhs Vol. I-VI and **(4)** complaint,

COMPLAINT

non-paper exhs.,VOL. I-VI, *manually on dvds*; **Compl., Exh. 2 - pdf record documents #1-48,** *manually filed on dvds*; **Compl., Exh. 24,** *manually filed on dvds*;and **Compl., Exh. 23(a)-(e) - appended**

**ALL *existing and newly added* DEFENDANTS have engaged in violation of and participated in furtherance of:** Intentional Infliction of Emotional Distress-Outrageous Conduct

***See* Compl., Exhs. 1 and 2 *manually filed on dvds*; Compl., Exh. 24,** *manually filed on dvds*; and **Compl., Exh. 23(a)-(e) - *appended***

**Excerpts from:**

Marquette Law Review: Article 3

Volume 90

Issue 4 Summer 2007

The Four Faces Of Tort Law: Liability for Emotional Harm

John J. Kircher

     The tort of intentional infliction of emotional distress first appeared in the **Restatement of Torts in a 1948 supplement**. It was there stated that one who intentionally causes severe emotional distress to another is liable "(a) for such emotional distress, and (b) for bodily harm resulting from it." *Restatement of Torts § 46 (Supp. 1948).* The California Supreme Court considered that development four years later when it decided the landmark case of *State Rubbish Collectors Ass'n v. Siliznoff.* 240 P. 2d. 282 (Cal.1952). After considering the evidence, the court concluded:

[T]hat a cause of action is established when it is shown that one, in the absence of any privilege, intentionally subjects another to the mental suffering incident to

serious threats to his physical well-being, whether or not the threats are made under such circumstances as to constitute a technical assault. *Id.* at *284-285*

**In 1965, the second Restatement refined that rule further**. According to its section 46, a cause of action for intentionally infliction of emotional distress exists when:

> (3) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

> (4) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress.

>> (c) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

>> (d) to any other person who is present at the time, if such distress results in bodily harm. *Restatement (Second) of Torts § 46 (1965)*

As stated previously, the term "intent" is used throughout the Restatement to mean "that the actor desires to cause consequences of his act, or… believes that the consequences are substantially certain to result from it. *Id* § 8A. It should be noted however, that although the rule is dubbed "Intentional Infliction," recovery also will be allowed when the defendant's conduct is not intended to cause emotional distress, but the defendant is merely reckless in doing so.

The Restatement does not require proof of any physical symptoms to recover for Intentional Infliction of Emotional Distress. *Restatement (Second) of Torts § 46 cmt. k (1965).* The defendant's extreme and outrageous conduct alone tends to prove the severity of the distress.

COMPLAINT

## **OUTRAGEOUS CONDUCT**

Because section 46 fails to offer a concise definition of outrageous conduct, courts have had difficulty formulating clear standards as to what conduct is prohibited. Despite the numerous elements provided in section 46, critics have argued that in practice, the tort is reduced to a single element – the outrageousness of the defendant's conduct. *Id*. at 46. In turn, courts may assume that severe emotional distress resulted anytime there is evidence of outrageous conduct. *Id.*

In general, four categories of conduct support a finding of outrage when the defendant intentionally inflicts emotional harm. (1) abusing a position of power; (2) emotionally harming a plaintiff known to be especially vulnerable; (3) repeating or continuing conduct that may be tolerable when committed once but becomes intolerable when committed numerous time; and (4) committing or threatening violence or serious economic harm to a person or property in which the plaintiff is known to have a special interest." *Restatement (Second) of Torts* § 46 , DOBBS, *supra note 37*, at 827.

### *continued from* **XII.  EIGHTH CAUSE OF ACTION**

(for Civil Conspiracy)

Plaintiff hereby incorporates certain of the above paragraphs of this complaint and *related documents and exhibits manually filed on DVDS* as if fully set forth at length: To wit paragraphs **1-373 and Compl., Exh. 1 -** previously 2:18-cv-08604 **(1)** *scanned* complaint w/appended color exhibits; **(2)** complaint, exhs. 4,7,21, *manually filed on dvds* **(3)** *scanned* complaint, exhs Vol. I-VI and **(4)** complaint, non-paper exhs.,VOL. I-VI, *manually on dvds*; **Compl., Exh. 2 - pdf record**

**documents #1-48,** *manually filed on dvds*; **Compl., Exh. 24,** *manually filed on dvd* **and Compl., Exh. 23(a)-(e) - *appended***

**ALL *existing and newly added* DEFENDANTS have engaged in mens rea conspiracy both civil and criminal.**

*See* **Compl., Exhs. 1 and 2** *manually filed on dvds*; **Compl., Exh. 24,** **and Compl., Exh. 23(a)-(e) - *appended***

There is widespread consensus on the elements of civil liability for conspiracy under the federal common law. It generally requires: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; and (4) the overt act was done pursuant to and in furtherance of the common scheme. *Halberstam v. Welch,* 705 F. 2d. 472, 477 (D.C. Cir. 1983) *See also In re Sumitomo Copper Litigation,* 120 F Supp. 2d. 328 (S.D.N.Y. 2000); *Kashi v. Gratsos,* 790 F. 2d. 1050, 1055 (2d. Cir. 1986)(*Winter, J.).Cabello,* 402 F. 3d. at 1157-58; *In re Terrorist Attacks September* 11,2001, 392 F. Supp. 2d. 539,554 (S.D.N.Y. 2005)("Conspiracy and aiding and abetting are varieties of concerted-action liability: <u>conspiracy requires an agreement to commit a tortious act</u> … aiding and abetting requires that a defendant have given substantial assistance or encouragement to the primary wrongdoer…In order to be liable for acting in concert with the primary tortfeasor under either theory, the defendant must know the wrongful nature of the primary actor's conduct.")

<u>**Liability for conspiracy requires a showing that :**</u>
(1)two or more persons agreed to commit a wrongful act, (2) [the defendant] joined the conspiracy knowing at least one of the goals of the conspiracy and intending to

help accomplish it, and (3) one or more of the violations was committed by someone who was member of the conspiracy and acted in furtherance of the conspiracy.

A conspirator is liable for the acts of his co-conspirators if they are the reasonably foreseeable consequences of the unlawful scheme. *Halberstam*, F 2d. at 487. *See also Ungar v. Islamic Republic of Iran,* 211 F. Supp. 2d. 91, 100 (D.D.C. 2002), *citing Pinkerton v. United States,* 328 U.S. 640, 647 – 48 (1946); *SEC v. Yun,* 148 F. Supp. 2d. 1287, 1292 (M.D. Fla. 2001); *Williams v. Feder*, 69 F. Supp. 2d. 649, 666 (M.D. Pa. 1999) The defendant need not be the perpetrator of the tortious conduct. "As to the extent of liability, once the conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy. A conspirator need not participate actively in or benefit from the wrongful action in order to be found liable. He need not even have planned or known about the injurious action" *Halberstam* at 482. " It is only where means are employed, or purpose are accomplished, which are themselves tortious, that the conspirators who have not acted but have promoted the act will be held liable" *Halberstam* 477, citing W. Prosser, Law of Torts § 46, at 293 (4th ed. 1971) (footnote omitted) Proof of a tacit, as opposed to explicit, understanding is sufficient to show agreement. *Halberstam* at 477, citing *Prosser, supra*, at 292: 16 Am Jur. 2d. *Conspiracy* § 68 (1979).

The mens rea of civil conspiracy is reflected in the defendant's knowledge of the unlawful act and his or her agreement to participate in the act. *Moore v. Brewster*, 96 F 3d. 1240, 1245 (9th Cir. 1996) ("The indispensable elements of civil conspiracy include a wrongful act and knowledge on the part of the alleged conspirators of [the conspiracy's] unlawful objective."); *Jones v. Chicago,* 856 F. 2d. 985, 992 (7th Cir. 1988) (a defendant need not agree to the details of the

conspiratorial scheme or even know who the other conspirators are, so long as he understands the general objectives of their scheme, accepts them, and agrees to do his part to further them);( *United States v. Andolschek,* 142 F 2d. 503, 507, (2d. Cir. 1944) (L. Hand J.)(same); *Ingar,* 211 F Supp. 2d. at 100 (same).

## **ADDITIONAL PRAYER FOR DAMAGES:**

In addition to the prayer for damages above totaling 4,000,000,000.00, for additional "RICO" violations engaged in by existing and newly added Defendants, Plaintiff prayers for additional award for damages as follows:

**$1,000,000,000.00** – General, Punitive, and Consequential for wrongful death resulting from obstruction and other additional violations of "RICO" and other U.S. Code, by existing Defendants and newly amended Defendants who engaged in conspiracy to commit the murder of Alexander Basile. This award should be split amongst ALL DEFENDANTS as this Court deems just and proper.

Plaintiff also prayers for injunctive remedy related to Gov. Newsom by means of signature on the document for pardon forwarded to him from the panel of the State of California, for the worlds databases, process to be facilitated by agencies of the The United States Government and its offices, to reflect the removal of this first paper generated and conspiracy generated illegal arrest and charge - conspiracy preparation in motion before during and after the bullet 1-30-99 - after exposure of the entire conspiracy as it were by Johnny Depp, Hollywood Division LAPD, other LAPD precincts, and the LA Superior Court; Plaintiff prays for award for damages for Gov. Newsom having furthered this illegal arrest and paper conviction, in addition to Plaintiff's prayer for damages for the noted

violations of "RICO" and violation of U.S. Code, and related and consequential civil torts; both awards for damages in the amount this court deems just and proper.

If this Court agrees time is an issue and amended issues too complicated politically, a summary judgement for the claims in their entirety after responses by Defendants of **$2,000,000,000.00** would be accepted.

**DATED: January 16, 2024**

**CONSTANTINO BASILE**
**PLAINTIFF PRO SE**

COMPLAINT

# EXHIBIT 1a.